1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF INDIANA
2                  INDIANAPOLIS DIVISION

3
     RICHARD N. BELL,            )
4                                ) CAUSE NO.
          Plaintiff,             ) 1:16-cv-01174-JRS-MPB
5                                )
          -vs-                   )
6                                ) Indianapolis, Indiana
     CARMEN COMMERCIAL REAL      ) September 23, 2019
7    ESTATE SERVICES,            ) 10:50 a.m.
                                 )
8         Defendant.             ) Volume 1

9

10                      **BEFORE THE**
               **HONORABLE JAMES R. SWEENEY II**

11

12          OFFICIAL REPORTER'S TRANSCRIPT OF

13                     JURY TRIAL

14

15
     FOR THE PLAINTIFF:          Maura K. Kennedy
16                               THE LAW OFFICE OF MAURA K.
                                 KENNEDY, LLC
17                               PO Box 55587
                                 Indianapolis, IN  46205
18
     FOR THE DEFENDANT:          Paul B. Overhauser
19                               OVERHAUSER LAW OFFICES LLC
                                 740 W. Green Meadows Dr.
20                               Suite 300
                                 Greenfield, IN  46140-4019
21

22   Court Reporter:    Cathy Easley Jones, RDR, FCRR
                         Official Court Reporter
23                       46 East Ohio Street, Room 290
                         Indianapolis, IN  46204
24

25          PROCEEDINGS TAKEN BY MACHINE SHORTHAND
               COMPUTER-AIDED TRANSCRIPTION

2

1           **I N D E X   O F   W I T N E S S E S**

2                                             PAGE

3   For The Plaintiff:

4   RICHARD N. BELL
    Direct Examination by Ms. Kennedy ..............20
5   Cross-examination by Mr. Overhauser ..........108
    Redirect examination by Ms. Kennedy ..........188
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1               I N D E X   O F   E X H I B I T S

2                                          PAGE
  Exhibit Number:

3
  1 ..............................................19
4 2 ..............................................19
  3 ..............................................19
5 4 ..............................................19
  5 ..............................................19
6 6 ..............................................19
  7 ..............................................19
7 8 ..............................................19
  9 ..............................................19
8 10 .............................................19
  11 .............................................19
9 12 .............................................19
  13 .............................................19
10 14 .............................................19
  15 .............................................19
11 16 .............................................19
  17 .............................................57
12 18 .............................................59
  19 .............................................19
13 20 .............................................19
  21 .............................................19
14 22 .............................................19
  23 .............................................19
15 24 .............................................19
  25 .............................................19
16 32 ............................................179
  38 .............................................20
17 39 .............................................20
  40 .............................................20
18 41 .............................................20
  42 .............................................20
19 46 .............................................20
  47 .............................................20
20 51 .............................................20
  75 .............................................20
21 77 .............................................20
  78 .............................................20
22 79 ............................................146
  81 .............................................20

23

24

25

4

1      *(In open court)*

2      *(Jury voir dire was held and preliminary instructions were*

3  *given.)*

4      *(Jury in.)*

5                OPENING STATEMENT FOR THE PLAINTIFF

6          MS. KENNEDY:  May it please the Court.  Ladies and

7  gentlemen, first of all, let me thank you for being here

8  today.  It is truly a pleasure for my client to get his day in

9  court today, and serving on the jury is such an important

10  duty; and we really appreciate your time and consideration.

11          A couple of housekeeping issues before I begin.  I

12  am 16 weeks pregnant, and I might need to use the restroom a

13  little more than usual.  I'll be drinking a lot of water, and

14  that's why.

15          Also, throughout the trial, we will be referring to

16  the defendant corporation as Carmen Commercial.  It is

17  imperative for you to remember the defendant in this case is

18  Carmen Commercial Real Estate Services, Inc.  It is not

19  Mr. Carmen, who is seated over here with defendant's counsel.

20  It is Carmen Commercial Real Estate Services.

21          Likewise, if you hear me refer to defense counsel,

22  that means Mr. Overhauser over here; and the plaintiff is my

23  client right there.

24          The parties have attempted to settle this case many

25  times but simply could not agree.  So here we are today, three

5

1   years after Mr. Bell filed suit in this federal court.  My

2   client is still fighting to protect his copyright of the

3   photograph known as "the Indianapolis photo."  He copyrighted

4   and registered this photo back in 2011 with the U.S. Copyright

5   Office.  Today, in presenting the plaintiff's side, we plan to

6   be fairly quick, bringing only one witness; and as you can

7   see, those small white binders in front of you are the

8   plaintiff's.  Throughout our evidence we present, we will

9   prove that Mr. Bell owns the copyrighted photo and that

10  defendant, Carmen Commercial, infringed upon that photo by

11  including it on their website various times from 2013 to 2016;

12  and even two years after being sued in federal court, Carmen

13  Commercial continued to publish this Indianapolis photo on

14  another website called HubSpot.  This is all without

15  Mr. Bell's permission; and this is all without including

16  Mr. Bell's copyright symbol, Rich Bell, small C, which is the

17  copyright symbol.

18          Again, this is intentional infringement, also known

19  as willful infringement, because Carmen Commercial at the

20  bottom page of each page of its web page included the relevant

21  year, such as 2013, Carmen Commercial Real Estate Services,

22  with their copyright symbol.  Again, they did that in 2016.

23          What that symbolizes is that means they own

24  everything on the web page, from photographs all the way down

25  to the content that they have provided.  Well, that's not the

6

1   case.  Mr. Bell owns this photo.  Mr. Bell took this photo in

2   2000.  He registered it with the copyright office to enjoy

3   further protection by law in 2011.

4          So why is Carmen Commercial claiming that they own

5   this photo?  Never was there a mention in a caption "unknown

6   photographer" or "this may be subject to copyright."  They

7   simply did not do their due diligence.

8          Carmen Commercial has been in business since 1998.

9   It's a sophisticated commercial real estate business.  They

10  should have known better.

11         Now, once the defense starts, don't get confused.

12  Don't get dragged down.  None of the defense's defense should

13  stick because, again, Carmen Commercial has no excuse for

14  intentionally and willfully infringing upon Richard Bell's

15  Indianapolis photo.

16          So again, remember to stay focused on the facts and

17  always remember that even when the defense raises several

18  defenses we anticipate for, they only apply to the action of

19  Carmen Commercial real estate, not Christopher Carmen.

20         Okay, so the Copyright Act and its purpose.  The

21  Copyright Act is a federal law.  That's why we're here in the

22  federal courthouse; and under the Copyright Act, as soon as a

23  photograph is taken, by the flick of the camera shutter, it is

24  automatically protected by the copyright law, and the person

25  who owns that photo has some rights.

7

1          However, once they actually register with the

2     copyright office, they enjoy more protections, including the

3     ability to come to court today and the actual copyright symbol

4     that goes at the bottom of a photograph.

5          Now, once Mr. -- or Carmen Commercial Real Estate

6     found out about this lawsuit -- and they had various

7     discussions back and forth, as the evidence will show, in

8     April and May of 2016 -- shockingly, for two years afterwards,

9     they continued to infringe on the photo, posting it on their

10    website with a new article and then also posting it on

11    HubSpot.com.

12         Although at times the instructions may seem complex

13    and intimidating, I assure you it's not.  Every day you run

14    into the Copyright Act whether you realize it or not.  If you

15    read a newspaper and, let's say, there's a photo of Muhammad

16    Ali, you might see a copyright symbol "2019 Muhammad Ali

17    Enterprises."  Also, if it's a personal photo provided, let's

18    say by Laila Ali, you might see "Photo provided from the

19    personal member of Ali's family" or Laila Ali.  That is an

20    attempt for the person who writes the article or the

21    publication to show you who the owner of that photo is.  The

22    *Indy Star*, they don't own this photo.  Let's just say they

23    were the ones who published the article.

24         So the copyright symbol is extremely important, and

25    including credit to the actual owner is why we're here today.

1  Again, think of the Copyright Act as an anti-plagiarism act.
2  It's pretty cut and dry.  If you were in school and you
3  plagiarized a couple paragraphs in one of your essays, your
4  teacher might say, "I looked this up, and three paragraphs
5  have been plagiarized.  You gave no credit to the author."
6  And as we all know, you can get in trouble, sometimes
7  suspended, sometimes academic probation.  It's not okay, and
8  today is our day to hold Carmen Commercial Realty liable for
9  this willful infringement.
10           Now, on a personal basis, let me tell you a quick
11  story.  I have been at the other side of this table
12  figuratively.  I actually settled the matter; but in 2018 it
13  was my birthday, home for Christmas break; and I got a knock
14  on the door.  "Maura Kennedy, you have been served."
15           I said, "Served?  Served with what?"
16           "A lawsuit for violating the Copyright Act."
17           I had illegally downloaded music many years prior,
18  using the music platform Kazaa.com.  At the time, I wasn't
19  really sure that that was illegal; but I read the paperwork.
20  And it said that Columbia Records and Sony, including Mariah
21  Carey were suing me because the song "Always Be My Baby," one
22  of my favorites, was downloaded illegally.
23           As I went through the paperwork, I admitted, yep, I
24  definitely downloaded and loved that song.  I had put it on
25  several CDs.  I had enjoyed that free download.  So I knew it

1   was wrong; and I knew that by this time, many artists had been

2   hurt from record sales and that these lawsuits were kind of

3   coming about.

4          I had gotten rid of the computer.  I believe it was

5   in a landfill somewhere.  I had deleted the Kazaa music

6   platform, but the damage was done.  It didn't matter.  I had

7   downloaded the song, and Mariah Carey deserved to be paid for

8   it.  So did Columbia Records.

9          Now, even worse, similar to this case, there was a

10  sharing feature on Kazaa.  So other Internet users could

11  actually download my song from my storage on my computer, and

12  they could enjoy the song for free.  This is similar to Carmen

13  Commercial's website.  Their photo was always able to be

14  saved, downloaded, copied by any third-party Internet user,

15  hackers.  Anyone on the Internet could throughout several

16  years download this photo; and again, it should have had "Rich

17  Bell" with a copyright symbol under there.  It didn't.  So

18  they certainly subjected him to more and more infringement, as

19  I did by downloading that Mariah Carey song.

20         At 18 I knew I was wrong.  I was able to take

21  responsibility.  I immediately settled the case, paid for it

22  out of my savings and knew I didn't want to drag it out, come

23  to federal court, face up to $150,000 per song in penalties.

24  I simply paid for the settlement and moved on, and I have

25  never illegally downloaded a song or a photo ever since.

1        As I said earlier, today I'm on the other side of

2   the table; and I will ask you, the jury, to hold Carmen

3   Commercial liable for willful copyright infringement of

4   Mr. Bell's photos.  I took responsibility at 18.  Certainly

5   Carmen Commercial, such a sophisticated company, can take

6   responsibility here today.

7        So now that you know the gist of the plaintiff's

8   case, Mr. Bell, I'm going to just briefly go over the

9   defendant's case and some defenses that they might bring up

10  today.

11       The first one is that Christopher Carmen, again, not

12  the defendant in this case -- Christopher Carmen, the

13  individual, about eight days after being sued in federal

14  court, attempted to buy the Indianapolis photo on

15  richbellphotos.com, where he sells the photos typically for a

16  price of about $200.  Again, buying that license, as you will

17  see in Exhibit 9 -- we will show you those terms -- the

18  license is not transferable.  It's not assignable.

19       So Christopher Carmen, an individual buying the

20  license to use the photo, does not give Carmen Commercial the

21  right to use such photo.

22       Again, also, buying the song -- buying Mariah

23  Carey's song eight days after being sued would have done me no

24  good.  For years people have used and downloaded the photo --

25  I'm sorry -- the song from my computer.  For years I had put

1   it on CDs, usually as my last track.  That just simply didn't

2   do it.  Ninety-nine cents was nothing compared to what I

3   settled that case for.

4          Similarly, if I were to park outside today, which I

5   did, and put money in the meter, which I did, perhaps maybe

6   the max amount of time has elapsed.  When I come out today,

7   there's a parking violation on my dashboard.  I have to pay

8   that violation because I had a certain amount of time of

9   unpaid parking.  I can't run up to the meter, throw some

10  quarters in and hope that my past wrong was righted.  That's

11  not even a word, but it makes no sense.

12         So when they argue and argue that this license is

13  retroactive, again, remember it's Carmen Commercial, who's

14  never purchased a license; and you can't after the fact do

15  that.  $200 is not enough for how much -- for five years worth

16  of infringement of my client's photo.

17         Now, second, they're going to claim that Bell made a

18  settlement with the National Association of Realtors recently

19  in 2019; and somehow, the defendant is going to claim that

20  this applies to Carmen Commercial.  Again, I'm not sure how a

21  corporation could be considered a Realtor.  A Realtor is a

22  person who acts as an agent for the sale and purchase of

23  buildings and land.  The National Association of Realtors is

24  just for that.  It's for a person.  It's not for a

25  corporation.

1          And again, Mr. Bell did not settle this case with

2    the National Association of Realtors with Carmen Commercial in

3    mind.  That would take both sides agreeing to that.

4          Third, they might bring up a work-for-hire because

5    my client worked for a law firm in 2000, Cohen & Malad.  They

6    may claim they think Cohen & Malad owns this photo.  Cohen &

7    Malad and no partners and not former workers there have ever

8    testified to owning this photo; and, in fact, recently, they

9    testified the exact opposite.

10         Lastly, they might bring up a fair use defense.

11   There is no fair use.  You can't use the Indianapolis photo on

12   your website.  You're not a news reporting agency.  You're not

13   a not-for-profit.  I just don't know how that will stick; but

14   please, you know, listen to all the facts and consider

15   everything with an open mind.

16         Lastly, to sum everything up.  I'm going to tell you

17   about my client.  Richard Bell is a retired lawyer.  He did

18   not work as a copyright lawyer.  He retired in 2009; and after

19   2011, he became interested in the Copyright Act when he

20   started noticing his photos were appearing on other people's

21   publications, and he wanted to copyright and further protect

22   his rights under the Copyright Act.

23         So ever since August of 2011, it has certainly been

24   a learning experience for Mr. Bell.  There have definitely

25   been some wins, and there have definitely been some losses;

1  but he has now learned the Copyright Act in and out, and in

2  essence, he is fighting to enforce the rights of artists,

3  photographers, musicians, and creatives in this district.

4  Your guys' decision today could affect case precedent in other

5  cases, and Mr. Bell is very adamant about protecting the

6  copyright and his Copyright Act.

7           In terms of damages, we're going to be asking that

8  you, the jury, find the defendant liable for willful, also

9  known as intentional, infringement and that you award Mr. Bell

10  $150,000 in damages today.

11           Now, remember Mr. Bell has had to front the bill for

12  the past three years to get us here today; and we do believe

13  that's a fair amount.  Please send a message.  Send a message

14  that the Copyright Act in our district will be protected.

15  Photographers, musicians, creatives, they deserve protection.

16  Thank you.

17           THE COURT:  All right.  Mr. Overhauser.

18              OPENING STATEMENT FOR THE DEFENDANT

19           MR. OVERHAUSER:  May it please the Court.

20           THE COURT:  Yes.

21           MR. OVERHAUSER:  Ladies and gentlemen of the jury,

22  again, I share Ms. Kennedy's pronouncement that we appreciate

23  your service.  It's an important civic duty; and I think we

24  all know that out of everyone here in the courtroom, you are

25  the least well compensated.

14

1          This is a copyright infringement case, and Mr. Bell

2  has the burden of proving certain things throughout the case.

3  One of the things he has the burden of proving is that he

4  actually took this picture.  That will be disputed, but it's

5  for you to decide.

6          Mr. Bell, I believe, will testify that he took this

7  picture in -- on March 8th of the year 2000.  We don't think

8  that's correct; and that if he took the picture, it was

9  probably as a part of his job at the law firm of Cohen and

10  Malad where he worked.  That's one issue you will need to

11  decide.  Did he really take this picture in March of 2000?

12          Now, Ms. Kennedy argued that this was put on Carmen

13  Commercial's real estate -- or Carmen Commercial Real Estate's

14  website with a copyright notice that said Carmen Commercial

15  Real Estate, Inc.  The way that picture got on the website was

16  that Carmen Commercial went to Google, searched for pictures

17  of Indianapolis.  This popped up.  There was no copyright

18  notice on it.  There was no mention of Richard Bell on it, and

19  it appeared from all intents and purposes that it was in the

20  public domain and was free.

21          He put it on his website in connection with a blog

22  posting; and after that, some months elapsed; and Mr. Bell

23  wrote him an e-mail saying, "Hey, you're infringing.  Pay me

24  $5,000."  Where did this 5,000-dollar amount come from?  I'm

25  not sure.  Perhaps Mr. Bell can explain that.

1          But Mr. Carmen responded saying, "I'm sorry.  I'll

2     take it down.  I didn't know it was copyrighted.  There was no

3     notice of copyright on the picture," and he offered to pay a

4     thousand dollars.

5          Mr. Bell rejected that.  Mr. Carmen thought that was

6     a very reasonable offer because he was aware that if you're

7     building a website, you can go out and buy a stock image from

8     anywhere; and they charge 10 or 15 bucks, a nominal amount;

9     and a demand by Mr. Bell for $5,000 was just simply

10    unreasonable.  Carmen Commercial Real Estate Services is a

11    very small company.  It has just one other employee besides

12    Mr. Carmen himself, and he simply couldn't afford $5,000.

13         Well, after that happened, Mr. Carmen did some

14    researching; and he found out that, in fact, Mr. Bell has this

15    website called richbellphotos.com in which he posts all sorts

16    of photographs.  And richbellphotos.com is, in essence, the

17    same as another commercial website called SmugMug.com.  You

18    may have heard of that.  SmugMug is a website where anyone can

19    go and post their pictures and offer to sell copies of them.

20    So when you go to richbellphotos.com, you're going to SmugMug.

21         In fact, through SmugMug, you could buy a license to

22    this picture for $200; and Mr. Bell had, in fact, sold plenty

23    of copies of this picture for $200, not being clear whether or

24    not he actually owns it but he did.  Regardless, Mr. Carmen

25    bought a license for $200, and he thought that would put the

16

1  matter to rest; but apparently it did not.  Mr. Bell was not

2  satisfied, and this litigation ensued.

3          Now, Ms. Kennedy told you that that purchase of the

4  license was made by Chris Carmen individually.  She will have

5  no evidence of that.  It was purchased by the corporation.

6  Obviously, it was the one that ran the website.  The

7  corporation needed it, and the corporation bought it.  But

8  that will be an issue for you to decide, who actually bought

9  the license to the photo.

10          Another issue for you to decide will be for the

11  license that he purchased, what was the scope of that license.

12  I think it's undisputed that the license terms and conditions

13  say that the license was perpetual.  Mr. Carmen will testify

14  that he understood the word "perpetual" to mean unrestricted

15  as to time, meaning that it covered anything that happened in

16  the past as well as anything that might happen in the future;

17  but at the very least, at the very least, it covered anything

18  that might happen in the future; but we think it covered a

19  broader term.  We think it was, in essence, a retroactive

20  license.

21          Notwithstanding that, there is yet another defense

22  that Carmen Commercial is asserting today.  That defense is

23  called a release defense; and that release results from the

24  fact that in March of this year, Mr. Bell filed another

25  copyright infringement lawsuit against the National

1   Association of Realtors, and the National Association of

2   Realtors wanted to settle that case.  Many cases do get

3   settled, but it wanted a very broad scope of release.

4          The National Association of Realtors thought, "Well,

5   as long as we're going to grant a release, because we don't

6   want to mess with this lawsuit, we want it to apply not just

7   to us as an association but to all of our members and not just

8   all of our members, to all of our past, present and future

9   members."  We'll show you the terms and conditions of that

10  license agreement later.  It is extremely broad.  If anyone --

11  we will contend that if anyone is sued by Mr. Bell today, they

12  could simply become a member of the National Association of

13  Realtors and be covered by the release because it was so

14  broad.  That release is even so broad that Mr. Bell will admit

15  that it covered claims he did not know about against people he

16  did not know about.

17          Admittedly, Carmen Commercial is not named as one of

18  the people that were released by the settlement of that

19  lawsuit, but neither were any of the other thousands and

20  thousands of members of the National Association of Realtors.

21  But Mr. Bell made off very well with that settlement.  He was

22  paid $15,000, and that's why the scope of the release in that

23  settlement was so broad.

24          So in sum, the issues that you will be asked to

25  decide are whether Mr. Bell owns the copyrights and the

1   picture, whether the infringement was innocent or willful, and

2   we maintain it was innocent because there was no copyright

3   notice on here; and as soon as Mr. Carmen found out about it,

4   he bought a license.

5           Third, you'll be asked to decide whether Carmen

6   Commercial purchased a license to the picture and how broad

7   that license was and finally, whether Carmen Commercial is

8   covered by this very broad release that Mr. Bell sold in

9   exchange for $15,000 earlier this year.

10          On behalf of my client, we appreciate your

11  attention; and we look forward to presenting our case to you.

12  Thank you.

13          THE COURT:  All right.  Thank you Mr. Overhauser.

14          A little housekeeping here, ladies and gentlemen.

15  The parties should have the stipulations.  You're getting them

16  now.  Please look at those, and make sure that those are

17  correct before the Court reads those to the jury.

18          MS. KENNEDY:  Yes, Your Honor.

19          MR. OVERHAUSER:  Yes, Your Honor.

20          THE COURT:  All right.  Ladies and gentlemen, as I

21  said, stipulations are some facts that the parties have agreed

22  are true.  What that means is that these things that I'm going

23  to read to you should be taken by you as true, and neither

24  party is required to submit any evidence on these points

25  whatsoever.

1          So first -- and these will also be in your final

2   instructions, but the parties have stipulated to the

3   following:

4          Exhibit 1 is copyrightable.

5          No. 2, defendant copied protected expression

6   contained in Exhibit 1.

7          No. 3, Mr. Christopher U. Carmen became a member of

8   the National Association of Realtors on August 14th, 2019.

9   And so again, nobody has to submit any evidence on those

10  points whatsoever.  And with that, Ms. Kennedy, if you would

11  call your first witness, please.

12         MS. KENNEDY:  Yes, Your Honor.  Before I call my

13  witness, may I please move for admission all stipulated

14  exhibits, which include Plaintiff's Exhibits 1 through 16 and

15  19 through 26.  And then I also move to admit the Defendant's

16  Exhibits 38, 39, 40, 41, 42, 43 --

17         THE COURT:  43?

18         MS. KENNEDY:  I'm sorry.  Not 43.  45 --

19         THE COURT:  42 and then 45.

20         MS. KENNEDY:  46, 47, 51, 75, 77, 78 and 81.

21         THE COURT:  All right.  And those are stipulated as

22  admissible, so they are admitted without objection.

23         MS. KENNEDY:  Thank you, Your Honor.

24         *(Plaintiff's Exhibits 1-16 and 19-26 were received in*

25  *evidence.)*

20

1      *(Defendant's Exhibit 38-42 and 46, 47, 51, 75, 77, 78 and*
2  *81 were received in evidence.)*

3            MS. KENNEDY:  Thank you, Your Honor.

4            Your Honor, I would like to call the plaintiff's
5  first and only witness, Mr. Richard N. Bell.

6            THE COURT:  Mr. Bell, if you would come up here,
7  we'll give you an oath.

8      *(Witness sworn.)*

9            THE COURT:  You may be seated there, sir.  There's
10  some water there if you need it.

11           MS. KENNEDY:  Thank you, Your Honor.

12           **RICHARD N. BELL, PLAINTIFF'S WITNESS, SWORN**

13                   <u>**DIRECT EXAMINATION**</u>

14  BY MS. KENNEDY:

15  Q   Mr. Bell, could you please state your name and spell it
16  for the record?

17  A   It's Richard N. Bell.  My last name is B-E-L-L.  My first
18  name, R-I-C-H-A-R-D.

19  Q   Could you briefly state your address?

20  A   Yeah.  I live in Fishers, Indiana.

21  Q   Okay.  That's fine.  Where did you grow up?

22  A   I grew up in Indianapolis, went to Shortridge High School.
23  I later went to Indiana University for undergrad.  I graduated
24  in 1970 from undergrad at Indiana University, majored in
25  accounting.

BELL - DIRECT/KENNEDY                    21

1   Q    Did you go to law school after Indiana University?

2   A    Well, I worked a couple years for Pricewaterhouse in

3   California and came back and went to law school in

4   Indianapolis and graduated in 1975 from law school.

5   Q    Are you still a lawyer, Mr. Bell?

6   A    Yes, I am.

7   Q    What kind of lawyer were you before you retired?

8   A    I retired in 19 -- in 2009; and I practiced mainly as a

9   class action litigator, mainly representing plaintiffs who had

10  been defrauded.  My specialty, because of my CPA background,

11  was financial transactions, and sued a number of companies

12  that had defrauded people in the stock market and other

13  frauds.

14  Q    And Mr. Bell, you were not a copyright lawyer in your time

15  working?

16  A    No, I wasn't.

17  Q    Are you also an accountant?

18  A    Yeah.  I passed the CPA exam in 1973 -- became a CPA in

19  1973, and worked as a CPA during the day and went to law

20  school at night.

21  Q    And Mr. Bell, when did you begin taking photos?

22  A    In 1975 when I graduated from law school.  I picked it up

23  as a hobby and did quite a bit of photography work.  My

24  brother and I are excellent photographers.

25            MS. KENNEDY:  Your Honor, I would like to mark

 1   Plaintiff's Exhibit 1.

 2              THE COURT:  Okay.

 3              MS. KENNEDY:  I guess quickly housekeeping, should I

 4   just give one of the binders --

 5              THE COURT:  There's binders there.  It's been

 6   admitted into evidence.

 7              MS. KENNEDY:  So just refer to it?

 8              THE COURT:  Yes.  You can publish it.

 9              MS. KENNEDY:  Your Honor, may I publish Exhibit 1,

10   the Indianapolis photo, to the jury?

11              THE COURT:  You may.

12              MS. KENNEDY:  Thank you.

13   BY MS. KENNEDY:

14   Q   All of the exhibits are in the binders, and they are in

15   front of the tab.  So it'll say Exhibit 1, and just in front

16   of it you will see the photo.

17              MS. KENNEDY:  Also, Mr. Rogers it's on my screen.

18   Will it come up on the monitors?

19   BY MS. KENNEDY:

20   Q   Mr. Bell, do you recognize this photo?

21   A   Yes, I do.

22   Q   Is this the photo that is the subject of the copyright

23   suit that we're all here for today?

24   A   It is.

25   Q   And this was marked as Exhibit A to your complaint in this

BELL - DIRECT/KENNEDY                          23

1  original suit?

2  A    It is.

3  Q    Did you take this Indianapolis photo, as we're going to

4  call it?

5  A    Yes, I did.

6  Q    Do you know when you took this photo?

7  A    Well, I've testified that I took it in March 8th of 2000;

8  but as I've looked at the photograph over the last 20 years

9  since I took it, there's too much foliage in the photograph to

10 be March.  And so I think that when I wrote down March, it was

11 actually May.  So it's probably closer to May 8th that I took

12 the photograph rather than March 8th.

13       But in any event, I know I took it in 2000.  I first

14 published it in August of 2000, and the first publication was

15 on the Internet with a company called Webshots.

16 Q    Okay, Mr. Bell.  So you certainly took the photo before it

17 was first placed on the Internet, so sometime before August of

18 2000?

19 A    Yes.

20 Q    Where was the photo taken and what time of day?

21 A    It was taken at 4:30 on that day.  The sky was just

22 absolutely fabulous.  So I knew it was going to be a fabulous

23 photo.  I took it on St. Clair Avenue overlooking the canal.

24       And the reason -- there's some distinguishing things

25 in the photograph.  I can always tell it's mine, and that is

1  the fact that there are these two people walking on the --

2  right near the canal that would be impossible for anybody to

3  duplicate.

4  Q   Mr. Bell, what side of the photograph -- I know it's a

5  little bit bigger in some upcoming exhibits, but what side

6  were the two people walking on?

7  A   On the right side right near a sign.

8  Q   And what other distinguishable characteristics do you see

9  of this photo?

10 A   Well, first of all, as you can imagine, the skyline has

11 changed in Indianapolis since then.  There's the Simon

12 building.  There's also signage on both -- different signage

13 on the building that the bank used to be in and Regions Bank

14 also has some signage on it.  It's a little outdated, but it's

15 still -- still people use it.

16 Q   Now, you testified it's a little outdated.  So could

17 someone go to the bridge on St. Clair Avenue today and capture

18 the same photo?

19 A   Not possible.

20 Q   And could you explain why?

21 A   Well, one, the distinguishing characteristics that I

22 talked about, plus the people -- those two people probably

23 would never ever walk on that path again like that and get

24 captured, especially with that sign there.

25 Q   And Mr. Bell, is this photograph in Exhibit 1, has it been

BELL - DIRECT/KENNEDY                    25

1  Photoshopped?

2  A    It has been.

3  Q    By you or by someone else?

4  A    By me.  One of the things I try to do is sharpen the

5  picture.  I also want to make sure the color is absolutely

6  pristine.  And so I do some brightening of it.  I mean,

7  there's a lot of technique of -- on Photoshop that I employ on

8  virtually all my photos, and it makes them pop.

9            THE COURT:  Mr. Rogers.

10            MS. KENNEDY:  Your Honor, I may have to move the

11  mouse and change the setting.

12            THE COURT:  Okay.

13  BY MS. KENNEDY:

14  Q    But for now, Mr. Bell, are Photoshop photos still

15  protected by the U.S. copyright?

16  A    Yes.

17  Q    And would you consider Photoshop and your edits that you

18  made and described a form of creativity?

19  A    Yes, I do.

20  Q    Mr. Bell, do you recall around what time you actually

21  Photoshopped -- what month or what time of year, what year

22  even you Photoshopped this Indianapolis photo?

23  A    Well, usually what I do is I go home and download it onto

24  my computer.  My computer is the only one -- I didn't have

25  Photoshop at Cohen and Malad.  I do the Photoshop editing at

BELL - DIRECT/KENNEDY                    26

1   my home.

2        After I took the photograph, I worked on that.  I did

3   a lot of Photoshop work prior to going back downtown in

4   Indianapolis for the evening and taking another picture, which

5   I've also copyrighted.  It's a nighttime photo of

6   Indianapolis.

7   Q   Okay.  And we'll go into that in a few minutes.

8        So Mr. Bell, from your personal understanding of the

9   copyright law, when you took that photo, was it protected by

10  the Copyright Act?

11  A   Yes.

12  Q   When did it enjoy protection?

13  A   Immediately.

14  Q   Upon taking the photo, it enjoys protection?

15  A   Yes.

16  Q   And then does it enjoy further protection when you later

17  in 2011 registered with the copyright office?

18  A   Yeah.  After that, if an infringer puts it on their

19  website or publishes it or distributes the photo, they're

20  liable for statutory damages, which are usually more

21  significant than actual damages.

22  Q   Mr. Bell, have you ever provided ownership or transferred

23  ownership of this Indianapolis photo to anyone else?

24  A   No, none whatsoever.

25  Q   Has anyone ever claimed to own this Indianapolis photo

BELL - DIRECT/KENNEDY                    27

1   that you see today as Exhibit 1?

2          MR. OVERHAUSER:   Objection, calls for speculation.

3          THE COURT:   Ask him what he knows.   You can ask him

4   if he knows.

5   BY MS. KENNEDY:

6   Q   Mr. Bell, do you know if anyone in your personal knowledge

7   has ever claimed to own this Indianapolis photo?

8   A   Nobody has.

9   Q   Not an ex-wife or a current spouse or anyone?

10  A   No.

11  Q   No one at your former law firm of Cohen & Malad, which

12  keeps coming up, has ever claimed to own this photo?

13  A   That's correct.

14  Q   So in 20 years -- nearly 20 years since you took this

15  photo in 2000, no one has claimed to own this photo besides

16  you to your personal knowledge?

17  A   That's correct.

18  Q   Now, Mr. Bell I anticipate the defendant bringing up an

19  exhibit that we stipulated to.   So I just want to ask a couple

20  of questions about your ex-wife, Nancy.

21         Did you file or did you guys actually get divorced in

22  2009 or 2010?

23  A   The divorce was final in 2010.   She filed in 2008.

24  Q   During the divorce, was there some type of financial

25  disclosure you had to fill out?

BELL - DIRECT/KENNEDY                    28

1  A    That's correct.

2  Q    And that will be presented as Defendant's Exhibit 77?

3  A    Correct.

4  Q    In 2009, did your, at the time, wife, Nancy -- did she

5  file a financial declaration also?

6  A    She did.

7  Q    Okay.  On that financial declaration, certain assets are

8  listed.  Could you describe, to your knowledge, what assets

9  each party had to list on those declarations?

10         MR. OVERHAUSER:  Objection, calls for speculation

11 and a legal conclusion as to what they had to list.

12         THE COURT:  First of all, which one are you talking

13 about, in general, the wife's, or his?

14         MS. KENNEDY:  Your Honor, his is Exhibit 77

15 stipulated.

16         THE COURT:  So you can again ask him what he --

17 BY MS. KENNEDY:

18 Q    Personally, Mr. Bell, you have reviewed in anticipation of

19 this trial Exhibit 77, which will come in later.  Do you

20 personally recall what assets were listed on that financial

21 disclosure?

22 A    Only the assets that we asked the Court to divide.  We

23 didn't put minor assets on there.  The subject of copyright

24 notice didn't even come up.  At the time, I had only sold

25 three licenses.

BELL - DIRECT/KENNEDY                    29

1   Q    Three licenses to use this photo?

2   A    Yeah.  From the years 2000 to 2008.  I had only sold three

3   licenses.  One of them was to Community Hospital, who was the

4   first one to buy it; and I wasn't aware of any infringement at

5   the time I got divorced.

6   Q    And again, you got divorced before you actually applied

7   and registered with the U.S. copyright to cover the

8   Indianapolis photo by copyright?

9   A    Yes.

10  Q    So in your mind, this would -- let me retract that

11  question.

12          In the 35-year marriage of you and Nancy Bell, did you

13  and your wife accumulate numerous assets?

14  A    Yes.  The vast majority of things that were less than a

15  thousand bucks, we agreed on how to split it.  We didn't ask

16  the Court to get involved in splitting those assets.

17  Q    So could you name a couple assets, for example, that were

18  left out of your financial disclosure that you and your wife

19  agreed upon and split throughout the divorce?

20  A    Well, all the photos.  All the photos I took she allowed

21  me to take.  My golf clubs, I was able to take them.  She got

22  the china.  She got the silverware.  We didn't put those

23  things on the financial disclosure.

24  Q    And certainly those are valuable assets, golf clubs,

25  china?

BELL - DIRECT/KENNEDY                    30

1   A   Yeah.  I mean, they're valuable to those that use it; but,

2   you know, garden equipment and lawn equipment and tools, you

3   don't put those things on a financial disclosure to burden the

4   Court with dividing them.

5   Q   Did you and your wife at the time in 2009, 2010 have an

6   oral agreement as to the photographs?

7   A   Oh, yeah.  We didn't put anything in writing.  We actually

8   walked around the house looking at small things that we could

9   agree to, like the Christmas ornaments; and I remember the

10  dishes and stuff.  We just went around the house and agreed

11  "Okay, you can have this and I can have that."  It was a

12  pretty amicable situation as far as the small assets.

13          The big assets, the retirement plans, the value of my

14  law practice, the value of our home, those were disputed; and

15  so we asked the Court to get involved in that, and those are

16  things that are on the financial declaration.  I didn't put on

17  the financial declaration small, minor stuff.

18  Q   Okay.  And since the divorce, has Nancy ever contacted you

19  and said, "I own the Indianapolis photo"?

20  A   No.

21          MR. OVERHAUSER:  Objection, calls for hearsay.

22          MS. KENNEDY:  Your Honor, I can rephrase.

23          THE COURT:  That's sustained.  Please rephrase.

24  BY MS. KENNEDY:

25  Q   To the best of your knowledge, has Nancy claimed ownership

BELL - DIRECT/KENNEDY                    31

1   in that photo?

2   A   No.

3   Q   And your wife at the time, Nancy, did she know that you

4   had taken many, many picture?

5   A   Yeah.  She certainly knew -- she certainly knew the

6   Indianapolis photograph because it was in my office, my home

7   office.  It was also in my law office.  I had taken the

8   picture in early 2000, and it was on my -- in my office I know

9   by August of 2000.

10  Q   In 2000 and any other year really, did Nancy ever help you

11  do Photoshop edits?

12  A   No.

13  Q   Did Nancy ever tell you how and where to take a picture

14  and give you instructions?

15  A   No.

16          MR. OVERHAUSER:  Objection, calls for hearsay.

17          MS. KENNEDY:  I'll rephrase, Your Honor.

18  BY MS. KENNEDY:

19  Q   Did Nancy ever control your photographs, meaning she gave

20  instructions?

21  A   No.

22  Q   Mr. Bell, did your wife participate in any manner in the

23  creation of this Indianapolis photo as seen on Exhibit 1?

24  A   No, she did not.

25  Q   And Mr. Bell, to your knowledge, is Nancy Bell listed as a

BELL - DIRECT/KENNEDY                         32

1   witness for the defendant in this case?

2   A   No.

3   Q   So she will not be coming in today?

4   A   No.

5   Q   Mr. Bell, are all the photos on your website, which is

6   entitled "richbellphotos.com" -- are they all your photos?

7   A   Yes.

8   Q   They've been taken by you, I assume?

9   A   They have.

10  Q   And you are the sole owner of those photos?

11  A   I am.

12  Q   You testified earlier that you used Webshots at first to

13  post your photo online; and then at some point, you had moved

14  to Rich Bell Photos and as Mr. Overhauser pointed out, at

15  times, SmugMug.  When did you switch over to Rich Bell

16  Photos/SmugMug?

17  A   In April of 2011.  And what I did is do some research to

18  find out which one could sell my photos better and SmugMug --

19  which actually, there's a link from SmugMug to my domain name.

20  So actually, it's on SmugMug's under richbellphotos.com.

21  Q   So, Mr. Bell, let's start to go chronologically.  Do you

22  recall the date or around the year that you registered your

23  photo with the U.S. Copyright Office?

24  A   Yes, it was August 4th, 2011.

25          MS. KENNEDY:  Your Honor, may I publish Plaintiff's

BELL - DIRECT/KENNEDY                    33

1   Exhibit 2, the copyright certificate registration to the jury?

2           THE COURT:  Yes.  It's been admitted.

3   BY MS. KENNEDY:

4   Q   Mr. Bell, as you can see, Exhibit 2 on the monitor --

5   A   Yes.

6   Q   -- it looks a little bit faded on the monitor here, but in

7   the binders it won't.  Is that your copyright certificate?

8   A   Yes, it is.

9   Q   Is it VA No. 1785115?

10  A   That's correct.

11  Q   And it shows the date that you had mentioned, August 4th,

12  2011?

13  A   Yes.

14  Q   Did this copyright registration cover more than one photo?

15  A   It did.

16  Q   Now, we're going to get through a couple of these exhibits

17  quickly.

18          MS. KENNEDY:  Your Honor, I would like to publish

19  Plaintiff's Exhibit 3 to the jury.  It's an acknowledgment of

20  the receipt of Mr. Bell's U.S. Copyright Office registration.

21          THE COURT:  It's been admitted.  Any objection?

22          MR. OVERHAUSER:  No.

23  BY MS. KENNEDY:

24  Q   Mr. Bell, do you have a binder in front of you?

25  A   Yes, I do.

BELL - DIRECT/KENNEDY                    34

1    Q    If you will, turn to Exhibit 3.  This is entitled in the

2    e-mail to you, "Acknowledgment of Receipt from the U.S.

3    Copyright Office."

4    A    Yes, it is.

5    Q    In the body of the text, it says, "For digital uploads,

6    you could click on the upload deposit button, then browse and

7    select the file or files you wish to upload to your copyright

8    application."  Do you see that?

9    A    Yes.

10   Q    Did you, in fact, upload photographs digitally to your

11   application for copyright?

12   A    Yes, I did.

13   Q    Mr. Bell, on Exhibit 4, do you see anywhere the word

14   "metadata"?

15   A    No.

16   Q    Or any complex technological requirement of the U.S.

17   Copyright Office?

18   A    No.

19   Q    So it appears -- let me retract that statement.

20        So to your knowledge, was the only requirement that

21   you had to browse your computer and upload the deposits with

22   your application?

23   A    That's correct.

24   Q    And to your knowledge, does the Copyright Act include the

25   word "metadata"?

BELL - DIRECT/KENNEDY                     35

1   A    It does not.

2   Q    Not one time in the entire Copyright Act?

3   A    That's correct.

4   Q    So you uploaded your photographs, as Exhibit 4 calls them,

5   deposits.

6            MS. KENNEDY:  And I will now ask Your Honor may I

7   publish Exhibit 5 quickly to the jury, payment confirmation

8   for his copyright application?

9            THE COURT:  It's been admitted and without

10  objection.

11  BY MS. KENNEDY:

12  Q    Mr. Bell, as I pull that up, did you pay for your

13  application to register your copyright?

14  A    Yes.  It cost $35.

15           MS. KENNEDY:  Also, I would like to, Your Honor,

16  pull up the Plaintiff's Exhibit 4.  That's an actual

17  acknowledgment of the uploaded deposit -- I'm sorry.  We

18  already did 4.  Six.  Let's move on to 6.

19           THE COURT:  Okay.  That's admitted.

20  A    Six is the -- 6 is actually a certification that was later

21  received in some discovery that lists and has all of the

22  photographs that were sent to the copyright office.  They were

23  already copyrighted, but they were registered with the

24  copyright office.

25

BELL - DIRECT/KENNEDY                    36

1  BY MS. KENNEDY:

2  Q   So Mr. Bell, if you could, on Exhibit 6 -- there are no

3  page numbers here, so count the first page as a page.  Could

4  you flip through and let me know if you find the Indianapolis

5  photo and what page that would be so the jury can find it?

6  A   The second page.

7  Q   The second photo or the second page?

8  A   It would be the second page.  It would be the second

9  photo.

10  Q   Second photo?

11  A   Second photo, I'm sorry, third page.  A photograph that's

12  not part of this litigation is -- but was also taken the same

13  day would be the fourth page, would be the nighttime photo.

14  Q   So the second photo is the subject of this copyright

15  litigation, but the fourth photo is a nighttime photo of the

16  same location?

17  A   Correct.

18  Q   Could you describe taking that photo?

19  A   Yeah.  I took that in the evening around nine o'clock that

20  night.

21  Q   And was that a strategic move or creative move in going

22  back to the actual location to take a nighttime photo?

23  A   Well, I knew that the sky during the twilight time was

24  excellent.  So I took advantage of that.

25  Q   And Mr. Bell, do you sell these photos that have been

BELL - DIRECT/KENNEDY                    37

1  copyrighted with the copyright office as shown in Exhibit 6 on

2  richbellphotos.com?

3  A    I do.

4          MS. KENNEDY:  Your Honor, I would like to publish to

5  the jury Exhibit 11.  It's just a quick one-page version of

6  the cover page of Mr. Bell's website, richbellphotos.com.

7          THE COURT:  11's admitted.

8  A    Yeah, there are two pictures there that -- one is of

9  Yosemite National Park, and the other one is the -- I guess

10 you would call it the -- it's Kauai island in Hawaii.  So

11 anyway.

12 BY MS. KENNEDY:

13 Q    Now, Mr. Bell, some of the writing is hard to read on the

14 screen because it is in white font; but on richbellphotos.com,

15 do you have several galleries?

16 A    Yeah, there's 165 galleries.

17 Q    In those galleries, can Internet users purchase photos?

18 A    Yes, they can.

19 Q    And do you remember the title of the gallery where the

20 Indianapolis photo existed?

21 A    Indianapolis, Indiana.

22          MS. KENNEDY:  Your Honor, I would like to publish to

23 the jury Exhibit 7, "SmugMug Terms and Conditions of Use."

24 SmugMug is essentially like the PayPal of photos and was used

25 on richbellphotos.com.

BELL - DIRECT/KENNEDY                    38

1          THE COURT:  Seven is admitted.

2    BY MS. KENNEDY:

3    Q    So Mr. Bell, as I pull it up, if you could, could you turn

4    to Exhibit 7?

5    A    Yeah, I've got it.

6    Q    This is a long 27-page document; but I ask that you turn

7    to page 6.  I'm going to ask you to read something to the

8    jury.  It's in the second paragraph of page 6, Exhibit 7.

9    A    Okay.

10   Q    It begins with "You retain."  Could you read that

11   paragraph?

12   A    "You retain all intellectual property rights in and to any

13   user content you post, upload, or otherwise make available

14   through the services, including the copyright in and to your

15   media.  SmugMug does not claim any ownership right, title, or

16   interest in" -- "and to your user content."

17   Q    So did those terms and specifically, that term, satisfy

18   you when you decided to use SmugMug as a sales platform for

19   your photos?

20   A    Yeah.  It basically tells you that they're not going to

21   claim a copyright ownership to any of my photos.

22          MS. KENNEDY:  Your Honor, I would like to publish to

23   the jury Exhibit 8.  It's SmugMug's privacy policy.

24          THE COURT:  All right.  It's admitted.

25

BELL - DIRECT/KENNEDY                    39

1  BY MS. KENNEDY:

2  Q   In Exhibit 8, we won't go to any specific terms; but

3  Mr. Bell, did you review the privacy policy before you began

4  selling on SmugMug?

5  A   Yes, I did.

6  Q   And you felt comfortable putting your photos on

7  richbellphotos.com and SmugMug because of these terms and

8  conditions in Exhibit 8 and 7?

9  A   Yes.

10 Q   Mr. Bell --

11         MS. KENNEDY:  Your Honor, I would like to publish to

12 the jury Exhibit 10.  It's plaintiff's records of sales of

13 licenses on richbellphotos.com.

14         THE COURT:  All right.  It's admitted.

15 A   These are --

16         MR. OVERHAUSER:  Objection.  There's no question

17 pending.

18         THE COURT:  I'm sorry?  What's the objection?

19         MR. OVERHAUSER:  There's no question pending.

20         THE COURT:  I don't think there's a question yet.

21         THE WITNESS:  Sorry.

22 BY MS. KENNEDY:

23 Q   Mr. Bell, looking at Exhibit 10, are these the photos that

24 you have sold licenses to use certain photos using the SmugMug

25 platform and richbellphotos.com?

1  A    Yes, it is.

2  Q    Just a brief glance at it, it appears that the dates last

3  from 2011 up to 2017?

4  A    Correct.

5  Q    And this -- is this a recent --

6  A    No, I think it's 2019.

7  Q    2019?  Is this a recent look at all of the sales you have

8  had at richbellphotos.com?

9  A    Correct.

10  Q    Mr. Bell, I do believe we got this into evidence,

11  Exhibit 4, which is an acknowledgment of some of the files you

12  uploaded with your copyright application?

13  A    Um-hum.

14  Q    If you will turn to Exhibit 4 -- and I'll scroll down.

15  Let me know if you see what you believe to be the Indianapolis

16  photo.  Again, I know it's been more than 20 years.

17  A    It's the second from the bottom.  It's called

18  "Indianapolis Skyline From Canal."  I said, "Best picture."  I

19  took several pictures that evening -- or that day from that

20  location, and this was the one that I thought turned out the

21  best.  And it made it 300 resolution, which is pretty high.

22  Q    And Mr. Bell, that is the Indianapolis photo?

23  A    Yes, it is.

24  Q    And so Exhibit 4 shows that you had uploaded and deposited

25  these photos on the date that you applied with the copyright

BELL - DIRECT/KENNEDY                    41

1   office?

2   A   That's correct.

3   Q   Also confirmed by Exhibit 6, where the copyright office

4   sent us the whole packet of colored photos?

5   A   That's correct.

6   Q   Well, now, let's try to turn our focus to Carmen

7   Commercial and this case, Mr. Bell, now that we've gone

8   through some of those matters.

9           Mr. Bell, we remember Exhibit 2, which was the

10  copyright registration certificate covering the Indianapolis

11  photo.  Is that what you believe?

12  A   That's correct.

13  Q   And based on Exhibit 2, is that why you filed lawsuit in

14  this federal court, because you had obtained a copyright

15  certificate covering the Indianapolis photo?

16  A   Yeah, well, that and the fact that Carmen Realty wouldn't

17  take the photograph down and still wouldn't take it down.

18  Q   In 2016, they wouldn't take the Indianapolis photo off

19  their website?

20  A   No.  They left it on for another two years.

21  Q   So the copyright infringement -- you allege that Carmen

22  Commercial has committed infringement more than one time?

23  A   Oh, yeah.

24  Q   In 2013 or '16?

25  A   2013, 2014, 2015, 2016; and then after I wrote them a

BELL - DIRECT/KENNEDY                    42

1   note -- I wrote them a letter, e-mail in April of 2016, which

2   said, "Take it down" and pay me the amount that I deemed was

3   necessary for already four years of infringement -- or three

4   years of infringement.

5           And so when they didn't take it down, they continued

6   to infringe, even after they bought the license.  Well, it

7   wasn't Carmen Commercial that bought the license.  It was

8   Mr. Carmen.

9   Q   Mr. Bell, I'm going to ask the Court that I can pull up

10  Exhibit 21.  It's going to be several communications with you

11  and the defendant's president, Mr. Christopher Carmen,

12  regarding any infringement.

13          MS. KENNEDY:  Your Honor, may I publish Exhibit 21

14  to the jury?

15          THE COURT:  You may.

16  BY MS. KENNEDY:

17  Q   First, Mr. Bell, on the first page of Exhibit 21, it

18  appears to be a read receipt showing that you had reached out

19  to Carmen Commercial.  Do you recall that?

20  A   Yes.

21  Q   And can you see the date of that read receipt on the first

22  page of Exhibit 21?

23  A   April 24th -- yeah, April 24th.

24  Q   Of what year?

25  A   2016.

BELL - DIRECT/KENNEDY                    43

1  Q   So do you believe that was the first time to your

2  knowledge that Carmen Commercial had notice of a potential

3  copyright infringement issue?

4  A   Yes.

5  Q   Notice that they were using your Indianapolis photo?

6  A   Yes.

7  Q   And notice that you wanted it taken down?

8  A   That's correct.

9  Q   Briefly, Mr. Bell, could you please go over just some of

10 the content of Exhibit 21 and what your initial communication

11 was to Mr. Carmen?

12 A   Well, I tried to tell him the law.  I also told him that

13 he was going to have to pay for statutory damages, which I

14 believed should be at that time $5,000; and he was likely to

15 have to pay additional expenses.

16 Q   And at or around that time, did Carmen Commercial agree to

17 settle or come to some type of agreement with you?

18 A   No.  They went out and took this silly little trick of

19 buying a license and saying it acted retroactively to wipe out

20 all of the infringement.

21 Q   Before we go into the license purchase --

22        MS. KENNEDY:  Your Honor, I would like to publish

23 Plaintiff's Exhibit 12.  This is evidence through the Internet

24 web archive Wayback Internet Machine [sic] showing that 161

25 snapshots at the time were taken of Defendant Carmen

BELL - DIRECT/KENNEDY                    44

1   Commercial Realty's website --

2           MR. OVERHAUSER:  I object to counsel's

3   characterization of the exhibit.  The witness can testify to

4   it if he can.

5           THE COURT:  The exhibit's admitted, and you can ask

6   questions about it.

7   BY MS. KENNEDY:

8   Q   Mr. Bell, Exhibit 12, if you see it up there on the screen

9   or in front of you, it says that -- how many screenshots of

10  defendant's website had been taken up to that point?

11  A   Right.  From December 21, 1997, to June 10th, 2016, it was

12  161 times.

13  Q   To the best of your knowledge, does the Wayback Internet

14  Machine create a copy of the website on its Internet archive?

15  A   It does.

16  Q   Would you consider it to be a carbon copy?

17  A   Usually.

18  Q   Okay.

19          MS. KENNEDY:  Your Honor, I would like to publish

20  Exhibit 13 to the jury to start showing some of Carmen

21  Commercial's alleged infringement.

22          THE COURT:  All right.

23  BY MS. KENNEDY:

24  Q   Mr. Bell, if you can see on the screen, could you explain

25  to me what you see in Exhibit 13?

BELL - DIRECT/KENNEDY                    45

1   A   Well, I believe that this is, in fact, the first one that

2   I saw; and I saw that in April of 2016, and I later took a

3   screenshot of it just to see if it's still up on June 4th.

4         Up there in the left-hand corner of Exhibit 13 is, in

5   fact, a -- the date of June 4th, 2016, which is after I filed

6   suit.  So the photograph is still there.  They didn't take it

7   down.

8   Q   Mr. Bell, where do you see your photograph in this on

9   Carmen Commercial's web-archived website?

10  A   On the right side of the page.

11  Q   And is there a date, besides this screenshot being taken

12  all the way in June 4th, 2016, after filing suit -- can you

13  see the date when it might have been first published?

14  A   Yeah, July 23, 2013.

15  Q   So do you believe your photo was on their website from

16  July of 2013 all the way till June of 2016 when this exhibit

17  was created?

18  A   Sure looks like that.

19  Q   Did Carmen Commercial have your permission to have your

20  photo on their website?

21  A   No.

22  Q   Do you see anywhere on this page -- and I'll scroll

23  down -- where your name appears?

24  A   No.

25  Q   Do you see your copyright symbol, Rich Bell with a little

BELL - DIRECT/KENNEDY                    46

1  C copyright?

2  A    No.

3  Q    So for what appears and as you testified to be three

4  years, this photo was on Carmen Commercial's website.  Do you

5  see any other copyright symbols on the website?

6  A    Yeah, I see "Carmen Commercial."

7  Q    Could you read it to me word for word?

8  A    It says the small circle "213 Carmen Commercial Real

9  Estate Services," which indicates to me --

10          MR. OVERHAUSER:  Objection.  Nonresponsive to the

11  extent he's elaborating.

12          THE COURT:  Sustained.  You've got to wait for a

13  question.

14  BY MS. KENNEDY:

15  Q    Mr. Bell, to your personal knowledge, what does the

16  copyright symbol "2013 Carmen Commercial Real Estate Services"

17  at the bottom of a web page mean?

18  A    It means it owns all of the -- it owns the copyrights to

19  all of the publishing and all of the photographs on that page.

20  Q    And certainly, in 2013 when you had never even heard of

21  Carmen Commercial Real Estate Services, they hadn't had

22  permission to use your photo?

23  A    No.

24  Q    And this three-year infringement, was that part of the

25  reason you requested a high amount when you first reached out

BELL - DIRECT/KENNEDY                    47

1   in Exhibit 21 to Carmen Commercial?

2           MR. OVERHAUSER:  Objection.  Assumes facts with

3   respect to the characterization of "three-year infringement."

4           THE COURT:  Sustained.

5           MS. KENNEDY:  I'll rephrase.

6   BY MS. KENNEDY:

7   Q   When you first reached out to Carmen Commercial in April

8   and May of 2016, you earlier testified you had offered a

9   number of around $5,000.  Why that number?

10  A   Primarily because they had had -- the evidence that I saw

11  was that they had it on their -- they've been using the

12  photograph for at least three years.

13  Q   If someone uses the photograph for more years, does that

14  constitute more damages to you?

15  A   Yeah.  It's infringement.

16          MS. KENNEDY:  Your Honor, I would like to publish

17  Exhibit 14 to the jury.  This is similar to Exhibit 13, but it

18  shows that third-party infringers can download and save the

19  Indianapolis photo.

20          MR. OVERHAUSER:  Objection to the characterization

21  or description of the exhibit.

22          MS. KENNEDY:  Your Honor, may I publish to the jury

23  Exhibit 14?

24          THE COURT:  Fourteen is admitted, yes.

25          MS. KENNEDY:  Sorry, Your Honor.  I didn't hear

BELL - DIRECT/KENNEDY                    48

1  that.

2          THE COURT:  Yes, I'm sorry.  Fourteen is admitted.

3  BY MS. KENNEDY:

4  Q   Mr. Bell, Exhibit 14, there is a dialogue box that appears

5  in your photo.  Could you explain what that is, what that

6  means to you?

7  A   It means that that photograph can be copied by a third

8  party.

9  Q   Third-party Internet users?

10 A   Yeah.

11 Q   So third-party Internet users could download or save the

12 Indianapolis photo if they were to stumble upon or go onto

13 Carmen Commercial's website?

14 A   Yes.  Carmen Commercial not only took -- used my

15 photograph --

16         MR. OVERHAUSER:  Objection, nonresponsive.  Move to

17 strike.

18         THE COURT:  Why don't the parties approach.

19     (*Beginning of bench conference.*)

20         THE COURT:  Your objection is to what, to the word

21 "took"?

22         MR. OVERHAUSER:  After the first sentence, he

23 started elaborating on what -- additional -- it was not

24 responsive to the initial question that was asked.

25         THE COURT:  Hold on, let me look.

BELL - DIRECT/KENNEDY                    49

1          So she asked if a third party could download it?  Is

2    that it?

3          MR. OVERHAUSER:  Yes.  That's a yes-or-no question.

4          THE COURT:  Well, he can certainly elaborate on what

5    he means by "yes" or "no."  But try to keep him -- he seems to

6    want to go on to testify before you ask him a question.

7          MS. KENNEDY:  Right.

8          THE COURT:  You need to control him on that.

9          MS. KENNEDY:  I will.  Thank you.

10        *(End of bench conference.)*

11   BY MS. KENNEDY:

12   Q   So, Mr. Bell, back to that question, I believe I asked

13   could third-party Internet users download that photo?

14   A   Yes.

15   Q   Do you see anything on this exhibit, as well as

16   Exhibit 13, that constitutes to your personal knowledge

17   intentional infringement?

18        MR. OVERHAUSER:  Objection.  Calls for speculation.

19   A   Well, other than the fact --

20        THE COURT:  Hold on.

21        She's asking personal knowledge.

22        I guess you could rephrase it to make it clear that

23   it's his opinion.

24        MS. KENNEDY:  Thanks, Your Honor.

25

BELL - DIRECT/KENNEDY                    50

1  BY MS. KENNEDY:

2  Q   Mr. Bell, in your opinion, do you see acts of intentional

3  infringement committed by Carmen Commercial in Exhibit 13 and

4  14?

5         MR. OVERHAUSER:  Objection.  Calls for opinion

6  testimony.

7         THE COURT:  Well, it's -- first of all, you're

8  asking what he thinks, if that's his picture.  Certainly,

9  infringement is a -- determining infringement is up to the

10 jury to determine.  You can ask him if that's his picture.

11 BY MS. KENNEDY:

12 Q   Mr. Bell, do you see any steps that Carmen Commercial Real

13 Estate took to confer credit to any owner of the photograph

14 that has appeared in Exhibit 13 and 14 on their website?

15 A   No.

16 Q   Do you see the opposite?

17 A   Well, I know it's my photograph.  I don't see my name

18 there.

19 Q   So Mr. Bell, is this Exhibit 13 and 14 the first instance

20 of infringement that you've discovered throughout the

21 litigation in this case?

22 A   Yes.

23 Q   And again, with the simple click of a mouse, third-party

24 Internet users could download your photos from 2013 to what

25 year?

BELL - DIRECT/KENNEDY                    51

1  A    Until they took it off in 2018.

2  Q    And from a brief look at Carmen Commercial's website in

3  Exhibit 13 and 14, does it appear to advertise or what does

4  their website appear to do?

5  A    Well, it's a commercial entity that's trying to, in my

6  opinion, advertise about Indianapolis, Indiana.

7          MS. KENNEDY:  Your Honor, I would like to publish to

8  the jury Exhibits 15 and 16.  I'll be going back and forth.

9  It's another alleged infringement by the plaintiff.

10          THE COURT:  All right.  Those are admitted.

11 BY MS. KENNEDY:

12 Q    Mr. Bell, on Exhibit 15, do you see your Indianapolis

13 photo?

14 A    I do.

15 Q    Is that on a thumbnail version or a full-size version?

16 A    It's a thumbnail.

17 Q    And in a minute, I'm going to scroll back up to the top of

18 Exhibit 15; but does this thumbnail of your Indianapolis photo

19 appear to be on Carmen Commercial's cover page or their main

20 web page?

21          MR. OVERHAUSER:  Objection, lack of foundation.

22 A    It appears to be.

23          THE COURT:  Well, you've got to lay some foundation.

24 It appears to be a little leading, too.

25          MS. KENNEDY:  Yes, Your Honor.

BELL - DIRECT/KENNEDY                    52

1  BY MS. KENNEDY:

2  Q    Exhibit 15 is a snapshot from 2016.  The screenshot date

3  was April 21st, 2016; and at the top of the page in the

4  left-hand corner, you can see the actual website that we were

5  on, which is carmencommercialrealestate.com; and I do believe

6  this is the front page of this website.

7          MR. OVERHAUSER:  Objection, Your Honor.  Counsel is

8  testifying again.

9          THE COURT:  That's sustained.

10 BY MS. KENNEDY:

11 Q   So Mr. Bell, looking at Exhibit 15, just explain what you

12 see, please.

13 A   It's Carmen Commercial Real Estate Services web page.

14 It's their front page.  I believe I downloaded this on 2016 in

15 April the 21st.

16 Q   And was that before you filed suit in this case?

17 A   It was.

18 Q   And do you see any copyright symbols on this web page?

19 A   No, other than Carmen Real Estate, which says "2016."

20         MS. KENNEDY:  Your Honor, I would like to publish to

21 the jury Exhibit 16.  It's similar to Exhibit 14.

22         THE COURT:  Okay.  Sixteen is admitted.

23 BY MS. KENNEDY:

24 Q   Mr. Bell, it's a little bit difficult to see; but do you

25 see a dialogue box on Exhibit 16?

BELL - DIRECT/KENNEDY                    53

1   A    Yes.

2   Q    Is that next to your Indianapolis photo?

3   A    It is.

4   Q    Does that -- what does that signify to you?

5   A    That that photo -- that a Internet user could download my

6   photograph from Carmen Real Estate -- Commercial Real Estate's

7   website.

8   Q    So again, for the second time, are you testifying that

9   Carmen Commercial subjected you to other Internet users

10  downloading your photo?

11  A    Well, they haven't taken it and protected the photograph.

12  Let's put it that way.

13  Q    So this was the second instance, all before you filed

14  lawsuit?

15  A    Correct.

16  Q    And earlier you testified and we showed another exhibit

17  that you reached out about April 2016 and May 2016 to Carmen

18  Commercial?

19  A    Yes, I did.

20  Q    So these two -- four exhibits really -- are they instances

21  of prior knowledge -- excuse me.  Let me strike that.

22        These four exhibits, what do they represent to you in

23  terms of the timeline of the lawsuit?

24  A    Well, they were before the lawsuit was filed; but they

25  still remained up after I filed suit.

BELL - DIRECT/KENNEDY                    54

1  Q    So after you communicated with Carmen Commercial, these

2  exhibits still were live?

3  A    Yes.

4  Q    And in your communication to Carmen Commercial, did you

5  warn the defendant or the potential defendant at that time

6  that you would be filing a lawsuit?

7  A    Yes.  I said -- I think I said the date May 9th of 2016

8  would be the date I would file a lawsuit.

9  Q    And on or around that time you did, in fact, file a

10 lawsuit?

11 A    Yes, I did.

12 Q    And if you would refer, Mr. Bell, to Exhibit 21, these are

13 e-mail threads; so the numbering of the pages are difficult,

14 so please refer to the actual physical page of the exhibit.

15 A    Okay.

16 Q    Do you see anywhere where Carmen Commercial or Mr. Carmen

17 said that Carmen Commercial had only posted your photo one

18 time?

19 A    Yes.

20 Q    Had they, in fact, only posted it one time?

21 A    No.  I found at least four instances by that date.

22 Q    Also in those communications, do you see any promises that

23 your photo had been removed?

24 A    Yes.

25 Q    Had the photo been removed from Carmen Commercial's

BELL - DIRECT/KENNEDY                              55

1   website?

2   A   No.  They weren't removed until 2018.

3   Q   Did Carmen Commercial continue to infringe in future posts

4   or future websites?

5   A   Yes.

6          MR. OVERHAUSER:  Objection.  Calls for a legal

7   conclusion.

8   BY MS. KENNEDY:

9   Q   Mr. Bell --

10          THE COURT:  Sustained.

11  BY MS. KENNEDY:

12  Q   Let me rephrase.  Did Carmen Commercial post your photo

13  again after you filed lawsuit?

14  A   Yes.

15  Q   Okay.

16          MS. KENNEDY:  Your Honor, I would like to present

17  Plaintiff's Exhibit 17 and 18.  They have not been stipulated

18  to.  So however you would like us to handle that.

19          THE COURT:  Lay a foundation for them, and we'll see

20  if there is an objection.

21          MS. KENNEDY:  Your Honor, Exhibit 17 is a --

22          MR. OVERHAUSER:  Objection.  She's not allowed to

23  testify.

24          THE COURT:  You need to do that with Mr. Bell.

25          MS. KENNEDY:  Oh, sorry, Your Honor.

BELL - DIRECT/KENNEDY                    56

1  BY MS. KENNEDY:

2  Q   Mr. Bell --

3  A   Yes.

4  Q   -- do you have a copy of what we hope to get in as

5  Exhibit 17 and 18?

6  A   Yes.

7  Q   So are you looking at that document right now?

8  A   I am.

9  Q   And what is, first, Exhibit 17, to the best of your

10 recollection?

11 A   Okay.  It's dated August 1, 2016, which is after the

12 lawsuit was filed.

13 Q   And was that the print date of the exhibit?

14 A   Yes, and that indicates that that's the day I printed it.

15 That's the day I saw it.  It's an identical -- it's a true and

16 accurate copy of their website -- the front page of the

17 website of Carmen Commercial Real Estate Indianapolis.

18 Q   Is there another article or a date listed on Exhibit 17?

19 Could you describe what you're looking at?

20 A   Well, there's an article next to my photograph that says,

21 "Indianapolis Visibly Surges With Nationwide Tech Tenant."

22 That was posted on July 19th, 2016, which, again, is after the

23 date -- is two months after the day that I filed the lawsuit.

24 So they obviously knew.

25          MR. OVERHAUSER:  Objection to speculation.

1          THE COURT:  Sustained.

2          Mr. Bell, you've got to wait until a question is

3   posed to you.

4          Any objection to the admission of this exhibit?

5          MS. KENNEDY:  I don't think he heard you?

6          MR. OVERHAUSER:  I'm sorry?

7          THE COURT:  Any objection to the admission of this

8   exhibit?

9          MR. OVERHAUSER:  No, Your Honor.

10         THE COURT:  It's admitted without objection.  You

11  may publish it.

12      *(Plaintiff's Exhibit 17 was received in evidence.)*

13  BY MS. KENNEDY:

14  Q   Mr. Bell, do you recall clicking on a link or going to

15  Carmen Commercial Real Estate's website and actually seeing

16  what is before the jury as Exhibit 17?

17  A   Yeah.  I don't know that the jury has Exhibit 17.

18         MS. KENNEDY:  Oh, yes.  We need to get them that.

19         Your Honor, may I publish Exhibit 17 to the jury?

20         THE COURT:  You may.

21         MS. KENNEDY:  Your Honor would you prefer I hand

22  each of these to the jurors?  May I approach?

23         THE COURT:  Mr. Rogers, can help you there.  They

24  have the monitor there in the meantime.

25         While this is going on though, why don't you go

BELL - DIRECT/KENNEDY                    58

1   ahead and have Mr. Bell look at Exhibit 18 and ask him about

2   that one, unless you have no objection to Exhibit 18,

3   Mr. Overhauser?

4           MR. OVERHAUSER:  I have no objection to Mr. Bell

5   describing Exhibit 18, if he can.

6           THE COURT:  Okay.  So let's see if you can lay a

7   foundation for 18, and maybe we can get that admitted too or

8   not, depending; and then we can give it to them at the same

9   time.

10  BY MS. KENNEDY:

11  Q   Mr. Bell, do you have before you Exhibit 18?

12  A   I do.

13  Q   Could describe what you're looking at, and do you recall

14  finding that?

15  A   This is actually the article on "Indianapolis Visibly

16  Surges With Nationwide Tech Talent."  The way you get to this

17  page is you click on their first page, and it pops up; and

18  then it has my photograph right there on the right-hand side

19  of that article.  And that article was posted on July 19th,

20  2016; and I copied this on August 1, 2016, indicating that

21  this was another infringement.

22          MS. KENNEDY:  Your Honor, may we publish to the jury

23  Exhibit 18?

24          THE COURT:  So any objections to the admission of

25  Exhibit 17 -- or excuse me -- 18?

BELL - DIRECT/KENNEDY                      59

1          MR. OVERHAUSER:  No objection, Your Honor.

2          THE COURT:  All right.  You may publish it and

3  Mr. Rogers will get it to the jury.  It's admitted without

4  objection.

5          MS. KENNEDY:  Thank you, Mr. Rogers.

6      (Plaintiff's Exhibit 18 was received in evidence.)

7  BY MS. KENNEDY:

8  Q   Mr. Bell, looking at Exhibit 18, it's a more close-up

9  photo of your picture, as you earlier testified --

10 A   Yes.

11 Q   -- from the thumbnail.  Looking carefully at it, do you

12 see your copyright symbol on that photo?

13 A   No.

14 Q   You don't see it anywhere?

15 A   No.

16 Q   There's no caption conferring the credit to you?

17 A   No.

18 Q   Again on that website throughout Exhibit 18, do you see

19 any other copyright symbol?

20 A   Yeah.  I see a copyright symbol at the very end of that

21 article that says the copyright sign, C, "2016 Carmen

22 Commercial Real Estate Services."

23 Q   Mr. Bell, you have testified about a license or attempted

24 license purchase.  Did that happen after or before this

25 Exhibit 18 was created?

1  A    My memory serves me that it happened in May of 2016.  I

2  specifically wrote a letter to Carmen Real Estate counsel and

3  told them to take it down, and I sent the $200 back because

4  they were arguing -- they were telling me that they were going

5  to argue that the matter was retroactive.

6  Q    Okay.  And Mr. Bell, to your recollection -- and I may

7  refresh your recollection with a quick exhibit -- do you --

8  when an interested buyer purchases your photo on your website,

9  specifically the Indianapolis photo, so this photo appearing

10 on Carmen Commercial Real Estate's Exhibit 18 --

11 A    Correct.

12 Q    -- is a copyright symbol on that photo?

13 A    Yes, it is.

14 Q    So if Mr. Carmen -- and we'll go into this later --

15 purchased the Indianapolis photo after being sued, would the

16 "copyright symbol Rich Bell" appear on his purchase?

17 A    That's actually a condition of the copyright of my license

18 is that they are only buying that photo that they actually

19 select on the website, and that photo has my copyright notice.

20 I wanted to make sure that my copyright notice was on anybody

21 that acquired the rights to publish my photo for $200, that

22 that would be on there forever.

23 Q    So any purchase that Mr. Carmen may have made to use the

24 Indianapolis photo, you don't see that photo on Carmen

25 Commercial Real Estate's website on Exhibit 18, do you?

BELL - DIRECT/KENNEDY                    61

1   A    No.

2   Q    And what is missing?

3   A    The copyright symbol.

4   Q    And typically, do you recall where that copyright symbol

5   is located?

6   A    It's on the right side.

7   Q    The right-hand side of the upper or lower?

8   A    Lower.

9   Q    Mr. Bell, when you went to Carmen Commercial Real Estate's

10  website on August 1st, as you previously testified, 2016, to

11  the best of your knowledge, could third-party Internet users

12  also download this image?

13  A    I don't know about that.

14          THE COURT:  Ms. Kennedy, how much longer do you

15  think you have on direct?

16          MS. KENNEDY:  Not too much longer but --

17          THE COURT:  How's the jury doing?  We've been going

18  at this about two hours?  You ready for a break?  Lunch?

19  Probably got more than five or ten minutes?

20          MS. KENNEDY:  Probably a few more minutes than that.

21          THE COURT:  We're going to take our morning break

22  here.  Actually, not our morning break.  We're going to take

23  our lunch.

24          I told you -- I promised you, members of the jury,

25  that I would give you a nice, long admonition, so here it

BELL - DIRECT/KENNEDY                         62

1   comes.

2          During any recess or adjournment, you --

3          You may be seated, Ms. Kennedy.

4          You may step down, Mr. Bell.

5          During any recess or adjournment, you must confine

6   your knowledge of this case only to what you learn in this

7   courtroom.  You must not discuss this case among yourselves or

8   anyone else, and you must not permit anyone to discuss the

9   case, including radio or TV reporters or personalities with

10  you or in your presence.  It is your duty not to form or

11  express an opinion in this case until you have heard all of

12  the evidence and the case is submitted to you for your

13  decision and verdict.

14          Therefore, until you have finished your

15  deliberations, you must not conduct your own research or

16  discuss this case with anyone, including with members of your

17  family, people involved in the trial, or anyone else.  This

18  includes not mentioning this case or any issue or definition

19  related to the case in any form of media, including on TV, the

20  radio, print media, or the Internet, including on Snapchat,

21  Twitter, Facebook, Myspace, in a blog, in a podcast, or on a

22  post to any website or any other type of media.

23          You must not let others discuss the case with you.

24  If anyone tries to talk to you about the case, please give a

25  signed note to the courtroom deputy, Mr. Rogers, immediately.

BELL - DIRECT/KENNEDY                          63

1  You cannot even discuss this case with members of the trial

2  team or witnesses in this case.

3            Therefore, the trial lawyers are not allowed to

4  speak with you during this case.  When you see them at recess

5  or pass them in the halls and they do not speak to you or if

6  they refuse to get on the elevator with you or otherwise avoid

7  you here or anywhere outside of the courtroom, they are not

8  being rude or unfriendly.  They are simply following the law

9  as you must, too.

10           Similarly, you must avoid any witnesses in this case

11  and should inform the courtroom deputy if you have any

12  encounter with one of them, no matter how brief or trivial.

13           If you need to tell me something, simply give a

14  signed note to my courtroom deputy to give to me.  If any

15  attempt is made by anyone to talk to you concerning this case,

16  you should report that fact to the courtroom deputy

17  immediately.

18           You must decide this case based solely on evidence

19  presented here within the four walls of this courtroom.  This

20  means that during the trial, you must not conduct any

21  independent research about this case, the matters in the case,

22  and the individuals or corporations involved in the case.  In

23  other words, you should not consult dictionaries or other

24  reference materials, search the Internet or any other media,

25  including any websites, blogs, newspapers, radio, television,

BELL - DIRECT/KENNEDY                    64

1  use any other print or electronic tools to obtain information

2  about this case or to help you decide the case.  Please do not

3  try to find out information from any source outside the

4  confines of this courtroom.

5          Finally, if at any time you decide that you have

6  personal knowledge of facts, materials -- that is material to

7  the case, you must inform the courtroom -- or the Court

8  immediately in writing, given to my courtroom deputy.

9          So with that, we're going to take a lunch break; and

10  we will be back in here at 1:30.  Please be back around 1:25

11  or so so that we can come in at 1:30.

12          COURTROOM DEPUTY:  All rise.

13      *(Jury out.)*

14          THE COURT:  Please be seated.  So any idea how much

15  longer, 15 minutes, 20 minutes?

16          MS. KENNEDY:  Probably about 20 minutes, Your Honor.

17  Maybe -- maybe 30.  But the slow, painful going through what

18  we allege on the infringements, there's only one more.  So

19  that'll speed things up right after that.

20          THE COURT:  Okay.  There are a couple things.  First

21  of all, let's go to those e-mails I excluded.  So somewhere

22  between 52 and 74 -- Exhibits 52 through 74, with the

23  exception of that web page, which is 62.  There's a different

24  objection on that.  So let's look at 52.

25          So tell me again, Mr. Overhauser, why you would seek

1    admission of these exhibits or what's the purpose of them?

2            MR. OVERHAUSER:  The purpose of them are, first of

3    all, to show the scope of the license as construed by Mr. Bell

4    when a person purchases a SmugMug license.  Specifically, each

5    of these people have been contacted by Mr. Bell and, as a

6    result, purchased a license for $200; and Mr. Bell agreed that

7    that resolved all claims for past infringement.  We think the

8    same thing should apply to Mr. Carmen.

9            THE COURT:  Okay.  So let me make sure I understand.

10   So if I sell my bike to somebody for $50 --

11           MR. OVERHAUSER:  I'm sorry?

12           THE COURT:  If I sell my bike to somebody for $50

13   and I go to sell my other bike to somebody else, I should have

14   to sell it to them for $50 because I sold it to somebody else

15   for $50?  Is that the argument, that this would be what he

16   gave the -- the deal he gave to some other party is the deal

17   that he should give to Mr. Carmen or the defendant?  Is that

18   the argument?

19           MR. OVERHAUSER:  The deal that everybody got, all of

20   these people and Mr. Carmen, is the deal described by the

21   SmugMug commercial terms of agreement, which I think is

22   Exhibit 9.  If all of these other people --

23           THE COURT:  Let me make sure I understand that

24   statement.  You're saying that every other person got $200

25   retroactively, that Mr. Carmen or Carmen Commercial is the

BELL - DIRECT/KENNEDY                    66

1   only entity in the universe that did not get a retroactive

2   $200 license?  Is that what you're saying?

3              MR. OVERHAUSER:  I don't know about anybody in the

4   universe.

5              THE COURT:  You said everybody got this.  So I just

6   want to make sure that there aren't other people.  I don't

7   know that it's relevant here; but again, I'm having problems

8   following it because it seems to me that what the argument is

9   is that the benefit of the deal he gave other people should go

10  to everybody he decides to deal with, regardless of the

11  circumstances.

12             MR. OVERHAUSER:  Well, yes; and the reason is

13  because when you go through the process of buying a license,

14  you have to agree to the commercial terms of license that are

15  on the smugmug.com website; and all of these other people

16  agreed to those terms, just as Chris Carmen did.

17             THE COURT:  But do those terms on SmugMug say that

18  they're retroactive?

19             MR. OVERHAUSER:  It uses the word "perpetual."

20             THE COURT:  Well, that gets us into the next thing.

21  I think that's a strain.  I'm going to look at that over the

22  break too; but it seems to me also that Judge Pratt already

23  ruled on that, didn't she?

24             MR. OVERHAUSER:  Well, what was before Judge Pratt

25  was a motion by us, the defendants, for summary judgment.  One

BELL - DIRECT/KENNEDY                    67

1    of the arguments was that this license provides a perpetual

2    license going backwards -- or retroactive license going

3    backwards and forwards.  What her conclusion was was that

4    there was not sufficient evidence to allow that to be

5    justified.

6           Well, here at trial, we are going to present

7    additional evidence.  To be clear, at summary judgment,

8    Mr. Bell did not move for summary judgment on the license

9    defense.  So that was never decided.  All that was decided was

10   that there was an issue of fact -- a disputed issue of fact

11   with regard to the scope of the license.  Therefore, what the

12   word "perpetual" means is at issue; and it's an issue for the

13   jury to decide.

14          THE COURT:  But Judge Pratt wrote that, "This

15   definition of 'perpetual' suggests that holding an office" or

16   quote-unquote, "something continues into the future for an

17   unlimited time.  An individual cannot hold a perpetual office

18   retroactively to the time of their birth but rather, they can

19   hold an office from the time they enter office and into the

20   future.

21          "In the legal world, the word 'retroactive' is

22   commonly used to denote something that will apply into the

23   past.  The license agreement did not state that authorization

24   to use the Indianapolis photo was retroactive.  In order for a

25   license to apply retroactively, such authorization must be

BELL - DIRECT/KENNEDY                    68

1   clearly stated."  And again, she cites to *Davis*, 505 F.3rd at

2   101 through 105.

3          So it seems to me that the -- and it goes on to say,

4   "Bell's license agreement does not clearly provide for

5   retroactive authorization to use the Indianapolis photo."

6          So seems to me that what she said is "perpetual" is

7   forward looking.  "Retroactive" is backward looking, and

8   perhaps there's a question of fact of whether or not it's

9   retroactive.  And I would agree with that, by the way.

10          MR. OVERHAUSER:  Again, that was based on the

11   summary judgment motion evidence before the Court at that

12   time.  But we expect to present additional evidence that will

13   show that the term is "perpetual"; and that evidence will

14   include a specific acknowledgment by Mr. Bell that when a

15   licensee asked whether the license terms would be retroactive,

16   he agreed.

17          THE COURT:  Okay.  That's an agreement between two

18   parties, right?

19          MR. OVERHAUSER:  Correct.

20          THE COURT:  Did Mr. Carmen or whatever -- other

21   representative of the defendant have such a discussion with

22   Mr. Bell that it would be retroactive?

23          MR. OVERHAUSER:  It was not a discussion, but

24   Mr. Carmen will testify that that was his understanding.

25          THE COURT:  So he can do that.  Why does he need

1   this?  Do any of these talk about "perpetual" in any of these

2   e-mails?

3          MR. OVERHAUSER:  Yes.  Specifically, Exhibit 67, the

4   one with Jeff Shelton, talks about perpetual -- I'm sorry.  It

5   talks about "retroactive."  Excuse me.  He used the word

6   "retroactive."

7          THE COURT:  I'm talking about "perpetual."  You said

8   that these seem to -- that these e-mails would help define

9   "perpetual" but not one of them mentions "perpetual"?

10         MR. OVERHAUSER:  Okay.  What the e-mail does --

11         THE COURT:  Which one are you pointing to?

12         MR. OVERHAUSER:  I'm looking at Exhibit 67, the

13   third page of that exhibit, the one that has Bates No. Bell

14   777 on it, and -- I can point to where it is.  There is a part

15   from an e-mail from Mr. Bell.  "The statement below by Midwest

16   user is fully agreeable."

17         Okay.  Now jump down to the lower e-mail in the

18   thread; and it says that -- you see what was fully agreeable

19   is "agreed to retroactively grant us full rights to use the

20   photo."

21         Now, jump back up here and it says -- so the

22   statement below by Midwest User Group is "fully agreeable."

23   Then the next sentence.  "This can be accomplished by the

24   download low resolution version at my website"; and then he

25   gives a link to richbellphotos.com, which is the same as

BELL - DIRECT/KENNEDY                    70

1  SmugMug, where is displayed the commercial terms of license

2  that include the "perpetual" language.

3          So what we have is Mr. Bell agreeing to

4  retroactively and further stating that the license terms at

5  SmugMug provide him or provide this user with a retroactive

6  license, which uses the term "perpetual."

7          THE COURT:  I understand what you're saying; and

8  again, this is a negotiation between a different entity.  And

9  when you say that he -- that Mr. Carmen felt that that was

10 retroactive, did he have the benefit of this document when he

11 entered into that license agreement?  Are you saying that he

12 knew about this?

13         MR. OVERHAUSER:  I don't recall when this was

14 produced in other litigation off the top of my head.

15         THE COURT:  When did he get the license, before or

16 after the litigation?

17         MR. OVERHAUSER:  Mr. Carmen got his license on

18 May 12th, 2016.

19         THE COURT:  When was the litigation -- when did

20 discovery begin in the litigation?

21         MR. OVERHAUSER:  I don't know the date of that off

22 the top of my head, Your Honor.

23         THE COURT:  Certainly you can tell me if it was

24 before or after that.

25         MR. OVERHAUSER:  I've been dealing with Mr. Bell

BELL - DIRECT/KENNEDY                    71

1  for -- since 2011, and I have had 40 or 50 cases involving

2  him.  So I can't place this one along the timeline right now

3  off the top of my head.

4        THE COURT:  When did you start representing

5  Mr. Carmen in this?

6        MR. OVERHAUSER:  Whenever he was sued in 2016.

7        THE COURT:  This is dated 2011.  You seriously can't

8  tell me whether or not he knew about this 2011 document when

9  he entered a license in 2016?

10        MR. OVERHAUSER:  This document was not produced to

11  me until much later.

12        THE COURT:  I understand that, but my question is --

13  I think what you're trying to argue is that Mr. Carmen, when

14  he entered into a license agreement on SmugMug, felt that that

15  was retroactive because of stuff that's in these documents

16  that you would like to admit.  Isn't that what you're arguing?

17        MR. OVERHAUSER:  It's not because of these

18  documents.  It's just that these documents further corroborate

19  the correct meaning of the word "perpetual."

20        THE COURT:  Well, when we look at contracts, don't

21  we look at the understanding between the parties, what's

22  contained in the four corners of the document unless that's

23  ambiguous?

24        MR. OVERHAUSER:  And our argument is that the term,

25  the word "perpetual" is, in fact, ambiguous.  Mr. Bell

BELL - DIRECT/KENNEDY                      72

1  construes it as looking forward only.  Mr. Carmen will testify

2  that it's consistent with the Merriam-Webster definition,

3  which is "for all time," which would go backwards.

4          THE COURT:  Which I suppose you can argue, but I say

5  suppose -- I'm not retracting my ruling yet because I'm going

6  to have to look at what Judge Pratt ruled here to see if it's

7  dispositive or binding in this case as opposed to just for

8  summary judgment matter.  I'm going to look at these again, in

9  addition to me -- for the purpose that you're asking them for,

10 I will look to see if, in fact, it's acceptable as an

11 exception under Rule 408.

12         In addition, however, seems to me that it's

13 cumulative.  I don't need or the jury doesn't need -- if, in

14 fact, what you want to do is admit one of these, they don't

15 need to see and have their time wasted on 52 through 74, 22

16 instances of it.

17         MR. OVERHAUSER:  Okay.

18         These other license purchases are separately

19 admissible for a second reason, and that reason is that we

20 expect Mr. Bell is going to argue that the value of his

21 photograph is whatever it is based on this series of purchases

22 of SmugMug licenses; and he introduced Exhibit 10 earlier,

23 which has a long list of his sales.

24         The jury needs to know that nearly every one of

25 those sales resulted as a result -- resulted after Mr. Bell

BELL - DIRECT/KENNEDY                    73

1   had written that person threatening them with a copyright

2   infringement lawsuit.  So they were not arm's-length

3   transactions.

4          The testimony from Mr. Carmen will be the typical

5   average price for a picture like this to put on your website

6   is about 10 bucks, not the $200 per copy.  So that's why these

7   other e-mails are also admissible.  They will show that they

8   were, in essence, licenses purchased under duress to avoid an

9   infringement suit by Mr. Bell.

10         MS. KENNEDY:  Your Honor, if I may, actual damages

11  aren't -- we're not going to be testifying about the value of

12  his photo.  Actual damages are not an issue before the jury.

13         And also, one thing that these e-mails, we must

14  point out, is this is all before Mr. Bell had registered with

15  the copyright office.  So although he enjoyed automatic

16  protection at first when he took the photo, you know, he gets

17  this more further protection and more rights and everything

18  after 2011.

19         So this particular e-mail in 67 is June 2011.  So it

20  not yet had been copyrighted with the United States Copyright

21  Office; and that's why, again, we don't believe these are at

22  all relevant.

23         Also, they're protected by 408.  This is -- like you

24  said, if you buy a bike and you sell it for a certain price,

25  you don't have to sell it to everyone for a certain price.

BELL - DIRECT/KENNEDY                    74

1          THE COURT:  Well, that's different than 408; but let

2    me make sure I understand what Mr. Overhauser is arguing for

3    these other e-mails, which is that you would like to introduce

4    them to show that the $200 is what he took to settle other

5    disputes, and so the value of it in this instance, regardless

6    of whether or not there's statutory damages or not, is $200?

7          MR. OVERHAUSER:  In essence, yes.  I would describe

8    it slightly differently.

9          THE COURT:  Yeah, please.

10         MR. OVERHAUSER:  I want to counter Mr. Bell's

11   evidence with regard to the value of the picture by showing

12   that an element of the purchase price in these SmugMug

13   licenses was the avoidance of a copyright infringement

14   lawsuit.  They were not arm's length transactions.

15         THE COURT:  Okay.  Well, that is expressly excluded

16   under 408, which says, "Evidence of the following is not

17   admissible on behalf of any party either to prove or disprove

18   the validity or amount of a disputed claim," which is what we

19   have here.  So you're trying to introduce those to dispute,

20   prove -- excuse me -- prove or disprove -- in this case

21   disprove $200 because it's not an arm's-length transaction, in

22   your words, which of course every litigation is because they

23   could certainly choose instead to go to trial, as your client

24   has done, the amount of a disputed claim.

25         MR. OVERHAUSER:  But Mr. Bell has already introduced

BELL - DIRECT/KENNEDY                    75

1  this spreadsheet, Exhibit 10, of the SmugMug transactions

2  showing they're at $200.  Having relied on that evidence so

3  far, we're entitled to counter that by showing the

4  circumstances of those licenses.

5          THE COURT:  Well, first of all, you stipulated to

6  that.  You had no objection to the admission to that.  So you

7  can't be heard to complain that you now have some objection to

8  it or that --

9          MR. OVERHAUSER:  I don't object to it.

10          THE COURT:  Yes, you are.

11          MR. OVERHAUSER:  I'm saying they opened the door.

12          THE COURT:  I don't know what they've relied on.

13  All they've done is introduce it.  I don't really know what it

14  said other than "Here it is."

15          What you're saying is that the amounts that are in

16  there -- when you say dispute it or counter it, again, that

17  you're going to dispute it based on why they paid $200 when

18  they're not even asking for $200 in this case?  Now, we're

19  getting into even relevancy.  So we've got a 408.  We've got

20  relevancy and we've got cumulative.  So I really don't know

21  where we're going.  I will think about that.  I will think

22  about the "retroactive" versus "perpetual"; and we should be

23  back here at oh, 1:15 so that we can talk about these things.

24  The jury will be back at 1:25.  We'll have them back in here

25  at 1:30.  All right.

BELL - DIRECT/KENNEDY                    76

1           Before I do that, anything else from the plaintiff
2      before we recess for lunch?
3           MS. KENNEDY:  No, Your Honor.  Thank you.
4           THE COURT:  Anything else from you, Mr. Overhauser,
5      for the defendant?
6           MR. OVERHAUSER:  No, Your Honor.
7           THE COURT:  So we're in recess until 1:15.
8           COURTROOM DEPUTY:  All rise.
9        *(A luncheon recess was taken.)*
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1           **A F T E R N O O N   S E S S I O N**

2      *(Jury out.)*

3           THE COURT:  Please be seated.  And we are back on

4      the record in 1:16-cv-1174.  The defendant is here.  The

5      plaintiff is not.

6           Mr. Rogers, could you look and see if they're out

7      there?

8           No?

9      *(A discussion was held off the record.)*

10          THE COURT:  All right.  We've been on the record

11     since 1:15, which is when I said we would be back on the

12     record.  We expect to start on time and not keep the jury

13     waiting.  So the next time I'll just start.  I haven't done

14     anything yet.

15          Let's talk about a couple things.  In the short time

16     we have remaining before we bring the jury in.

17          First of all, we need to tighten up the Rules of

18     Evidence and how we're doing things, which Ms. Kennedy, you

19     can't be testifying when you ask questions, and you can't be

20     leading Mr. Bell.

21          Mr. Bell, you can't just start answering questions

22     that aren't posed to you, all right?

23          MR. BELL:  All right.

24          THE COURT:  Also, the exhibits that are admitted,

25     they've been admitted without objection.  So you don't have to

1  keep asking me to publish them.  They've got the binders

2  there.  They can look at those, and you don't really need to

3  put them up here.  You can I guess, but just go ahead and do

4  it.

5          With respect to the -- I still need to -- I guess

6  we'll see what happens on the Rule 50 motions between the

7  parties with respect to "retroactivity" and "perpetual."

8  Those seem to be issues of contract interpretation unless

9  there was some problem with a meeting of the minds, which

10 might be a question of fact for the jury.  So we'll see how

11 that develops.

12         With respect to these previously excluded exhibits,

13 52 through 74, with the exception of 62, which is different in

14 character and 61 doesn't exist, but those ones that have to do

15 with these e-mail threads, they are going to remain excluded

16 under 403, 408, relevance, with the exception of 67; and at

17 the appropriate time when you offer those, I will consider --

18 or excuse me -- that one, 67, Mr. Overhauser, I will consider

19 it at the time to see, in fact, why you're using it.

20         My understanding is that you want to use this to

21 give some indication of what "perpetual" means and that it

22 means "retroactive."

23         Of course, I'm sure that the cross-examination on

24 that will be that there was no discussion between Mr. Bell and

25 Mr. Carmen on that and that accordingly, just the four corners

1   of the license agreement are what control here as opposed to

2   what some other party negotiated and an agreement that's

3   essentially just an addendum to the license for those e-mails,

4   which I don't think are alleged here; but we'll see when you

5   offer it, but only that one.  Does that make sense?  Is that

6   understandable?

7           MR. OVERHAUSER:  Can I just make one other comment?

8   There was one of those other licenses slash attempt at

9   settlement that I think would be admissible and that is 72.

10          THE COURT:  Hold on one second.  Let's make sure

11  that we're understanding on 67.

12          MR. OVERHAUSER:  Yes.  I understand 67, you will --

13          THE COURT:  When you offer it --

14          MR. OVERHAUSER:  Allow it to be offered, it and

15  you'll make a ruling at that time.

16          THE COURT:  She will make an objection, and I'll

17  rule on the objection; and it will be for the limited purpose.

18  And if it goes beyond that, then maybe I will have to do a

19  limiting instruction anyway.  Of course, that instruction

20  would be that the $200 cannot be considered as what would be

21  appropriate statutory damages in this case, just like that

22  can't -- those other e-mails can't be used for that under 408.

23          So now you're moving to what, 72?

24          MR. OVERHAUSER:  Seventy-two.

25          THE COURT:  Let me make sure, by the way, that's --

BELL - DIRECT/KENNEDY                    80

1  that you understand, Ms. Kennedy, that -- what's going to

2  happen with respect to 67?

3         MS. KENNEDY:  Yes, I believe I do, Your Honor.  Just

4  make an objection at the time after he tries to get it in?

5         THE COURT:  Right.  So we'll have to see what the

6  objection is.  Again, if it's for that limited purpose, I'll

7  probably allow it; and you can cross-examine on that.

8         Then 72, what's on 72?

9         MR. OVERHAUSER:  Seventy-two is the cease and desist

10  letter to a company called Diversified Vehicle Services and a

11  copy of their receipt for buying a license from SmugMug.

12  These are dated around July 5th of 2011.  At least the

13  purchase from SmugMug is.

14         That is admissible for an additional reason, which

15  is to counter Mr. Bell's testimony that people that purchase a

16  SmugMug license are required to put a copyright notice on

17  their web page.  So we see that Diversified Vehicle Services

18  bought a license.

19         There is also Exhibit 62, which is that one in the

20  middle of the range --

21         THE COURT:  I'm sorry.  So how does this show -- I

22  mean, you can either point to it being in the license or not

23  being in the license, right?  Is it in the license agreement

24  or is it not?

25         MR. OVERHAUSER:  Mr. Bell just testified a short

BELL - DIRECT/KENNEDY                    81

1   time ago that it was in the license.  I don't agree with that.

2              THE COURT:  We have a copy of the license, don't we?

3              MR. OVERHAUSER:  Yeah, we have a copy of that.

4              THE COURT:  And this is 2011.  Do we have a copy of

5   the 2011 license?

6              MR. OVERHAUSER:  It's the same.  I trust --

7              THE COURT:  Where does this talk about -- where does

8   this talk about attribution or not?

9              MR. OVERHAUSER:  Well, I don't think it does; but

10  Mr. Bell testified --

11             THE COURT:  Seventy-two, where does Exhibit 72 talk

12  about that?

13             MR. OVERHAUSER:  Seventy-two just reflects the

14  purchase of the license through SmugMug.

15             THE COURT:  All right.

16             MR. OVERHAUSER:  Okay.  And Mr. Bell testified

17  earlier that the reason it was important for all of these

18  people to have a license is because they would be required to

19  display the copyright notice on the picture on their website.

20             Well, 62 is a copy of a web page to the person that

21  bought that license --

22             THE COURT:  Seventy-two or 62?

23             MR. OVERHAUSER:  Sixty-two is the web page from 2018

24  of Diversified Vehicle Services, and it shows that a version

25  of the picture that was used does not have Mr. Bell's

BELL - DIRECT/KENNEDY                    82

1  copyright notice on it.  So it shows that he allows people

2  that purchase the SmugMug license to use a copy that does not

3  have his copyright notice on it.

4           THE COURT:  So we went from 72 to 62.

5           MR. OVERHAUSER:  Correct.

6           THE COURT:  So you're talking about both of those?

7           MR. OVERHAUSER:  Both of those I think should be

8  admitted.  I will offer to admit them later.

9           THE COURT:  All right.  But how does 62 show that he

10 doesn't require that?

11          MR. OVERHAUSER:  It shows that he's not requiring

12 his licensee to comply with the purported requirement that his

13 picture have a copyright notice on it.

14          THE COURT:  First of all, why does that matter?

15 What element of his claim does he have to have -- I thought

16 what he was saying was -- and correct me if I'm wrong -- that

17 he was pointing out that his copyright notice, which appeared

18 on the website after a certain time on the picture, was not on

19 there; and, therefore, it was not the one that was purchased

20 by that license, right?

21          MR. OVERHAUSER:  Well, what he is arguing is that

22 infringement is willful, if you will, because the picture that

23 appears on the website excludes his copyright notice; and

24 that's exactly the type of picture without a copyright notice

25 that is on 62, which is of Diversified Vehicle Services.

BELL - DIRECT/KENNEDY                    83

1          THE COURT:  But what does that have to do with him?

2    Do you know if he has some other deal with Diversified Vehicle

3    Services?  Do you know what the terms --

4          MR. OVERHAUSER:  My understanding is that he does

5    not.

6          THE COURT:  Your understanding from what?

7          MR. OVERHAUSER:  From having represented Diversified

8    Vehicle Services and consulted with them with regard to how to

9    resolve this dispute with Mr. Bell by acquiring a license.

10         THE COURT:  So you're saying that Diversified

11   Vehicle Services said that they didn't have to put their

12   copyright notice on there or they did have to put the

13   copyright notice on there or that it was never discussed with

14   them or what?

15         MR. OVERHAUSER:  What I'm saying is that they did

16   not put the copyright notice on there, and that was just fine

17   with Mr. Bell, notwithstanding his testimony today in which he

18   said he requires everybody that uses it to use a version of

19   the copyright --

20         THE COURT:  Where does it say in this document that

21   was just fine with him?

22         MR. OVERHAUSER:  We have deposition testimony to

23   that effect in which I asked him during his deposition, "If

24   you want your copyright notice on all of the pictures, why

25   didn't you require it to be on Diversified Vehicles"?  And he

BELL - DIRECT/KENNEDY                    84

1  had no explanation.

2          THE COURT:  Okay.  Ms. Kennedy?

3          Let me back up though.  Why does it make a

4  difference?

5          MR. OVERHAUSER:  Because Mr. Bell is somehow

6  claiming as damages or higher damages or willful infringement

7  damages that because Chris Carmen did not include a copy of

8  the picture that had the copyright notice on it.  Well, how

9  can Mr. Carmen be subject to higher damages if Mr. Bell allows

10 that to happen freely?

11         THE COURT:  I thought he was arguing higher damages

12 because it was still up there two years after he sent him a

13 cease and desist letter.

14         MR. OVERHAUSER:  Well, he's arguing that, and that

15 will be disproven; but that is an additional reason, I mean,

16 why these Exhibits 62 and 72 are admissible.

17         THE COURT:  Ms. Kennedy?

18         MS. KENNEDY:  Your Honor, we obviously disagree with

19 Mr. Overhauser's characterization of the deposition in regards

20 to Diversified.  If it does come in, Mr. Bell can clear that

21 up on the stand; but again, that's another matter, another

22 case.

23         THE COURT:  All right.  These are excluded right

24 now.

25         Now, if you want to ask him if there are other

1   instances where he knowingly let somebody not have that

2   copyright notice on there, you can ask him.  If he says, "No,

3   it never happened," then you can use this to impeach him or to

4   refresh his memory.

5           And then if it comes in at that point, you can

6   rehabilitate him on redirect or recross or wherever it is in

7   the heck we are at the time.  Okay?  Does that make sense?

8           MS. KENNEDY:  Yes, Your Honor.

9           MR. OVERHAUSER:  Yes, Your Honor.

10          THE COURT:  So just ask him, and he'll answer your

11  question; and if you want to talk specifically about that,

12  then we'll take that up at the time.  All right?

13          MR. OVERHAUSER:  Thank you.

14          THE COURT:  Okay, anything else?

15          MR. OVERHAUSER:  Your Honor, you indicated that

16  these other license agreements would be inadmissible.  Would

17  now be an appropriate time for me to make an offer of proof as

18  to them?

19          THE COURT:  You're talking about the ones that I

20  just said under 403, 408, and relevancy?

21          MR. OVERHAUSER:  Yes, Your Honor.

22          THE COURT:  Yeah, sure.

23          MR. OVERHAUSER:  Thank you.

24          Your Honor, I would offer -- make an offer of proof

25  with respect to exhibits -- let me see -- 52 through 60 and 62

BELL - DIRECT/KENNEDY                        86

1   through 74.  Each of these exhibits show a cease and desist

2   letter from Mr. Bell -- cease and desist e-mail from Mr. Bell

3   to various persons that he alleges were infringing his

4   copyright, and they also show that those individuals purchased

5   a license from smugmug.com.  We believe that is relevant

6   because the purchase of the smugmuglicense.com with respect to

7   all of these recipients resolved all preceding claims of

8   infringement by Mr. Bell.  Therefore, they are probative on

9   the issue of whether the SmugMug terms of license, in fact,

10  acted retroactively.

11          THE COURT:  But I thought we already covered that,

12  that those e-mails were essentially addendum to the license;

13  and those were an agreement between those parties, right?  And

14  so those are agreements which are expressly covered by 408,

15  compromise offers and negotiations.  I don't think that you've

16  told me anything that you didn't already tell me either in the

17  final pretrial conference or earlier today with respect to how

18  you want to use these, which is to show that these offers of

19  compromise -- first of all, what you told me before was you

20  wanted to use it to show the $200 is the proper measure of

21  damages; but now you've been talking about the issue of

22  retroactivity.

23          You talk about -- I mean, that is using it to prove

24  or disprove the validity or the amount of the disputed claim.

25  The amount, of course, would be the $200; and then the

BELL - DIRECT/KENNEDY                87

1   validity would be the fact that it's not a valid claim of

2   infringement because it was retroactive based on it being

3   retroactive in these prior settlement compromise offers,

4   negotiations or whatever.  So it seems to be the exact same

5   thing.

6           So I'm still going to rule that those are

7   inadmissible under 408, but in addition, as I said, under 403.

8   I mean, the danger of confusion, the undue delay, wasting

9   time, cumulative evidence for that number of things that,

10  again, are with different parties; and so those are excluded.

11  You get 67, and then as I said on those other two -- let me

12  make sure I marked those.  Those were 62 and 72?

13          MR. OVERHAUSER:  Yes, Your Honor.

14          THE COURT:  Is that right?  Okay.  So those will be

15  a contemporaneous objection or offer, and then I'll see what

16  the objection is.  Same with 67; but at least you can offer

17  those, whereas you've made your record on these other ones

18  both at the pretrial conference and here in court both this

19  morning and now; and I don't see any difference to that.

20          Now -- okay.  Thank you.  All right.  Anything else

21  before we bring the jury in?

22          MS. KENNEDY:  No, Your Honor.

23          THE COURT:  Anything for you, Mr. Overhauser?

24          Mr. Overhauser, are you ready for the jury?

25          MR. OVERHAUSER:  Yes, Your Honor.

BELL - DIRECT/KENNEDY                           88

1          THE COURT:  All right.

2          Mr. Bell, you can get back up here, please, sir, so

3     we're ready to go.

4       (Jury in.)

5          THE COURT:  Please be seated.  Ladies and gentlemen

6     of the jury, welcome back.  Hope you had a good lunch.  We had

7     to discuss some things.  Sorry to keep you waiting.

8          While you were at lunch, did anybody discuss this

9     case among yourselves?  With anybody else?  See or hear

10    anything about the case?  Do any research about the case?

11    Seeing everyone answering "no," please proceed.  And recall

12    that we were on the direct examination of Mr. Bell.

13         MS. KENNEDY:  Thank you, Your Honor.

14    BY MS. KENNEDY:

15    Q   Mr. Bell, if you would, and the jury also, we ask that you

16    turn to Exhibit 19 and also Exhibit 20, which is right behind

17    it.

18         Mr. Bell, are you familiar with Exhibit 19?

19    A   I am.

20    Q   What are these e-mails -- what does this e-mail thread

21    entail?  Who is it between?

22    A   Well, you actually have to go to the second page of the

23    e-mail.  Actually, it starts at the bottom of -- no, I'm

24    sorry.  It starts at the top of the page, and it was dated --

25    let me see if I have this date correct.

BELL - DIRECT/KENNEDY                        89

1          I apologize.  It's the middle of the page, and it's --

2    it starts off from myself on April 9th of 2018.  And it's a

3    letter -- or it's e-mail that I sent to chutzpah, which based

4    upon my research from Google Images, it showed that chutzpah

5    had one of my photographs.

6    Q    Okay, Mr. Bell, I'm going to slow you down just to break

7    it up a little bit.  So briefly, to the jury, could you

8    explain the process of searching on Google Images for people

9    infringing upon your Indianapolis photo?

10   A    Right.  I put my image in Google Images question, and it

11   will pop up -- it will literally come back and tell me

12   everybody that has that photograph on their website.

13   Generally speaking, it works pretty good.

14   Q    Did you find HubSpot to be one of these infringers?

15   A    I did, in 2018.

16   Q    In 2018?  So was this e-mail, Exhibit 19, in response to

17   you finding the Indianapolis photo on HubSpot's website?

18   A    Yes.

19   Q    And if you could turn to Exhibit 20.  Is that an accurate

20   depiction of the Indianapolis photo on HubSpot's website as

21   you had found it in 2018?

22   A    It is.

23   Q    So Mr. Bell, from initial glance, did you think HubSpot

24   was a separate and different infringer than Carmen Commercial?

25   A    I did.

BELL - DIRECT/KENNEDY                    90

1  Q   So you sent them an e-mail similar to the one in

2  Exhibit 21 that you had sent to Carmen Commercial?

3  A   Yes, that's correct.

4  Q   That would be the content of Exhibit 19, page 2, pretty

5  much?

6  A   Correct.

7  Q   And did you hear back from HubSpot via e-mail?

8  A   Yeah.  I got an e-mail back from their general counsel,

9  their corporate counsel, Matthew Kelly, which is at the top of

10 Exhibit 19, in which he informs me that the image in question

11 was posted by one of our customers, Carmen Commercial Real

12 Estate, found here; and then it gives the website, which

13 happens to be the website of Carmen Real Estate.

14         So anyway, he directed me that if I have any issues

15 with this, to go to Carmen Commercial.

16         What was disturbing to me was that here it was in

17 2018, two years after I had filed suit, that they had posted

18 another one.

19 Q   When you say "they posted another one," who do you mean

20 "they"?

21 A   Carmel -- Carmen Commercial.

22 Q   Carmen Commercial you said "posted another one."  What do

23 you mean "another one"?

24 A   Another infringement.

25 Q   Of the Indianapolis photo?

BELL - DIRECT/KENNEDY                    91

1   A    Yes.

2   Q    And was this infringement on a whole separate website?

3   A    Yes.

4            MR. OVERHAUSER:  Objection, Your Honor.  She keeps

5   referring to this as an infringement, which is a legal

6   conclusion.

7            THE COURT:  Sustained.

8   BY MS. KENNEDY:

9   Q    Was this Indianapolis photo without your copyright symbol

10  on it as depicted in Exhibit 20 on another website?

11  A    Yes.

12  Q    And you testified this was nearly two years after you

13  filed a lawsuit against Carmen Commercial?

14  A    That's correct.

15  Q    Were you surprised or shocked that there continued to

16  seemingly be more posts of your photo by Carmen Commercial?

17  A    Yes.

18  Q    Do you recall if you reached out to Carmen Commercial or

19  Carmen Commercial's attorney at that time?

20  A    I'm not sure I did.  I just listed it as another item that

21  we needed to talk to when we had a discussion about this.

22  Q    So based on earlier testimony, I think we have gotten most

23  exhibits in.  Let's now turn the focus towards Christopher

24  Carmen.

25  A    Correct.

BELL - DIRECT/KENNEDY                    92

1  Q   At some point in this lawsuit, which -- do you recall the

2  date that you filed the lawsuit?

3  A   Sometime in May.

4  Q   Early May 2016?

5  A   Yeah.

6  Q   Did Mr. Christopher Carmen attempt to purchase a license

7  to use the Indianapolis photo?

8  A   He did.

9  Q   Ladies and gentlemen of the jury and also Mr. Bell, I ask

10  you to turn to Exhibit 22.  This appears to be a SmugMug

11  purchase --

12          MR. OVERHAUSER:  Objection, Your Honor.

13          THE COURT:  Sustained.

14  BY MS. KENNEDY:

15  Q   Mr. Bell, do you have Exhibit 22 in front of you?

16  A   I do.

17  Q   Do you recall this document?

18  A   Yes, I do.

19  Q   Could you read to the jury at the top of the document who

20  this e-mail was sent to?

21  A   SmugMug sent it to Chris Carmen.

22  Q   Is Chris Carmen the defendant in this case?

23  A   He is not.

24  Q   The defendant in this case is Carmen Commercial Real

25  Estate; is that correct?

BELL - DIRECT/KENNEDY                    93

1  A    That's correct.

2  Q    And on Exhibit 22, it says, "Here's what you ordered"; is

3  that correct, Mr. Bell?

4  A    That's correct.

5  Q    And when they say "you," again, who is this e-mail sent

6  to?

7  A    Chris Carmen.

8  Q    Mr. Bell, throughout your sales of the Indianapolis photo

9  on richbellphotos.com, have you become familiar with the terms

10 of the commercial download license --

11 A    Yes, very much so.

12 Q    Okay.  Ladies and gentlemen of the jury and Mr. Bell, I

13 ask that you turn to Exhibit 9.

14      Mr. Bell, are these the terms of the commercial

15 download license from SmugMug?

16 A    They are.

17 Q    Mr. Bell, could you read the first sentence of the second

18 paragraph after the bullet points to the jury?

19 A    "The buyer may not resell, relicense, redistribute without

20 express written permission from the content provider."

21 Q    Mr. Bell, are you the content provider?

22 A    I am.

23 Q    And who do you believe to be the purchaser of the SmugMug

24 license?

25 A    Chris Carmen.

BELL - DIRECT/KENNEDY                    94

1   Q    Was Mr. Carmen the buyer of that license?

2   A    Yes.

3   Q    So does that line apply to Mr. Carmen?

4   A    That's correct.

5   Q    So Mr. Carmen never had your permission to transfer,

6   assign or sell or redistribute the license to use the

7   Indianapolis photo to Carmen Commercial Real Estate?

8   A    I never got contacted by it -- about any kind of transfer,

9   and he certainly didn't have my permission.

10  Q    Now, Mr. Bell, after you became aware of Exhibit 22,

11  Mr. Carmen's purchase of a photo, did you contact Carmen

12  Commercial or Carmen Commercial's attorney?

13  A    I did because I got -- I think I got a letter before that

14  from Mr. Overhauser indicating that he -- he said that he was

15  going to argue that the license was retroactive and would wipe

16  out his client's prior copyright infringement.

17  Q    And if you could and, ladies and gentlemen of the jury,

18  turn to Exhibit 23, is that an accurate depiction of the

19  letter and returned check that you sent to Mr. Overhauser

20  after Exhibit 22?

21  A    Yes.  I basically informed Mr. Overhauser that because he

22  had misinterpreted the license and that he was going to argue

23  that it was retroactive, that I was going to cancel it, that

24  his client would no longer be able to use -- he was going to

25  get his $200 back; and he was not going to be able to use the

BELL - DIRECT/KENNEDY                    95

1   license.

2   Q   So you sent back a check?

3   A   I certainly did.

4   Q   And is that check included in this Exhibit 23?

5   A   It is.

6   Q   Now, I note some of it has been blacked out.  Is that

7   because you had communication about other issues with

8   Mr. Overhauser?

9   A   That's correct.

10  Q   That has nothing to do with these cases -- this case?

11  A   Correct.

12  Q   So the date on your check indicates that you wrote it on

13  June 1st, 2016?  Is that what you recall?

14  A   I do recall that.

15  Q   And then the last page of Exhibit 23 appears to be a

16  receipt from the post office showing that you sent this check

17  and letter June 1st, 2016?  Is that what you recall?

18  A   That's correct.  I sent it certified mail to

19  Mr. Overhauser.

20  Q   And Mr. Bell, do you recall if after that time -- so after

21  June 1st, 2016, Carmen Commercial Real Estate posted your

22  Indianapolis photo on their website or others?

23  A   Yes.

24  Q   Do you know how long after you had returned this check

25  that they did that?

BELL - DIRECT/KENNEDY                    96

1  A    About two years.

2  Q    Two years?

3        Okay.  Ladies and gentlemen of the jury and also

4  Mr. Bell, I ask you guys to turn to Exhibit 24.  It's rather

5  long, but we're going to go through it quickly.

6        Mr. Bell, what is this exhibit exactly?

7  A    It's a exhibit of the website, with the second page being

8  the photograph of the -- the Indianapolis photograph and then

9  how you go about buying it.

10 Q    So it accurately depicts the process of purchasing the

11 Indianapolis photo for commercial download?

12 A    Yeah, step by step.

13 Q    Who was the person who actually purchased this to get this

14 progression shot?

15 A    You.

16 Q    Yes.

17       So on page 1, it says "Indiana Indianapolis Gallery."

18 Is that where the Indianapolis photo was located?

19 A    It is.

20 Q    Okay.  And Mr. Bell, on page 2, is this the photo that

21 Carmen -- Christopher Carmen attempted to purchase in

22 Exhibit 22?

23 A    He did.

24 Q    In this photo on page 2, do you see your copyright symbol?

25 A    Yes.

BELL - DIRECT/KENNEDY                    97

1   Q    Where is that located?

2   A    Far right side.

3   Q    Far right side?

4   A    Bottom.

5   Q    "Rich Bell copyright symbol"; is that it?

6   A    Yes.

7   Q    In fact, throughout these progression shots, does your

8   copyright symbol appear the entire time throughout the buying

9   process?

10  A    It does.  And if I could -- I think the license is in here

11  and --

12           MR. OVERHAUSER:  Objection, nonresponsive.

13           THE COURT:  Sustained.

14  BY MS. KENNEDY:

15  Q    All right, Mr. Bell.  So I'm scrolling through these.  I

16  see your copyrighted symbol.

17           Moving along to "downloads," which is about page 5 of

18  Exhibit 24, it gives the option, I believe -- you tell me --

19  of either personally downloading the photo or commercial photo

20  license?

21  A    Yes.

22  Q    To your knowledge, do you know which license Christopher

23  Carmen attempted to purchase in Exhibit 22?

24  A    The commercial license.

25  Q    And the next page appears to have some prices and

BELL - DIRECT/KENNEDY                    98

1  resolutions.  Does that appear correct?

2  A   Yeah.

3  Q   And you see that 200-dollar value?

4  A   Yes.

5  Q   And is that the same value that you returned to Mr. Carmen

6  by check June 1st?

7  A   Yes.

8  Q   And again, while scrolling through this, you continue to

9  see your copyright photo in the bottom right-hand corner?

10 A   Yes.  In fact, the --

11          MR. OVERHAUSER:  Objection, Your Honor.

12 Nonresponsive again.

13          THE COURT:  Sustained.  Mr. Bell, you've got to wait

14 until you're asked a question.

15          THE WITNESS:  All right.

16 BY MS. KENNEDY:

17 Q   Now, a little bit further down the line after "single

18 photo download," the next page shows "Commercial photo

19 license."  Do you see that, Mr. Bell?

20 A   Yes.

21 Q   And about halfway through that page, it says, "Terms of

22 commercial use license"?

23 A   Yes.  In fact, it tells you what you can do, and in

24 particular, the reason why --

25          MR. OVERHAUSER:  Objection, Your Honor.

BELL - DIRECT/KENNEDY                    99

1  BY MS. KENNEDY:

2  Q   Mr. Bell, do you see on the page where it says what you

3  can do, also what you cannot do?

4  A   Yes.

5  Q   So a interested buyer who's going through the process of

6  buying gets the terms fairly spelled out to them as they're

7  buying this photo; would you agree?

8  A   Yes.

9  Q   Mr. Bell, could you read under, "What you may not do" --

10 it's at the bottom of the commercial license terms.  Could you

11 read the first paragraph or first line?

12 A   Yeah.  "Photographer or videographer" --

13 Q   I'm sorry, Mr. Bell, what you can't do, what you may not

14 do.

15 A   Oh, I'm sorry.

16      "You may not resell, relicense, redistribute without

17 express written permission from the content provider."

18 Q   And Mr. Bell, are you the content provider in this case?

19 A   Yes.

20 Q   You provided the photos on SmugMug?

21 A   Correct.

22 Q   And you just read to the jury that you may not resell,

23 relicense, redistribute without express written permission?

24 A   Correct.

25 Q   Did you ever provide Carmen Commercial with written --

BELL - DIRECT/KENNEDY                          100

1   express written permission to resell, redistribute, or assign

2   this license?

3   A    No.

4   Q    Did you, in fact, do the opposite?

5   A    Yes.

6   Q    Okay.  And Mr. Bell, could you briefly keep scrolling

7   through Exhibit 24 onto the shopping cart.

8   A    Yes.

9   Q    It is very, very small; but looking at the photo in the

10  shopping cart, do you see your copyright symbol?

11  A    Just barely.

12  Q    Is it in the lower right hand, top left?  Where do you see

13  it?

14  A    Lower right-hand corner.

15  Q    Now, in the third to last page of Exhibit 24, it allows

16  you to download the photo after you have made an order.  Is

17  that the process as you know it?

18  A    Right.

19  Q    And then the second to last page shows, does that -- do

20  you believe that shows the photo that gets downloaded once you

21  have purchased the license?

22  A    Yes.

23  Q    And could you read the title without the numbers of that

24  photo, second to last page -- third to last page, I

25  apologize -- on Exhibit 24?

BELL - DIRECT/KENNEDY                          101

1   A    Yeah.  It says, "Indianapolis Skyline From Canal

2   Pictures."

3   Q    To the best of your recollection and what you've testified

4   to today, is that the photo that you submitted to the U.S.

5   Copyright Office?

6   A    It is.

7   Q    So throughout this entire buying process, Mr. Bell, is it

8   your opinion that the copyright symbol must appear in the

9   right-hand corner of the Indianapolis photo?

10  A    Yeah.  In fact, it says so in the license agreement.

11  Q    Okay.  Mr. Bell, let's now turn back to Exhibit 9, which

12  is the terms of the commercial download license from

13  smugmug.com.  Would you please read the first line of that

14  "terms and conditions," specifically paying attention to

15  "accompanying image"?

16  A    "Photographer or videographer (content provider) grants

17  you a perpetual, nonexclusive, nontransferable worldwide

18  license to use the accompanying image."  In other words, the

19  image that you are buying is the accompanying image; and

20  therefore, it must have the copyright notice on it because

21  that's the only one that they're getting the license for.

22  Q    And Mr. Bell, on Exhibit 24, throughout the entire buying

23  process as we just went through, is that Indianapolis photo

24  the accompanying image that Mr. Carmen alleges that he bought?

25  A    Yes.

BELL - DIRECT/KENNEDY                                102

1  Q   Yet, do you ever see the accompanying image purchased

2  throughout the process of Exhibit 24 and Exhibit 22 on Carmen

3  Commercial's website?

4  A   No.

5  Q   Why not?  What's the difference of the photo on the

6  website and the difference of the photo pictured in

7  Exhibit 24?

8  A   It has his copyright notice.  It does not have my

9  copyright notice.

10 Q   So the photo is missing "Rich Bell copyright symbol" --

11 A   Yeah.

12 Q   -- on Carmen Commercial's website?

13 A   Right.

14 Q   And also on HubSpot?

15 A   Yes.

16 Q   Mr. Bell, could you explain a little bit more about your

17 purpose of Exhibit 23, the letter dated or at least sent

18 June 1st, 2016, and mailed to defendant's counsel?

19 A   Well, as I explained earlier, since he misunderstood the

20 terms and conditions of the license and that he wanted to

21 apply it retroactively to wipe out his past infringement, I

22 was not going to accept that.  I sent his $200 back to him.

23 Q   Is it fair to say that you and Mr. Carmen or Mr. Carmen's

24 counsel -- Carmen Commercial's counsel had a misunderstanding

25 of the terms of the license?

BELL - DIRECT/KENNEDY                103

1        MR. OVERHAUSER:  Objection.  Calls for speculation.

2        THE COURT:  Ask him what his understanding was.

3   BY MS. KENNEDY:

4   Q   What was your understanding --

5        MS. KENNEDY:  Thank you, Your Honor --

6   BY MS. KENNEDY:

7   Q   -- of the license purchased by Christopher Carmen,

8   Mr. Bell?

9   A   As I just testified, it was not retroactive.

10  Q   And there's nothing in writing between you and the

11  defendant or even you and Mr. Carmen saying that the license

12  is retroactive?

13  A   That's correct.

14  Q   Okay, Mr. Bell, we're wrapping up.  Was any of Carmen

15  Commercial's use of your photo in your opinion fair use?

16  A   No.

17        MR. OVERHAUSER:  I'm sorry.  Calls for a legal

18  conclusion.  Move to strike the answer.

19        THE COURT:  Sustained.

20        MS. KENNEDY:  I can rephrase.

21  BY MS. KENNEDY:

22  Q   Mr. Bell, to your knowledge is Carmen Commercial a news

23  reporter?

24  A   No.

25  Q   Are they -- is Carmen Commercial an educator?

BELL - DIRECT/KENNEDY                          104

1  A    No.

2  Q    Is Carmen Commercial a non-for-profit business?

3  A    No.

4  Q    Why was the Indianapolis photo on Carmen Commercial's

5  website?  Was it for those purposes of news, religion,

6  nonprofit, to your opinion?

7          MR. OVERHAUSER:  Objection.  Calls for speculation

8  as to why.

9          THE COURT:  Sustained.  You can rephrase.

10 BY MS. KENNEDY:

11 Q    Mr. Bell, so as you testified earlier, Carmen Commercial

12 to your knowledge was not a news reporter?

13 A    No.

14 Q    One more question.  Have you ever released Carmen

15 Commercial, the defendant in this case -- released them from

16 liability for copyright infringement?

17          MR. OVERHAUSER:  Objection.  Calls for a legal

18 conclusion.

19          MS. KENNEDY:  Let me rephrase.

20          THE COURT:  Why don't the parties approach.

21     (Beginning of bench conference.)

22          THE COURT:  What she's asking -- my understanding is

23 she's asking if he gave a release.  He's going to say, "No."

24 You're going to come back and say, "Didn't you give something

25 to these Realtors?"  Is that right?

1          MR. OVERHAUSER:  Correct.

2          THE COURT:  What's the legal conclusion with whether

3   or not he gave him a release?  I guess she can rephrase it.

4          MR. OVERHAUSER:  Whether he got a release --

5          MS. KENNEDY:  He's not a "he."  You've got to

6   remember that.

7          THE COURT:  You speak to me.  You speak to me.

8          MR. OVERHAUSER:  Whether Carmen Commercial got a

9   release is a legal conclusion derived by the facts regarding

10  the contents of the settlement agreement.  It's an ultimate

11  legal issue.

12         THE COURT:  "The release" also is a common term.

13  "I'm handing you this release" or whatever and then you look

14  at what's in it."  I guess you could ask if he ever -- you've

15  already asked if it was retroactive.

16         MS. KENNEDY:  Right.

17         THE COURT:  "Did you ever have an agreement that you

18  wouldn't sue for past damages or past -- you wouldn't sue

19  him?"  I don't know how you do it unless you say you release

20  them from any -- I mean, it's not really a legal conclusion.

21  How would you pose to rephrase it?

22         MS. KENNEDY:  It's hard without saying the word

23  "infringement."  It's just one question basically saying was

24  it fair use and was it a release?

25         THE COURT:  I guess you could ask this, couldn't

BELL - DIRECT/KENNEDY                    106

1  you, Mr. Overhauser?  "Do you feel that there was unauthorized

2  use of your photograph?  Did you ever tell him that you

3  wouldn't pursue that unauthorized -- what you perceived to be

4  an unauthorized use?"  That's a lot of words to say the same

5  thing.  Any objection to that?

6          MS. KENNEDY:  That would be great, Your Honor.

7          THE COURT:  No, I'm asking Mr. Overhauser if he's

8  got any objections to that.

9          MR. OVERHAUSER:  I would not object, Your Honor.

10      *(End of bench conference.)*

11  BY MS. KENNEDY:

12  Q   Mr. Bell, do you feel that there was unauthorized use of

13  your photo in this matter?

14  A   Yes.

15  Q   Did you ever tell Carmen Commercial that you wouldn't

16  pursue them in court or them in a lawsuit?

17  A   No.

18  Q   Okay.  Lastly, you're asking for damages in this case?

19  A   That's correct.

20  Q   For up to $150,000?

21  A   That's correct.

22  Q   Could you please explain that request?

23  A   Well, first of all --

24          MR. OVERHAUSER:  Objection, calls for a narrative.

25          THE COURT:  It's direct examination.  It's an

1  open-ended question.  Go ahead.

2  A   I counted.  There were three years of infringement before

3  I notified him.  And somebody could say, "Well, that was

4  innocent."

5         But after the fact that I notified him, after I

6  notified him in 2016, he continued to infringe.  He never --

7  the defendant never purchased a license, and their attempt to

8  make the license retroactive is simply wrong.  And then to

9  continue to infringe for two more years, including two more

10 posts that -- one after I filed suit and one as late as 2018,

11 with the third party, is outlandish.  It's all intentional.

12 You can't pass it off as being innocent when you continue to

13 infringe for that long.

14 BY MS. KENNEDY:

15 Q   And Mr. Bell, are there any other intentional acts that

16 you believe constitute willful infringement as far as your

17 request for $150,000?

18 A   Well, I think there are three -- there are three specific

19 infringements that -- or four, four that we've talked about.

20 They're in the record right now.  You know, how many more do

21 you need?

22        MS. KENNEDY:  I believe that's all the questions I

23 have for you, Mr. Bell.  Thank you.

24        THE COURT:  All right.  Any cross-examination?

25        Mr. Overhauser, we're going to move that back to

*BELL – CROSS/OVERHAUSER*                              108

 1   where it should be.

 2          Apologize for that, Ms. Kennedy, that we didn't get

 3   it back.

 4                        **CROSS-EXAMINATION**

 5   BY MR. OVERHAUSER:

 6   Q   Mr. Bell, I'm displaying on the monitor Exhibit 13.  Can

 7   you tell me why you think this shows infringement by Carmen

 8   Commercial?

 9   A   Well, it's an identical picture to mine, same picture that

10   I registered with the copyright office.

11   Q   And do you claim that this -- I think I heard you testify

12   that you claim that this exhibit showed infringement; but this

13   is from the Wayback Machine on August 1, 2013, correct?

14   A   That's correct.

15   Q   So this is an incident of what you claim is infringement,

16   but it occurred before you contacted Carmen Commercial; is

17   that correct?

18   A   Yeah.

19   Q   I just want to make sure we're clear.

20          Then let me show you Exhibit 14, and I believe you

21   testified that you thought this showed an additional instance

22   of infringement; is that correct?

23   A   I don't know that I said additional infringement.  I

24   said -- as to this particular one, this showed that third

25   parties could copy it.

*BELL - CROSS/OVERHAUSER*                                109

1   Q    So this is basically the same infringement that is shown

2   in Exhibit 13.  Is that your testimony?

3   A    Yeah.

4   Q    And then let me show you Exhibit 15.  Is this an exhibit

5   that you claim occurred after you notified Carmen Commercial

6   that you thought it was infringing?

7             MS. KENNEDY:  Your Honor --

8             THE COURT:  Please stand up -- Mr. Overhauser is

9   kind of in the way there.

10            MS. KENNEDY:  Objection, Your Honor.  I do believe

11  Exhibit 15 should -- or actually, I withdraw.  I do believe

12  this one was missing the label.  I just want to make sure that

13  actually was, in fact, Exhibit 15.

14  A    I think --

15            THE COURT:  Hold on.  Let me rule here.

16            So the objection is withdrawn; is that right?

17            MS. KENNEDY:  Yes, Your Honor.

18            THE COURT:  All right.

19            Do you understand the question?

20            THE WITNESS:  Yeah.  I think so.

21            No, it says down at the bottom 4-21, which is

22  different than -- I mean, it's sooner than I filed suit, which

23  was the next month.

24            THE COURT:  I'm sorry, which exhibit is this, 15?

25            THE WITNESS:  Fifteen.

*BELL – CROSS/OVERHAUSER*                                110

1  BY MR. OVERHAUSER:

2  Q   So Exhibit 15 does not show infringement after you

3  supposedly put Carmen Commercial on notice, correct?

4  A   That's correct.

5          It shows infringement but not --

6          THE COURT:  I'm sorry, what was your answer?

7          THE WITNESS:  It shows infringement but not after

8  the day I filed suit.

9  BY MR. OVERHAUSER:

10 Q   Now, let me show you again Exhibit 16.

11 A   Yeah.

12 Q   Is this one that you testified you think demonstrates

13 infringement after you notified Carmen Commercial of your

14 objections?

15 A   Let me make sure.

16         Yes.

17 Q   Okay.  How does this show infringement by Carmen

18 Commercial after you reported your objections to him?

19 A   If you'll look at the second page of that exhibit, I filed

20 suit in May of 2016; and it says right there --

21         THE COURT:  Sixteen?  Exhibit 16?

22         THE WITNESS:  Yeah.

23         THE COURT:  Are there two pages to this?

24         MR. OVERHAUSER:  My Exhibit 16 has just one page.

25         THE COURT:  Mine does, too.

BELL - CROSS/OVERHAUSER                    111

1            THE WITNESS:  I have three pages.

2            THE COURT:  For 16?

3            Show the top of that, Mr. Overhauser where it shows

4   the picture.

5            Is that your first page of 16?

6            THE WITNESS:  No.

7            Oh, I'm sorry.  I'm on 17.  I apologize.  Let me go

8   back to 16.

9            No, you're right.  Sixteen is not before the lawsuit

10  was filed.  It is before the lawsuit was filed.

11  BY MR. OVERHAUSER:

12  Q   In fact, it's before you sent an e-mail to Mr. Bell isn't

13  it -- I'm sorry -- an e-mail to Mr. Carmen complaining about

14  infringement, correct?

15  A   If you could refresh my recollection on the date of the

16  e-mail.  I know this is April 21 it says at the top.

17  Q   This is not evidence of infringement after you put Carmen

18  Commercial on notice of your objections, correct?

19  A   Correct.

20  Q   And let me show you again Exhibit 17.

21  A   Right.

22  Q   And do you claim Exhibit 17 is evidence of infringement

23  after you put Carmen Commercial on notice?

24  A   I certainly do.  You look at page 2.

25  Q   Okay.

*BELL - CROSS/OVERHAUSER*                                      112

1  A   Page 2 says that this was posted, including my photo, on

2  7-6, 7-19-2006.  That is two months after I filed suit.

3  Q   But it is also two months after a license was purchased,

4  wasn't it?

5           THE COURT:  I'm sorry.  Is that 2006 or 216.

6           THE WITNESS:  216.

7           THE COURT:  Sorry.  Go ahead.

8  A   A license was never purchased by Carmen Commercial.

9  BY MR. OVERHAUSER:

10 Q   Well, that will be an issue for the jury to decide; but

11 just so we are clear, you were previously shown an e-mail

12 confirmation of a license purchase from SmugMug dated

13 May 12th, 2016, correct?

14 A   To Carmen -- to Chris Carmen, not Carmen Commercial.

15 Q   Well, we'll get into that later; but at any rate, that

16 license purchase, whoever it was made to, occurred before the

17 date of this posting, which has July 19, 2016, correct?

18 A   Again, I sent my money back --

19 Q   That's just a yes or no question, Mr. Bell.  The date of

20 this posting, 7-19-2016, is two months after a license

21 purchase, correct?

22 A   A license purchased by Chris Carmen, not Carmen

23 Commercial.  Let's not confuse everybody.

24 Q   You also testified about Exhibit 18, which, again, shows

25 the full, complete copy of this blog posting dated July 19,

1  2016, correct?

2  A    That's correct.

3  Q    And again, that was a date after the license purchase,

4  which is dated May 12th, 2016, correct?

5  A    The license was purchased by Chris Carmen, not by Carmen

6  Commercial.

7  Q    That's not the question, and the jury will decide who the

8  license was purchased by.

9  A    It also does not have my copyright --

10 Q    There's no question pending before you, Mr. Bell.  Thank

11 you.

12         You also testified about Exhibit 23, which is a series

13 of screenshots showing the purchase --

14 A    That's correct.

15 Q    -- by Ms. Kennedy.

16         MS. KENNEDY:  Objection, Your Honor, just on the

17 number.  It's actually Exhibit 24.

18         THE COURT:  I think that's 24.

19         MR. OVERHAUSER:  I'm sorry.  You're correct, 24.

20 BY MR. OVERHAUSER:

21 Q    And you testified that the pictures shown in these

22 sequence of shots was the picture submitted to the copyright

23 office, correct?

24 A    Yes.

25 Q    The picture shown in Exhibit 24 has a copyright notice on

*BELL – CROSS/OVERHAUSER*                                114

1  it, doesn't it?

2  A   Yes.

3  Q   Let me remind you of your testimony about Exhibit 8.  So

4  let's look at that.  Exhibit 8 is the actual -- I'm sorry.

5  That's not the right one.  It is Exhibit 6.

6       Exhibit 6 shows the actual pictures that were

7  registered by the copyright office, right?

8  A   Yes.

9  Q   So Exhibit 6 is a certification of the pictures?

10 A   Yes.

11 Q   The first -- the next page is a picture of some sort of

12 building, and the next page is your Indianapolis photo, right?

13 A   Correct.

14 Q   But your Indianapolis photo does not have a copyright

15 notice on it, does it?

16 A   It does not, because it's not required.

17 Q   Okay.  But it's not the same picture that was demonstrated

18 in Exhibit 23 that Ms. Kennedy walked you through previously,

19 is it?

20       MS. KENNEDY:  Objection, Your Honor.  Again,

21 Exhibit 24.

22       MR. OVERHAUSER:  Twenty-four, I'm sorry.

23 A   It's the same picture without a copyright notice.

24 BY MR. OVERHAUSER:

25 Q   Could I ask you to direct your attention to Exhibit 43 in

*BELL - CROSS/OVERHAUSER*                              115

1   the exhibit volume?  And that will be the one in the black

2   binder that's in front of you.

3          And for the jurors, you have not had this exhibit

4   distributed to you yet.

5          MS. KENNEDY:  Your Honor, I object.  I don't believe

6   we have stipulated to Exhibit 43.

7          MR. OVERHAUSER:  That is correct.

8          THE COURT:  We haven't.  Let's see what happens.

9   BY MR. OVERHAUSER:

10  Q   Mr. Bell, can you tell me what Exhibit 43 is?

11  A   It's a copy of the amended complaint.

12  Q   Against Carmen Commercial Real Estate Services?

13  A   Correct.

14  Q   And you're an attorney now, aren't you?

15  A   Yes.

16  Q   And how long have you been an attorney?

17  A   Since 1975.

18  Q   And you're familiar with court rules about filing

19  complaints, aren't you?

20  A   Yes.

21  Q   And you know it's a violation of court rules to file a

22  complaint without a reasonable basis to believe the facts in

23  the complaint, don't you?

24  A   Yes.

25  Q   When you filed Exhibit 43, did you take care to make sure

*BELL – CROSS/OVERHAUSER*                                    116

1  all the facts alleged in the complaint were true?

2  A   Yes.

3  Q   Can you please read paragraph 5 of the complaint which was

4  on page 2, to the jury?

5              THE COURT:  First of all, parties approach, please.

6        (*Beginning of bench conference.*)

7              THE COURT:  What's the purpose here?  What are you

8  doing here?

9              MS. KENNEDY:  You didn't get this in yet.

10             THE COURT:  You look at me.  You guys don't look at

11 each other.

12             MR. OVERHAUSER:  I'm attempting to elicit testimony

13 that the statements he made in the complaint are untrue.

14             THE COURT:  Such as?

15             MR. OVERHAUSER:  Well, the first one is that he's a

16 professional photographer.  The second one will be that --

17             THE COURT:  First of all, you haven't asked him if

18 he's a professional photographer.

19             MR. OVERHAUSER:  That was my next question.

20             THE COURT:  Shouldn't that be your first question

21 before you impeach somebody?

22             MR. OVERHAUSER:  Okay.  I can reverse the order.

23             THE COURT:  No, that's usually how you impeach

24 somebody.  You ask them a question; and if they give you an

25 answer, then you present them with their deposition.  You

*BELL – CROSS/OVERHAUSER*                                    117

1   don't present them with their deposition first, same with

2   recollection.

3           MR. OVERHAUSER:  You're correct, Your Honor.

4           THE COURT:  I understand what you want to do is use

5   this for impeachment purposes, is that it?

6           MR. OVERHAUSER:  Yes, Your Honor.

7           THE COURT:  Well, let's do impeachment correctly

8   then.

9      *(End of bench conference.)*

10  BY MR. OVERHAUSER:

11  Q   Mr. Bell, are you a professional photographer?

12  A   Yes, since I get paid for my work.

13  Q   You've never worked for any company in the business of

14  providing photography services, have you?

15  A   I work for my own.

16  Q   And you don't have a college degree in photography, do

17  you?

18  A   No.

19  Q   How much money have people paid you this month to, say,

20  take wedding pictures?

21  A   I don't take wedding pictures.

22  Q   How much money have people paid you this month to take

23  graduation pictures?

24  A   I don't take graduation pictures.

25  Q   How much money have people paid you this month to take

*BELL – CROSS/OVERHAUSER*                                    118

1   family portraits?

2   A    I don't take family portraits.

3   Q    How much money have people paid you this month to take any

4   kind of picture?

5   A    I take a lot of my photographs for sale on SmugMug down

6   the road.

7   Q    How much people have paid you this year to take any kind

8   of picture [sic]?

9   A    Well, I've received a couple hundred dollars from folks.

10  Q    Was that -- you received a couple hundred dollars.  Was

11  that to take their picture for them?

12  A    Yeah.

13  Q    Who paid you that?

14  A    My sister.

15  Q    Any other nonrelatives that paid you money to take their

16  picture?

17  A    I do a lot for my relatives.

18  Q    And do they pay you?

19  A    Sometimes they do.  Sometimes they give me other gifts.

20  Q    And how does that contrast with other income that you have

21  earned so far this year?  Have you gotten more income from

22  other sources or more income from your professional

23  photography business?

24       MS. KENNEDY:  Your Honor, I object.  This is beyond

25  the scope of direct.

*BELL - CROSS/OVERHAUSER*                                    119

1              THE COURT:  All right.  Approach, please.

2         (*Beginning of bench conference.*)

3              THE COURT:  So we talked about I'd give some leeway

4    on this so we don't have to go back and forth.  The question

5    is what's the relevance of this, I guess, for the Court how

6    much he's been paid?

7              MR. OVERHAUSER:  It's relevant to damages.

8              THE COURT:  Those are -- statutory damages is what

9    he's asked for, right?

10             MR. OVERHAUSER:  Statutory damages can take into

11   account actual damages.  Actual damages can be predicated on

12   the skill of a photographer or the value of pictures.

13             THE COURT:  How much more do you have along this

14   line?

15             MR. OVERHAUSER:  Maybe three, four questions.

16             THE COURT:  I think it's becoming cumulative now.

17   I'll overrule it unless it just continues on.

18             MS. KENNEDY:  Your Honor, may I ask, where or

19   what -- he's saying actual damages has to do with statutory

20   damages.

21             THE COURT:  I don't know where that is.

22             MS. KENNEDY:  I don't see that.

23             THE COURT:  It's certainly not in the jury

24   instructions that I can see.

25             MS. KENNEDY:  Right.

1          THE COURT:  I'll look at that.  Like I said, either

2    he gets it here or he's going to call him back as a witness

3    and ask him the same thing.  I question the relevance as well.

4    I'll give you a couple more questions on it.

5          MS. KENNEDY:  Thank you, Judge.

6      *(End of bench conference.)*

7    BY MR. OVERHAUSER:

8    Q   Let me just put it this way, Mr. Bell.  So far this year,

9    have you made more money from your professional photography

10   business or more money from other sources?

11   A   Other sources.

12   Q   Now, let me show you the picture of the Indianapolis

13   photo.  This is the one that we're suing over, correct?

14   A   That's correct.

15   Q   And you've claimed that you took the Indianapolis photo on

16   March 8th, 2000, haven't you?

17   A   I have, and I've already corrected that.

18   Q   But you many times have stated that that is the date,

19   March of 2000, correct?

20   A   Yeah, and I corrected it, that I was wrong.

21   Q   Well, you've repeatedly over and over again --

22          MS. KENNEDY:  Objection, Your Honor.

23          THE COURT:  Sustained.  Move on.

24          MR. OVERHAUSER:  I'm sorry?

25          THE COURT:  I said, "Sustained."  He's answered it.

BELL – CROSS/OVERHAUSER                    121

1   BY MR. OVERHAUSER:

2   Q   You began stating as early as 2011 that you took the

3   Indianapolis photo in March of 2000, didn't you?

4           MS. KENNEDY:  Objection, Your Honor.  Asked and

5   answered.

6           THE COURT:  I think he's answered this question,

7   hasn't he, Mr. Overhauser?

8           MR. OVERHAUSER:  May I approach the bench, Your

9   Honor?

10          THE COURT:  Yes, sure.

11      (Beginning of bench conference.)

12          MR. OVERHAUSER:  The issue is that Mr. Bell has

13  repeatedly filed complaints alleging that he took this picture

14  in March of 2000.  He's filed dozens of them.  His

15  testimony -- and, in fact, at the Maloney trial last year, he

16  testified that he took it on March 8, 2000.

17          His testimony today that he may have taken it later

18  is made up and new.  I believe the jury is entitled to know

19  how long and how consistently he's been alleging that he took

20  the picture in March of 2000.  That's a very important issue

21  in this case because it goes to whether he owns the copyright

22  in this picture.

23          MS. KENNEDY:  Earlier, Your Honor, he testified that

24  he took the photo between May and certainly before the

25  August 29th I believe it was date, 2000, when it was first

1  published to the Internet.  We believe that any exact date is

2  irrelevant here, and that Mr. Overhauser is likely going to

3  use it for a different reason, like he was saying, to question

4  the validity of the copyright.

5       Mr. Bell's asked and answered several times.  He's

6  had plenty of depositions.  He's pretty bad with names, dates,

7  spellings.

8       MR. OVERHAUSER:  Until this date here in this

9  courtroom, this is the first time he's stated --

10      MS. KENNEDY:  That's not true.

11      THE COURT:  I told you two the arguments are not

12  taking place between you two.

13      MS. KENNEDY:  Right.  Your Honor as recently as -- I

14  don't remember the exact date but in the Bell v Marriott case

15  just recently, we just got the transcript of this deposition.

16  I can pull that up if needed.  He also testified similarly it

17  could have been April, could have been May; but it was

18  certainly before August 2011.  That was a recent deposition,

19  sworn.

20      THE COURT:  Okay.  I'll allow a couple more

21  questions.  You can ask him when he came to the realization

22  that that wasn't the date, and you've already established that

23  he said it was a date and when that was.  Maybe you haven't.

24      MS. KENNEDY:  I believe he just said that, Your

25  Honor.

1                THE COURT:  Just ask him that.  "When did you first

2   assert this as that date?  When did you discover or realize

3   that it was not that date?"

4                MR. OVERHAUSER:  Fair enough.

5                THE COURT:  Then you can come back, too.  Is there a

6   question that he took the picture I suppose is the ultimate

7   question.

8       *(End of bench conference.)*

9   BY MR. OVERHAUSER:

10  Q   Mr. Bell, isn't it true that as early as June 2011, you

11  maintained that you took this Indianapolis photograph in March

12  of 2000?

13  A   That's accurate.

14  Q   And isn't it true that as recently as last year in a

15  trial, you testified that you took the Indianapolis photo in

16  March of 2000?

17  A   I did testify to that; and that's probably when I began to

18  figure out maybe I wasn't as accurate as I should have been

19  because the foliage in this photograph is more like May than

20  it is like March.  And you know, my records may have just

21  simply been in error that it was March 8th, okay.

22  Q   So your realization that you may not have taken this in

23  March of 2000 just came to you in recent months; is that

24  correct?

25  A   Not in recent months.  It was a year ago, year and a half

*BELL - CROSS/OVERHAUSER*                              124

1   ago.

2   Q    Okay.  But we're talking about a picture that was taken

3   back in 2000, correct?

4   A    That's correct.

5   Q    Okay.  Now, in March of 2000, you worked at the law firm

6   of Cohen & Malad, didn't you?

7   A    That's correct.

8   Q    And I think you testified that that law firm specialized

9   or concentrated in class action lawsuits?

10  A    That's correct.

11  Q    And you worked at Cohen and Malad full time, didn't you?

12  A    Yes.

13  Q    And you were a part owner there at the time, weren't you?

14  A    That's correct.

15  Q    And as an owner, one of your responsibilities was to try

16  and get clients for Cohen and Malad, wasn't it?

17  A    Yeah, but I didn't take any photographs for anybody.

18  Q    What were the office hours of Cohen and Malad?

19  A    Usually eight to five, although I was a partner.  I could

20  always leave a little early.

21  Q    And judging from this picture, would you say that it was

22  taken between the hours of eight and five?

23  A    It was taken around 4:30.

24  Q    And in 2000, Cohen & Malad had a web page, didn't it?

25  A    It did have a web page.

*BELL - CROSS/OVERHAUSER*                                    125

1    Q    And, in fact, the Indianapolis photo appeared on Cohen and

2    Malad's web page in 2000, didn't it?

3    A    It did.

4    Q    Now, Mr. Bell, you regularly search Google to find web

5    pages that have the Indianapolis photo, don't you?

6    A    Yeah.

7    Q    And you do those searches about once per quarter, don't

8    you?

9    A    Yeah.

10   Q    So about every three months?

11   A    Yeah.

12   Q    To do the search, you upload the Indianapolis photo to

13   Google, correct?

14   A    Yes.

15   Q    Then it gives you a list of websites that have the photo,

16   doesn't it?

17   A    It does.

18   Q    And then you search for information about who owns the

19   website, don't you?

20   A    That's correct.

21   Q    Then you send the owner of the website an e-mail if you

22   think they're infringing, right?

23   A    Correct.

24   Q    And the e-mail that you use is a form e-mail that you've

25   sent to lots of people, isn't it?

*BELL - CROSS/OVERHAUSER*                                    126

1   A    Yes.

2   Q    You've not paid any private investigators to do these

3   reverse picture searches on Google, have you?

4   A    No.

5   Q    All these searches have been from your home and the

6   e-mails that you have sent out from your house, correct?

7   A    Correct.

8   Q    And you found out about Carmen Commercial by doing one of

9   these reverse Google image searches, didn't you?

10  A    Yes.

11  Q    Let me show you again, Exhibit 21, which you testified

12  about a little bit earlier.

13  A    Uh-huh.

14  Q    This document includes four e-mail threads that were

15  exchanged between you and Mr. Carmen, correct?

16  A    Let me get it so that I look at it in the book.

17       Yeah, I see Exhibit 21.

18  Q    This e-mail thread has the e-mails sort of in reverse

19  chronological order; so the very first one is at the end,

20  correct?

21  A    Correct.

22  Q    So let's go to the -- let me just -- the page that's shown

23  as page No. 3, this has a picture of the Indianapolis photo,

24  right?

25  A    Yes.

*BELL - CROSS/OVERHAUSER*                              127

1  Q   And there's no copyright notice in this Indianapolis

2  photo, is there?

3  A   No.

4  Q   Pardon?

5  A   No.

6  Q   So if we go to the last page, which has the number four on

7  the bottom, this is the original e-mail that you sent to

8  Carmen Commercial Realty, correct?

9  A   Which page are you showing?

10 Q   The last page of this Exhibit 21.

11 A   Yes.

12 Q   It's up on the screen?

13 A   Yes.

14 Q   Can you please read for the jury the full three paragraphs

15 of this e-mail?

16 A   Yeah.  "The purpose of this e-mail is to notify you" --

17          THE COURT:  Hold on.  Do you have an objection or --

18          MS. KENNEDY:  Your Honor, that seems a little long;

19 but if my client doesn't mind reading --

20          THE WITNESS:  I'm fine.

21          THE COURT:  Okay.  Please continue.

22 A   Do you want me to start with, "You have displayed"?

23 BY MR. OVERHAUSER:

24 Q   Yeah.  Just read the three paragraphs beginning, "The

25 purpose of this e-mail."

*BELL – CROSS/OVERHAUSER*                                    128

1    A    "You have displayed a fabulous photo" --

2    Q    That's not the first paragraph that's on this page.

3    A    Oh, I'm sorry.

4    Q    It says, "The purpose of this e-mail."

5    A    Okay.  "The purpose of this e-mail is to notify you that

6    you are using a photo without the necessary permission.  There

7    is no record that your organization has purchased the

8    necessary rights to publish and use such photo.  This can be

9    corrected by taking the photo down" -- that's my first

10   notification --

11            THE COURT:  Just read.

12   A    -- "and avoid any legal action by the payment of $5,000 to

13   Richard N. Bell.

14            "If you wish to avoid legal action, deleting the photo

15   without payment is not an option.  You still owe $5,000 for

16   past unauthorized use.  Should the photo not be taken down and

17   the $5,000 paid" -- "not paid within 14 days, Rich Bell will

18   be filing a lawsuit against Carmen Commercial Real Estate

19   services for copyright infringement.

20            "Should you have any questions, you or your lawyer may

21   contact Mr. Bell at 317-690-2053.  Attached is a copy of the

22   actual lawsuit that will be filed on May 9th, 2016.

23            "If not settled by noon May 9th, all offers will be

24   withdrawn; and any settlement offers will be substantially

25   higher, as you are responsible for statutory damages, costs,

*BELL - CROSS/OVERHAUSER*                                  129

1    and the copyright holder's legal fees.  Should you or your

2    lawyer wish to speak to me, I have provided below my contact

3    information."

4    BY MR. OVERHAUSER:

5    Q    So this e-mail demands $5,000?

6    A    Correct.

7    Q    As of that time, did you lose $5,000 in your professional

8    photography business because this picture was on Carmen

9    Commercial's web page?

10   A    Sir, I'm suing for statutory damages.

11          THE COURT:  All right.  An objection?

12          MS. KENNEDY:  Yes.  Objection, Your Honor.  He's

13   asking for -- it appears to be a legal conclusion, and he's

14   bringing up a form of damages that's not at issue here.

15          THE COURT:  Overruled.

16   BY MR. OVERHAUSER:

17   Q    Again, Mr. Bell, did you lose $5,000 in your professional

18   photography business because this picture was on Carmen

19   Commercial's web page?

20   A    I don't know exactly how much money I lost on that.

21   Q    Did you lose any money --

22   A    Yeah.

23   Q    How much money did you lose because Carmen Commercial --

24   A    Because he didn't pay me the standard $200 that would be

25   required.

*BELL - CROSS/OVERHAUSER*                                    130

1  Q    So your damage is $200?

2  A    My actual damages are probably $200.

3  Q    Now, returning to Exhibit 21, Carmen Commercial's response

4  is on page 2 of Exhibit 21.  Let me zoom in on it.

5  A    Twenty-two?

6  Q    Exhibit 21, on page 2.  Page numbered 2 of Exhibit 21.

7  A    Okay.

8  Q    Can you please read to the jury Mr. Carmen's response to

9  your e-mail?

10 A    Yes.  "We did use the photo in question on a one-time blog

11 post.  Candidly, there was no idea whose photograph it was

12 when my assistant inserted it into a post.  Had we known, we

13 simply would not have used it.

14      "It has since been removed, and I would be willing to

15 compensate you in the amount of a thousand dollars for its

16 use.  It's established this level of compensation based upon

17 the highest amount ever paid for the use of a photo and then

18 multiplied the cost by two.  The amount is more than a

19 business like mine would ever pay for an item like this; and

20 thus, I believe this amount is more than fair.

21      "Let me know you agree to my offer, and I will send

22 you payment within five days."

23 Q    And then you responded to Christopher Carmen; and that

24 response is on the preceding page, correct?

25 A    That's correct.

*BELL – CROSS/OVERHAUSER*                               131

1   Q   And can you please read to the jury your response, which

2   is on the -- starts in the middle of that page and the very

3   end of it is on the following page.  When you read it, I see

4   you have some legal citations in here.  You can omit those,

5   but can you please read the rest of the text?

6            THE COURT:  Hold on a second.

7            MS. KENNEDY:  Your Honor, I object to this being

8   cumulative.  All of this evidence has been placed before the

9   jury.  Reading every single page of every communication just

10  seems to be voluminous, and we've covered the terms of these

11  e-mails in direct.

12           THE COURT:  It seems to be somewhat cumulative.  Do

13  you have a question that you're going to ask here,

14  Mr. Overhauser?

15           MR. OVERHAUSER:  I beg your pardon, Your Honor?

16           THE COURT:  Do you have a question that you're going

17  to ask about these?

18           MR. OVERHAUSER:  I'm just trying to establish the

19  sequence of events and the discussions between the parties.

20  He's already read the initial request, the response from

21  Mr. Carmen; and this is the last follow-up from -- last

22  communication from Mr. Bell.  I think the jury deserves to

23  hear what Mr. Bell had to say.

24           THE COURT:  Well, they can read it.  If this is the

25  last one, I'll overrule it; but we don't need to do this for

*BELL – CROSS/OVERHAUSER*                                132

1  every exhibit if you've got a question about it.

2          MS. KENNEDY:  Thank you, Your Honor.

3          THE COURT:  Go ahead.

4  A   "To establish a prima facie case of copyright

5  infringement, only two elements must be proven:  One,

6  ownership of a copyright, and two, copying of the constituent

7  elements of the work that are original."

8          I'll skip over the citations.

9          "Notably absent from this formulization of the prima

10 facie case is damage or any other harm the plaintiff resulted

11 from the infringement.

12         "Here I own a valid copyright, and you copied the

13 photo.  I do not have to establish that I was damaged or that

14 the organization made any money by using the photograph.  The

15 infringer is liable for statutory damages, plus copyright

16 holder's attorney fees and costs, which is substantially more

17 than $5,000."

18         "Suit will be filed May 9th, 2006 [sic].  If you wish

19 to avoid legal action, deleting the photo without payment is

20 not an option.  You still owe $5,000 for past unauthorized

21 use.  Should the $5,000 not be paid by noon May 9th, 2006

22 [sic], Rich Bell will be filing a lawsuit against Carmen

23 Commercial Real Estate Services for copyright infringement.

24 Once the lawsuit is filed, fees and costs go up and Carmen

25 Commercial Real Estate services will not be able to settle the

*BELL - CROSS/OVERHAUSER*                                133

1   case for $5,000.  It will cost substantially more.  Should you

2   or your lawyer wish to speak to me, I have provided below my

3   contact information."

4           THE COURT:  Maybe I'm not hearing you, but I keep

5   hearing 2006.  I want to make sure it's 2016.

6           THE WITNESS:  I'm sorry.  2016.  I apologize.

7           THE COURT:  Maybe it's me mishearing.

8   BY MR. OVERHAUSER:

9   Q   Carmen Commercial's response is at the top of this

10  exhibit.  He just says, "Okay.  Suit yourself"; is that

11  correct?

12  A   I don't see --

13  Q   It's right here on the monitor.

14  A   I don't see that.  In Exhibit 21, I don't see that.

15  Q   It's at the top --

16  A   Okay.  I'm sorry.  You're right.  It's the top of the

17  second page.  You're right.

18  Q   Now, Mr. Bell, when you exchanged these e-mails, you had

19  not investigated what company hosted the web page for Carmen

20  Commercial's web page, had you?

21  A   I don't have to.

22  Q   And sitting here today, you don't know what company hosts

23  Carmen Commercial's web page, do you?

24          MS. KENNEDY:  Your Honor, I'm going to object to

25  being beyond the scope of direct.

1          THE COURT:  I'm going to give a little leeway here

2     for what we talked about before.

3     A    Off the top of my head, I do not know who hosts the

4     website.  And it's a website owned by -- I've never heard any

5     denials that Carmen Commercial Real Estate doesn't own this

6     website.

7     BY MR. OVERHAUSER:

8     Q    Okay.  But you don't know who hosts it, do you?

9     A    Not off the top of my head.  I can research it.

10    Q    Mr. Bell, as of September -- I'm sorry, July 12th, 2016,

11    you had received payment for a license for the right to

12    publish the Indianapolis photo, haven't you?

13    A    From who?

14    Q    From Carmen Commercial?

15    A    No.  I never received any money from Carmen Commercial.

16    Q    Let me show you Exhibit 2 -- I'm sorry, Exhibit 42.

17         MR. OVERHAUSER:  This has been stipulated, Your

18    Honor.  At this time I would move to admit -- I guess it's

19    already been admitted.  Excuse me.  Ms. Kennedy did that

20    earlier.

21    BY MR. OVERHAUSER:

22    Q    Exhibit 42 is an e-mail that you received from SmugMug on

23    May 12th, 2016, isn't it?

24    A    Yes.  It says, "Chris Carmen."  It doesn't say, "Carmen

25    Commercial Real Estate."

*BELL – CROSS/OVERHAUSER*                          135

1  Q   And smugmug.com is the same website as -- in essence, as

2  your website, richbellphotos.com, correct?

3  A   Yes.

4  Q   So if someone goes to richbellphotos.com, they're

5  simultaneously going to smugmug.com; is that right?

6  A   That's correct.  They do the processing of collecting of

7  funds for me.

8  Q   And Exhibit 42 shows that the business using the e-mail

9  address CUC@carmenrealestate.com was used by the person that

10 purchased the license, correct?

11 A   That's an e-mail address.  That's not the purchaser.  The

12 purchaser is Chris Carmen.

13 Q   That's a question for the jury to decide.

14 A   Well, that's my interpretation.

15 Q   And, in fact, previously, you had sent an e-mail to that

16 e-mail address, CUC@carmencommercialrealestate.com [sic],

17 demanding $5,000, hadn't you?

18 A   If that's the address.  That was the address that the --

19 Q   I can go back and show you Exhibit 21.  It shows --

20 A   Yeah, you're right.  You're right.

21 Q   Okay.  So it was sent to "exchange with

22 CUC@carmenrealestate.com"?

23 A   Right.

24 Q   And the person or company at CUC@carmenrealestate.com is

25 who purchased the license, correct?

*BELL – CROSS/OVERHAUSER*                                136

1   A    That's not the owner of the license.  The owner of the

2   license is Chris Carmen.

3   Q    Respectfully, Mr. Bell --

4   A    Carmen --

5   Q    That's a question for the jury to decide, but let me ask

6   you this question.

7           This e-mail says that the order for this purchase is

8   for a license -- for an order No. 5839456, correct?

9   A    Yes.

10  Q    And Ms. Kennedy previously introduced Exhibit 10.

11  Exhibit 10 is a list of all of your license sales on SmugMug,

12  correct?

13  A    Correct.

14  Q    And if we turn to page 2 of Exhibit 10, we see a license

15  purchase on May 12th, 2016, correct?

16  A    Correct.

17  Q    And the order number is 5839456, correct?

18  A    Correct.

19  Q    And this shows that the purchase price was $200, correct?

20  A    Correct.

21  Q    Now, when somebody pays you for a license on smugmug.com,

22  you don't get the money instantly, do you?

23  A    No, I don't.

24  Q    But SmugMug gets the money instantly, and they hold it in

25  an account on your behalf, correct?

*BELL - CROSS/OVERHAUSER*                                        137

1  A    Correct, but they notify me.

2  Q    And then after there are a certain level of sales through

3  SmugMug, SmugMug will send you the money.  Is that the way it

4  works?

5  A    That's correct.

6  Q    Isn't that number $500?  Whenever they accumulate to $500,

7  they will send you the money?

8  A    I don't know the number off the top of my head.

9  Q    Okay.  Fair enough.  But Exhibit 10 shows -- has a

10  column -- let me show you -- the column headings are only on

11  page 1.  But there's a column for payment status and payment

12  date, correct?

13  A    Correct.

14  Q    Payment status indicates whether you have been paid, and

15  if so, the date you were paid by SmugMug, correct?

16  A    Correct.

17  Q    So if we look at this license on May 12th, 2016, it shows

18  that you were paid for it and that you received the payment in

19  June 2016, correct?

20  A    Yeah.  That's the $200 I sent back to you.

21  Q    But you got the $200 from SmugMug in June of 2016,

22  correct?

23  A    Right.  But I believe my letter --

24  Q    You don't need to elaborate, Mr. Bell.  I'll ask the

25  questions here, if that's okay with you.

*BELL - CROSS/OVERHAUSER*                                138

1    A    Okay.

2    Q    Now, you can update the pictures that you have on your

3    website at richbellphotos.com, can't you?

4    A    Can I update them?

5    Q    You can add new pictures, take out pictures, put up

6    different versions of pictures, right?

7    A    Yeah.  Okay.  I didn't understand your question.

8    Q    Okay, I'm sorry.

9          So, for example, if you had a picture on smugmug.com

10   without a copyright notice and then you later decided you

11   wanted to add a copyright notice, you could remove the old one

12   that didn't have the copyright notice and replace it with a

13   different one that had a copyright notice, correct?

14   A    Yes.

15   Q    And Exhibit 10 -- I'll try to -- I might have to zoom this

16   out a little bit.

17         Exhibit 10 has a column where it has a description --

18   or the name of a file that was purchased, correct?

19   A    Correct.

20   Q    And then it has -- I'll go back to page 1.  It has an

21   image ID, a unique number for that particular picture,

22   correct.

23   A    Yes.

24   Q    So, for example, on page 1, it shows two different

25   versions of the picture "Indianapolis photo."  It has one

1  here -- I can put a red circle around that top row.  It says,

2  "20100721, Indianapolis Skyline From Canal Best Picture 350

3  JPG"?

4  A   Right.

5  Q   That begins with image ID 1405, correct?

6  A   Yes.

7  Q   But if we go down to the bottom, it has a different

8  version of that picture, right?  It says, "Indianapolis

9  Skyline From Canal Picture (2) JPG," right?

10 A   Yes.

11 Q   And it has a different image ID number, correct?

12 A   Yes.

13 Q   So that indicates to you that they were different

14 pictures, right?

15 A   They might be the same picture.  In fact, I'm virtually

16 certain they're the same picture; but maybe some tweaking's

17 been done to them.

18 Q   But they have different image ID numbers, correct?

19 A   Right.  From time to time, I Photoshop.

20 Q   Then if we go to, say, the fourth page, there is yet

21 another version of this picture that you sold on smugmug.com

22 that's, for example, shown in the last row?

23 A   Right.

24 Q   That is, "Indianapolis Skyline From Canal Best Picture

25 300.JPG."  Do you see that?

1  A   Yes.

2  Q   And that has an image ID number that begins with 1297,

3  correct?

4  A   Yes.

5  Q   So would you agree there have been at least three

6  different versions of the Indianapolis -- of the Indianapolis

7  photo that you've sold on smugmug.com?

8         MS. KENNEDY:  Your Honor, this is getting

9  cumulative; and also, we don't believe it's relevant when

10  there is best evidence -- better evidence to show exactly what

11  was purchased from smugmug.com.

12         THE COURT:  Well, I'm not sure there's a question

13  yet, so overruled.  Let's see what the question is.

14  BY MR. OVERHAUSER:

15  Q   Again, Mr. Bell, you've sold at least three different

16  versions of the Indianapolis photo at different times on

17  smugmug.com, haven't you?

18  A   Yes; but every one of them had a copyright notice, my

19  copyright notice.  If I used SmugMug, that's the one I used.

20  Q   Well, Mr. Bell, can you tell the jury if you always put

21  your copyright notice on your picture, how did there get to be

22  a copy on the Internet of your picture without a copyright

23  notice?

24  A   I don't know.  They could have removed it?

25  Q   I'm sorry?

*BELL - CROSS/OVERHAUSER*                              141

1    A    They could have removed my --

2    Q    Who removed it?

3    A    I don't know.

4    Q    Do you have any evidence of that?

5    A    No, I don't.  That's what -- I ask people all the time how

6    they got my photo.

7    Q    Originally, you took the photo, correct?

8    A    That's correct.

9    Q    And you put it up on the Internet the first time, correct?

10   A    I put it on Webshots in August of 2000.

11   Q    And that version didn't have a copyright notice on it, did

12   it?

13   A    I don't believe that one did, right.

14   Q    Just like the version you filed with the copyright office.

15   It didn't have a copyright notice on it either, did it?

16   A    Right, but I changed my policy in 2011 --

17   Q    That's enough.  Let me ask you another question.  I'll

18   move on.

19          Let me show you what's been previously offered as

20   Exhibit 9, the commercial download license.  These are the

21   terms and conditions --

22          MR. OVERHAUSER:  Excuse me, can I get these for the

23   jury?

24          THE COURT:  We'll take care of it.

25          MR. OVERHAUSER:  Thank you.

*BELL - CROSS/OVERHAUSER*                                142

1   BY MR. OVERHAUSER:

2   Q   These are the terms and conditions that apply to people

3   that download your commercial -- that obtain a -- purchase of

4   commercial download license, right?

5   A   That's correct.

6   Q   And if someone buys a license, they have the right to use

7   the picture as allowed by this as long as the use is allowed

8   by the license, correct?

9   A   That's correct.

10  Q   And as long as the buyer's use is allowed by the license,

11  the buyer would have a defense to a suit to copyright

12  infringement, wouldn't it?

13  A   For past -- for future infringement.

14  Q   But whatever uses are allowed by this license, if you sued

15  for copyright infringement for one of those license uses, they

16  would have a defense, wouldn't you agree, Mr. Bell --

17  A   If they used --

18          THE COURT:  All right.  One at a time, please.  He's

19  got to finish his question before you answer.  She's very,

20  very good; but she can't get you both at the same time.

21  BY MR. OVERHAUSER:

22  Q   Let me reask it, and this is just a simple yes or no

23  question, Mr. Bell.

24          If a person's use of a downloaded picture per this

25  license is permitted by this license and that person was later

*BELL - CROSS/OVERHAUSER*                           143

1  sued for copyright infringement, they would have a valid

2  defense to copyright infringement suit, wouldn't they?

3  A   It depends on when the infringement occurred.  If the

4  infringement occurred before they purchased the photograph --

5  before they purchased the license, it doesn't apply.  And they

6  must use the photo that they purchased, not some other photo.

7  Q   So, for example, if a -- the license does not allow a

8  buyer to resell a picture, correct?

9  A   That's correct.

10 Q   So if a buyer that got a license did, in fact, resell it,

11 they would be infringing, right?

12 A   That's correct.

13 Q   But you don't have any evidence that Carmen Commercial

14 ever resold copies of any picture of yours, do you?

15         MS. KENNEDY:  Objection to the form of the question,

16 Your Honor.  It assumes that Carmen Commercial has a license.

17 We have very much disputed that, and the jury is deciding on

18 that issue.

19         THE COURT:  I'm not sure, but go ahead and rephrase.

20 BY MR. OVERHAUSER:

21 Q   Mr. Bell, you don't have any evidence that Carmen

22 Commercial ever offered to resell a copy of your Indianapolis

23 photo, do you?

24 A   Here's the evidence I have, that Carmen is arguing to the

25 Court that he -- the evidence is clear.  He purchased the

*BELL - CROSS/OVERHAUSER*                                  144

1   license; and now, he's trying to say that he can use that

2   license for Carmen Commercial.  He can't.

3   Q    Okay.  Well -- is that your response to the license

4   defense in this case, is you say the license was purchased by

5   Chris Carmen individually and not his company?

6   A    No.  There's other defenses.  First of all, he doesn't

7   have -- Chris Carmen doesn't even have a license because I

8   sent the $200 back to him and canceled the license.

9   Q    Well, we'll get to that.  We'll get to that.

10  A    All right.

11  Q    Now, this -- these terms say that the license is

12  perpetual, right?  Do you see that?

13  A    That's correct.

14  Q    Let me direct you to Exhibit 79 in your exhibit binder.

15  A    It's this one?

16  Q    The large one, Exhibit 79.

17  A    Is this one that's been admitted?

18          THE COURT:  You can go ahead and look at it.

19          THE WITNESS:  I've looked at it.

20  BY MR. OVERHAUSER:

21  Q    And you see the numbers at the very top of this.  This

22  document has been filed in this case, correct?

23  A    Yes.

24  Q    And you've seen -- tell me what this -- what is on this

25  Exhibit 79?

*BELL - CROSS/OVERHAUSER*                                145

1  A    Seventy-nine appears to be a Merriam-Webster dictionary on

2  the word "perpetual."

3  Q    This is, in fact, a correct definition of

4  Merriam-Webster's definition of "perpetual," don't you agree?

5  A    No.

6  Q    You disagree with the definition of "perpetual" that is

7  proposed by Merriam --

8  A    I'm accepting --

9           COURT REPORTER:  Excuse me.  One at a time, please.

10          THE WITNESS:  I'm sorry.

11 BY MR. OVERHAUSER:

12 Q    Do you disagree with *Merriam-Webster's* definition of

13 perpetual that's in Exhibit 79?

14 A    I think the Court will rule --

15          THE COURT:  I'm sorry.  Do you have an objection?

16          MS. KENNEDY:  Your Honor, we object to the relevance

17 of this exhibit and also any legal conclusion that it's the

18 correct definition of "perpetual."

19          THE COURT:  That's sustained.

20 BY MR. OVERHAUSER:

21 Q    So do you think the word "perpetual" can be ambiguous?

22          MS. KENNEDY:  Your Honor, we also object to this

23 question.  This is calling for speculation and legal

24 conclusion.

25          THE COURT:  It seems to border on a lot of things

*BELL - CROSS/OVERHAUSER*                              146

1  here.  Just ask him what he thinks "perpetual" means.  If you

2  want to have him read this, fine; and then you can follow up

3  with him any way you would like.

4  BY MR. OVERHAUSER:

5  Q   What does the word "perpetual" mean to you, Mr. Bell?

6  A   It means all future.

7  Q   And the definition in Merriam-Webster is different,

8  correct?

9  A   I don't know.  I don't necessarily read it that way.  For

10 example, holding an office for life or for an unlimited period

11 of time, well, you can only hold office in the future.

12 Q   Okay.  What you just described is the definition of

13 perpetual that's in Exhibit 79, correct?

14 A   Correct.

15         THE COURT:  Your Honor, I would move to admit

16 Exhibit 79.

17         Any objection?

18         MS. KENNEDY:  Yes, Your Honor.  We object to the

19 relevance to this case.

20         THE COURT:  Well, I think that it's listed in the

21 license.  I'll overrule the objection and it's admitted.

22    *(Defendant's Exhibit 79 was received in evidence.)*

23         MR. OVERHAUSER:  I move to publish Exhibit 79 to the

24 jury, Your Honor.

25         THE COURT:  You can publish it.

*BELL - CROSS/OVERHAUSER*                    147

1  BY MR. OVERHAUSER:

2  Q   Let me show it to you on the screen.

3        So Mr. Bell, Exhibit 79 says that according to

4  Merriam-Webster, the definition of "perpetual" can mean "valid

5  for all time," correct?

6  A   I guess in certain situations it can but certainly not

7  this situation.

8  Q   Okay.  So your definition of "perpetual" is different from

9  that of Merriam-Webster, correct?

10 A   My definition is what --

11 Q   I'm just asking you whether it's different, yes or no?

12 A   I was explaining the difference.

13 Q   If you can answer yes or no and then explain, that's fine;

14 but the jury deserves to know whether your definition of

15 perpetual is different from that of Merriam-Webster.

16 A   My definition is future; the future.

17 Q   Okay.

18        MS. KENNEDY:  Your Honor, the plaintiff would like

19 to object because there are several definitions listed here.

20 Mr. Overhauser continues to refer to it as one definition, but

21 I see an A.  I also see a B.

22        THE COURT:  I think that the witness answered

23 that -- he talked about B, and then you can follow up as well.

24 So --

25

*BELL − CROSS/OVERHAUSER*                                148

1  BY MR. OVERHAUSER:

2  Q   Mr. Bell, isn't it true that you have told others that if

3  they purchased one of your licenses through SmugMug, that the

4  license they get would be retroactive?

5  A   I have negotiated with lots of people to resolve cases,

6  and I can't remember everything I've done.  In certain

7  situations.

8  Q   So you may have, correct?

9  A   May have.

10 Q   And who is Jeff Shelton?

11       MS. KENNEDY:  Objection, Your Honor.  Mr. Shelton is

12 not part of this case.

13       THE COURT:  Overruled.

14 A   I don't remember exactly who he is.

15 BY MR. OVERHAUSER:

16 Q   Now, in this litigation, you've produced e-mails to people

17 threatening them with copyright infringements, correct, in

18 addition to the one you've read to Mr. Carmen, right?

19       MS. KENNEDY:  Objection, Your Honor.  I believe that

20 mischaracterizes.  There's just one person that he contacted

21 in this case.

22       THE COURT:  You're talking about Exhibit 21?

23       MS. KENNEDY:  Yes.  It was just one e-mail address.

24       THE COURT:  You can rephrase or we can just agree

25 that there's just the one.  Are there others you're talking

*BELL – CROSS/OVERHAUSER*                          149

1   about, Mr. Overhauser?

2   BY MR. OVERHAUSER:

3   Q   Did you send an e-mail to Jeff Shelton threatening him

4   with a copyright infringement suit?

5   A   It's possible.

6   Q   Let me direct your attention to Exhibit 67 in your exhibit

7   volume.  Tell me when you're there, please.

8   A   Has this one been admitted?

9   Q   No, it has not yet been admitted.

10          Now, Mr. Bell, Exhibit 67 includes an e-mail thread

11  that you exchanged with Jeff Shelton of Midwest User Group.

12  A   Uh-huh.

13  Q   And an e-mail SmugMug sent you confirming his purchase of

14  a license to the Indianapolis photo, correct?

15  A   Yes.

16          MR. OVERHAUSER:  Your Honor, I would move to admit

17  Exhibit 67.

18          THE COURT:  Any objections other than the ones

19  already on the record?

20          MS. KENNEDY:  No, Your Honor, just the three

21  objections on the record.

22          THE COURT:  It's noted and overruled.

23          MR. OVERHAUSER:  I would move to publish Exhibit 67,

24  Your Honor.

25          THE COURT:  You may publish it, and this is for the

*BELL – CROSS/OVERHAUSER*                              150

1   purpose of what we discussed before; is that correct?

2           MR. OVERHAUSER:  Yes, the scope of the license

3   issue.

4   BY MR. OVERHAUSER:

5   Q   Now, like we discussed previously, e-mails in an e-mail

6   thread are in reverse order.  So the first e-mail from you, I

7   think, is on -- let me find out where this is.

8           The first e-mail begins in the middle of page 1.  Let

9   me zoom in on this.  This is an e-mail from you to

10  midwestusergroup@comcast.net dated June 23rd, 2011, correct?

11  A   Right.

12  Q   And you have information about a domain name, and it says

13  the registrant is Jeff Shelton, correct?

14  A   Correct.

15  Q   And you have a picture of the Indianapolis photo, correct?

16  A   Correct.

17  Q   It doesn't have a copyright notice on it, does it?

18  A   No, it doesn't.

19  Q   And then the body of your e-mail's on the next page,

20  correct?

21  A   That's correct.

22  Q   Let me zoom out a little bit.

23          And it begins, "You have displayed a fabulous photo of

24  the Indianapolis skyline.  The photo was taken and copyrighted

25  by Rich Bell."  This is part of your standard e-mail, correct?

*BELL - CROSS/OVERHAUSER*                    151

1  A    Correct.

2  Q    And in this e-mail, you say, "If you wish to avoid legal

3  action, deleting the photo without payment is not an option.

4  You still owe $200 for the past unauthorized use."  And you

5  say, "Should the $200 not be paid within 14 days, Rich Bell

6  will be filing a lawsuit against you for copyright

7  infringement and theft."  Did I read that correctly?

8  A    You did.

9  Q    Now, let me go back to the first page of this so we can

10 see Mr. Shelton's response.  I'll try to zoom in on this.  And

11 his response on the first page is sent the same day,

12 June 23rd, 2011, correct?

13 A    Yes.

14 Q    And he says, "Wow, harsh.  Okay.  The photo has been

15 removed.  Sorry for the slight."

16         MS. KENNEDY:  Your Honor, we're going to object.

17 This is not the limited scope we had discussed earlier.  He's

18 reading the entire exhibit.  Nowhere has he mentioned the word

19 "perpetual."

20         MR. OVERHAUSER:  I'm getting to it, Your Honor.  I'm

21 putting it into context.

22         MS. KENNEDY:  It seems to be --

23         THE COURT:  Hurry up, Mr. Overhauser, and get to it.

24 BY MR. OVERHAUSER:

25 Q    And then it concludes with, "Found it on Google Images

*BELL − CROSS/OVERHAUSER*                    152

1   free and clear with no use notice."  Is that what it says?

2   A   That's what it says.

3   Q   Then there's another e-mail, which is on page 3 of this

4   exhibit.  Let me see if I can get this on here; and this

5   includes an e-mail from him to you on Friday, June 24th, 2011,

6   correct?

7   A   Yes.

8   Q   I'm going to just read this, and tell me if I'm reading it

9   correctly.  It says, "Rich, my own personal opinion aside, I

10  apologize for the statements I made this morning.  I hadn't

11  had my coffee."  Did you talk to him on the phone or

12  something?

13  A   I don't remember.

14  Q   Then he says, "I will agree to settle this issue and

15  provide the 200-dollar licensing fee within 14 days provided

16  that you" and then it says, "Number one, agree to

17  retroactively grant us full rights to use the photo as you see

18  fit without the need to pay you anything further now or in the

19  future."

20  A   Um-hum.

21  Q   And then the word says, "Agreed."  Had you agreed to that?

22  A   Yeah.  You want me to tell you why I agreed?

23  Q   No.  I just want to make sure you agreed to it.

24          And then later in this e-mail thread, you sent him --

25  or let me continue this one.

*BELL - CROSS/OVERHAUSER*                                153

1            With his e-mail, he concludes by saying, "Is that

2    acceptable," correct?

3    A    Yes.

4    Q    Then you e-mailed back to him, and what you said was -- if

5    I can get this all on the screen so the jury can read it.

6    It's a little bit fuzzy.  The statement below by Midwest User

7    is, "Fully agreeable."

8            And then you say, "This can be accomplished by buy

9    [sic] the download low-resolution version at my website."  And

10   then you give him a website link to click on for

11   richbellphotos.com, correct?

12   A    Correct.

13   Q    So you were agreeing -- and this would take him to

14   SmugMug, correct?

15   A    Correct.

16   Q    So you were agreeing that if he went to smugmug.com and

17   went through all those steps that Ms. Kennedy described --

18   A    Right.

19   Q    -- that you would be retroactively granting him full

20   rights to the picture, correct?

21   A    I would -- yeah.  That's correct.

22   Q    And then -- finally, this Exhibit 67 includes an e-mail

23   from SmugMug -- I'll try to zoom in on this to get it -- very

24   similar to the one that you got for Carmen Commercial, right?

25   It's from SmugMug, and it's to you --

*BELL – CROSS/OVERHAUSER*                                    154

1              MS. KENNEDY:  Your Honor, we object to

2    Mr. Overhauser characterizing it as a SmugMug purchase by

3    Carmen Commercial.  That is very much a dispute.

4              THE COURT:  Sustained.

5    BY MR. OVERHAUSER:

6    Q   At any rate, this e-mail that you got from SmugMug is

7    shown on this page, correct?

8    A   Yes.

9    Q   And it says, "Cha-ching, who loves ya baby?  Jeff Shelton,

10   midwestusergroup@comcast.net just ordered your photo,"

11   correct?

12   A   Correct.

13   Q   For him to have purchased that photo, he would have gone

14   through the same sequence of buying steps that Ms. Kennedy

15   described earlier, correct?

16             MS. KENNEDY:  Objection.  Asked and answered.

17             THE COURT:  I don't know if it was, but ask him if

18   he knows that.

19             You may answer the question.

20   A   Yes.

21   BY MR. OVERHAUSER:

22   Q   And the receipt shows that Mr. Shelton -- if I can zoom in

23   on this -- in fact, paid $200, correct?

24   A   Yeah.

25   Q   And it was for order 2294672, correct?

*BELL – CROSS/OVERHAUSER*                                    155

1  A   Yes.

2  Q   And that was on June 24th, 2011.  And if we go back to

3  Exhibit 10, which is a list of all your SmugMug sales,

4  correct?

5  A   Correct.

6  Q   It shows a SmugMug purchase on 6-24-2011, correct?

7  A   Yes.

8  Q   So this would have been the purchase for $200 that Jeff

9  Shelton made, correct?

10 A   Yes.

11 Q   And, in fact, there are -- there are other people that

12 have purchased SmugMug licenses from you as well, correct?

13 A   Yes.

14 Q   And for all of the people -- well, I'm going to pass on

15 that.  Let me -- I'll move on to something else.

16      Now, you testified previously about this Exhibit 23.

17 This is a letter that you sent to me in which you attempted to

18 cancel the license and return $200, correct?

19 A   No, I didn't attempt to.  I did.

20 Q   In fact, after you sent that letter, that check was sent

21 back to you, correct?

22 A   Yeah.

23      MR. OVERHAUSER:  I'm sorry.  I should not be

24 displaying this.  It's not been admitted.

25      Is this one admitted?

BELL - CROSS/OVERHAUSER                        156

1              THE COURT:  I don't know.  What exhibit is it?

2              MR. OVERHAUSER:  Forty-one, Your Honor.

3              THE COURT:  It's admitted.

4              MR. OVERHAUSER:  Thank you.

5    BY MR. OVERHAUSER:

6    Q   In fact, that 200-dollar check was sent back to you,

7    correct?

8    A   Yes.  As I've explained --

9    Q   I'm just asking if it was sent back to you.

10             THE COURT:  Mr. Overhauser, how much more do you

11   think you have on cross?

12             MR. OVERHAUSER:  Perhaps half hour.

13             THE COURT:  How's the jury doing?  You can make it

14   through another 30 minutes or -- okay.

15             All right.  Keep going.

16   BY MR. OVERHAUSER:

17   Q   Thank you.  So this check that you made out to Chris

18   Carmen dated June 1, 2016, that was never cashed, was it?

19   A   No.

20   Q   Now, let me return to showing you Exhibit 9, which is the

21   commercial terms of license.  Can you please show the jury

22   where in Exhibit 9 it says that you have a right to cancel a

23   license that has been paid for?

24   A   Sir, it's A101 law.

25   Q   I'm sorry?

1  A   I -- as the copyright owner, I get to decide who gets to

2  license my photos.  And in this case, because your client did

3  not understand --

4  Q   I'm sorry.  You haven't answered the question.  The

5  question was where in Exhibit 9 does it say that you have a

6  right to cancel a license that has been paid for?

7  A   I'm telling you the general rule of law.

8  Q   Is your testimony that there is no right to cancel

9  specified in Exhibit 9?

10 A   No, I think there's an inherent right.

11 Q   But there's no words in here that say --

12 A   No.

13 Q   -- you have a right to cancel, is there?

14 A   There's an inherent right --

15 Q   That's not my question, Mr. Bell.  The question is this

16 does not state that you have a right to cancel a license, does

17 it?

18        MS. KENNEDY:  Objection, Your Honor.  Asked and

19 answered.

20        THE COURT:  Well, I don't think he's answered it.

21 It's overruled.

22        You can answer the question.  Please do so, sir.

23 A   This document does not say this, except --

24 BY MR. OVERHAUSER:

25 Q   Okay.  That's all I'm asking.

1  A   Okay.

2  Q   And today, anyone could buy a license to your Indianapolis

3  photo, if, in fact, you really own it -- they could buy a

4  license for $200 today, correct?

5  A   Sir, I get to control who gets to buy a license and who

6  doesn't.  I can over- -- I can override SmugMug and send the

7  money back if they don't agree to the terms; and one of the

8  terms is that they don't try to play a game of making the

9  license retroactive, because it's not retroactive.

10          In order to be retroactive --

11 Q   Respectfully, Mr. --

12 A   No, I'm giving you the answer.  To be retroactive, you

13 have to have mutual consent, and there's no mutual consent.

14 Q   Okay.  Mr. Bell, the question was:  Right now, any member

15 of the public can go onto smugmug.com and buy a license to

16 your Indianapolis photo, correct?

17 A   They can attempt to buy a license, but I get to control

18 whether or not the license is effective --

19 Q   But you've already --

20          COURT REPORTER:  Excuse me.  One at a time, please.

21          THE WITNESS:  And that's what I did in your -- in

22 the situation of Carmen Commercial Real Estate because they

23 didn't understand the terms.

24 BY MR. OVERHAUSER:

25 Q   You don't know what Carmen understood or didn't understand

*BELL – CROSS/OVERHAUSER*                         159

1  because you can't read Carmen's mind, can you?

2  A   I got a letter from you expressing that it's going to be

3  retroactive, and I told you specifically not.  It's not

4  retroactive and --

5  Q   That's not --

6  A   And by the way, there's a court ruling that says it's not

7  retroactive.

8         MR. OVERHAUSER:  Objection.  Move to strike the last

9  comment.

10         THE COURT:  You can disregard that.

11         Mr. Bell, you need to answer the questions that are

12  asked of you, sir.  That's it.

13         THE WITNESS:  Okay.

14  BY MR. OVERHAUSER:

15  Q   If some member of the public today went and purchased a

16  download commercial license and used the Indianapolis photo on

17  their website and you sued them for copyright infringement for

18  doing that, they would have a valid defense, wouldn't they?

19         MS. KENNEDY:  Objection, Your Honor.  This calls for

20  legal speculation, legal conclusions; and it was a compounding

21  question.

22         THE COURT:  Any response?

23         MR. OVERHAUSER:  He's already testified as to his

24  understanding of what the commercial download license does.

25  He is an attorney.  He knows what a defense to a copyright

*BELL – CROSS/OVERHAUSER*                              160

1   infringement claim is.

2           THE COURT:  That's sustained.

3   BY MR. OVERHAUSER:

4   Q   Now, let me show you what you had up previously, one of

5   the exhibits, Exhibit 19, which is an e-mail that's already

6   been admitted.  What kind of business is HubSpot in?

7   A   I do not know.

8   Q   So if HubSpot is in the business of hosting web pages, you

9   don't have any information to contradict that, do you?

10  A   No, I don't.

11  Q   And if HubSpot hosted Carmen Commercial's web page, you

12  don't have any information to contradict that to you either?

13  A   No, other than the fact that the evidence shows that

14  Carmen committed infringement in 2008.

15          MR. OVERHAUSER:  Move to strike that last comment.

16  It's a legal conclusion, Your Honor.

17          THE COURT:  I'm not going to strike, but you've

18  talked about infringement on both and asked him to opine about

19  it.

20          MR. OVERHAUSER:  Very well.  I'll move on.

21  BY MR. OVERHAUSER:

22  Q   Now, this e-mail to HubSpot is dated in April of 2018,

23  right?

24  A   Correct.

25  Q   And that is after the date of the license purchase

1  involving either Christopher Carmen or Carmen Commercial,

2  which took place on May 12th of 2016, correct?

3  A    Let's make this clear.

4  Q    I beg your pardon?

5  A    I'll make this clear.  Carmen Commercial never bought a

6  license.  Chris Carmen attempted to buy a license, and I sent

7  the money back.

8  Q    We understand your position on that.  The jury will

9  decide.

10        Now, let me show you page 2 of this.  And this e-mail,

11 again, is based on a form e-mail that you send to lots of

12 people, correct?

13 A    I sent this -- a similar e-mail.

14 Q    Well, it starts out, "HubSpot has displayed a fabulous

15 photo of Indianapolis skyline."  That's very familiar to you,

16 correct?

17 A    Right.

18 Q    Now, this version contains something new that your

19 attorney has offered into evidence, and I would like to

20 discuss that with you.

21        This has a reference to the case of Bell versus A1

22 Luxury Limousine of South Florida, Inc.  Do you see that?

23 A    Yes.

24 Q    I would like to just read this paragraph or excerpts of

25 it.  You can confirm that I've read it correctly.  It says,

1   "In the case of Bell" --

2             THE COURT:  Do we have a question here?  We can all

3   read this.  Can we just get to the question?

4   BY MR. OVERHAUSER:

5   Q   Okay.  Now, you attached in this e-mail a copy of this

6   decision involving Bell versus A1 Luxury Limousine, correct?

7   A   It was decided by a federal court here.

8             THE COURT:  Mr. Bell, just answer the question.

9   Stop editorializing --

10            MS. KENNEDY:  Your Honor, objection.  I don't see

11  where there is any attachment in this e-mail or mention of any

12  attachment.

13            THE COURT:  What exhibit is this?

14            MS. KENNEDY:  Nineteen, I believe.  I don't see any

15  reference to any attachments whatsoever, no inclusions.

16  Usually those are at the bottom of the e-mail.

17            THE COURT:  I tell you what.  We're going to take

18  our midafternoon break.

19            Members of the jury, please don't discuss the case

20  among yourselves, do any research.  Please don't listen to or

21  look at anything, any reporting about this case; and we'll be

22  back in here at four o'clock.

23            COURTROOM DEPUTY:  All rise.

24      (Jury out.)

25            THE COURT:  All right.  Please be seated.

*BELL - CROSS/OVERHAUSER*                              163

1              Mr. Bell, you can step down.  So you've got to

2    answer the questions that are asked of you.  You know how this

3    works.  She can follow up with you, and you can tell your

4    story.  This is a waste of a lot of time with the jury.

5              Now, what's the story on this exhibit and this

6    attachment?  Mr. Overhauser?  Nineteen, is that it?

7              MR. OVERHAUSER:  Exhibit 19 purports -- it is an

8    e-mail that Mr. Bell sent to HubSpot.  The e-mail says it

9    attached a decision from Bell versus A1 Luxury Limousine, and

10   this e-mail goes on to say that that was a decision by the

11   Court for $150,000 in damages.  But, for some reason,

12   Ms. Kennedy did not attach that 150,000-dollar judgment.

13             THE COURT:  Okay.  And for some reason, you didn't

14   object to it; so I'm not sure why that's relevant to what

15   we're discussing here.

16             What is it that you want to do with this?

17             MR. OVERHAUSER:  This evidence of the 150,000-dollar

18   judgment as referenced in the e-mail is now before the jury.

19   Mr. -- Carmen Commercial would like to explain what that

20   judgment was, specifically, that it was a default judgment.

21             THE COURT:  So ask him that question.

22             MR. OVERHAUSER:  That's my next line of questions.

23             THE COURT:  I mean, that would be much appreciated,

24   I think, by me and the jury is if you just ask a question.  We

25   don't need the case.

*BELL – CROSS/OVERHAUSER*                              164

1          And if for some reason Mr. Bell does not remember or

2    is evasive, then you can follow up on that and make -- you

3    know, we can get the case if you need to, but I don't think

4    that's going to be necessary.  Ms. Kennedy?

5          MS. KENNEDY:  That's good, Your Honor.

6          THE COURT:  All right.

7          Okay.  So do you think you've got another 10, 15

8    minutes or what?

9          MR. OVERHAUSER:  Maybe 20 minutes.

10         THE COURT:  Wow.  It's expanded, okay --

11         MR. OVERHAUSER:  I'm going as fast as I can.

12         THE COURT:  I understand.  I understand.  Again, all

13   right.  So we will be back here in ten minutes so that we can

14   bring the jury down here on time and hopefully get him

15   finished and maybe start with Mr. Carmen, but it doesn't look

16   like it at this rate; but we'll see how the jury is doing, all

17   right.

18         COURT CLERK:  All rise.

19     *(A recess was taken.)*

20     *(Jury out.)*

21         THE COURT:  We are back on the record in

22   1:16-cv-1174.

23         Anything we need to take up before the jury comes

24   back?  Ms. Kennedy?

25         MS. KENNEDY:  Sorry.  Your Honor, it's hard to hear.

*BELL - CROSS/OVERHAUSER*                                165

1   No, I don't think so.

2                THE COURT:  Mr. Overhauser?

3                MR. OVERHAUSER:  There may be a couple of

4   impeachment exhibits that are not in the exhibit volume.  I

5   don't know if I'll need them, but I have them here, and I

6   assume I can -- if necessary, I have them numbered.

7                THE COURT:  And beginning with number -- looks like

8   it will be No. 99.

9                Okay.  So let's bring the jury up -- or down.

10      *(Jury in.)*

11               THE COURT:  All right.  Please be seated.

12               Ladies and gentlemen of the jury, anybody talk about

13  the case amongst themselves while you were out?  Anybody do

14  any research or hear anything or do anything about the case?

15  Did anybody get any jury snacks while we were out?  Yeah.  Got

16  some yeses to that.

17               You may proceed, Mr. Overhauser?

18               MR. OVERHAUSER:  Thank you.

19  BY MR. OVERHAUSER:

20  Q   We were talking about this e-mail that you sent to

21  HubSpot, and this included a paragraph that didn't appear in

22  some of your prior demand e-mails.  This one mentions a case

23  of *Bell versus A1 Luxury Limousine*.  Do you see that?

24  A   Yes.

25  Q   And you say that that was a case where you got a judgment

*BELL - CROSS/OVERHAUSER* 166

1  for $150,000, correct?

2  A  Correct.

3  Q  Did you mention that to try to scare HubSpot to show what

4  it might be subject to if it didn't pay you something?

5  A  I mentioned it because it looked like willful infringement

6  by whomever -- by HubSpot because they put their copyright

7  notice on it.

8  Q  Now, isn't it true that the A1 Luxury Limousine decision

9  was a default judgment?

10  A  It was.

11  Q  And a plaintiff like you gets a default judgment if you

12  file a complaint in a court against a defendant and the

13  defendant does not answer, right?

14  A  That's correct.

15  Q  And in a motion for default judgment, the plaintiff can

16  ask the Court to award it everything it sought in the

17  complaint, right?

18  A  It does, but the judge gets to make that decision as to

19  how much it is.

20  Q  So a default judgment is not contested by the defendant

21  because the defendant does not show up and object, right?

22  A  That's correct.

23  Q  And in the A1 Luxury Limousine case, the plaintiff never

24  answered your complaint, did it?

25  A  The defendant never answered the complaint.

*BELL - CROSS/OVERHAUSER*                          167

1  Q   And then you moved for a default judgment, didn't you?

2  A   That's correct.

3  Q   And you filed your motion for default judgment on June 23,

4  2017, didn't you?

5  A   I don't have the dates in front of me.

6         MR. OVERHAUSER:  May I approach the witness to give

7  him a document to refresh his recollection?

8         THE COURT:  You may.

9  BY MR. OVERHAUSER:

10 Q   Mr. Bell, does this refresh your recollection as to when

11 you filed a motion for default judgment?

12 A   Yes.  It says June 23, 2017.

13 Q   And you asked for the maximum amount you can get, which

14 was $150,000, right?

15 A   That's correct.

16 Q   Now, Mr. Bell, isn't it true that on June 23, 2017, when

17 you filed your motion for a default judgment, that A1 Luxury

18 Limousine of South Florida, Inc. didn't even exist as a

19 company?

20 A   It did exist.

21        MR. OVERHAUSER:  May I approach the witness, Your

22 Honor?

23        THE COURT:  You may.

24 BY MR. OVERHAUSER:

25 Q   Let me hand you a document.  And can you tell me what that

*BELL - CROSS/OVERHAUSER*                                    168

1  document is?

2  A   I haven't seen this document before.

3  Q   Well, there are numbers at the top of this document,

4  correct, that shows it was filed in this case, right?

5  A   Yes.

6  Q   And you've received all of the documents that have been

7  filed in this case, right?

8  A   Yes.

9  Q   So you've received this document before, haven't you?

10 A   It appears that way, but I don't know what it is.

11 Q   Okay.  Would you agree that this is a document issued by

12 the Florida Division of Corporations?

13 A   It does look like that.

14 Q   And would you agree that it indicates that A1 Luxury

15 Limousine of South Florida, Inc. was administratively

16 dissolved back on September 23rd, 2016?

17             THE COURT:  Ms. Kennedy?

18             MS. KENNEDY:  Your Honor, we object because this

19 goes beyond the scope of direct but also is starting to call

20 for legal conclusions; and it's not relevant to this case.

21             MR. OVERHAUSER:  Your Honor, this is relevant

22 because Mr. Bell has referenced this case in his demand letter

23 for $150,000; and we believe the jury deserves to know the

24 circumstances of that 150,000-dollar judgment.

25             THE COURT:  I think you've covered it.  So it's

1   sustained.  Go ahead and move on.

2   BY MR. OVERHAUSER:

3   Q    So having viewed the document I just handed you, would you

4   agree that A1 Luxury Limousine of South Florida, Inc. did not

5   exist at the time --

6           THE COURT:  I'm sorry.  I said it was sustained.

7   Let's move on.  You've established it's a default judgment.

8   BY MR. OVERHAUSER:

9   Q    And Mr. Bell, when you sought a default judgment, did you

10  inform this Court that A1 Luxury Limousine no longer existed?

11          MS. KENNEDY:  Your Honor, again, objection.  Asked

12  and answered.

13          THE COURT:  Well, I'm not sure he did.  That

14  specific question wasn't answered, but certainly he said that

15  he thought that they existed.  So why don't you ask him

16  regardless of what this document is, if he thought at the time

17  he filed this that it existed.  If he doesn't, then move on.

18  BY MR. OVERHAUSER:

19  Q    Well, sitting here today, would you agree that A1 Luxury

20  Limousine was dissolved on September 23rd, 2016?

21  A    Sir, a dissolved corporation -- administratively

22  dissolved --

23  Q    That's not my question.  Do you agree that it was

24  administratively dissolved on --

25  A    I don't know.  I don't know exactly whether it was

*BELL - CROSS/OVERHAUSER*                           170

1  administratively resolved.

2  Q   But you agree that this document shows that it was,

3  correct?

4  A   I've never -- I can't remember this document.

5  Q   But it was filed in this case.  So you've seen it before?

6  A   It was filed in that case.

7        MR. OVERHAUSER:  Your Honor, I would move to admit

8  this document as Exhibit 99.

9        THE COURT:  I haven't even seen it.

10        Ms. Kennedy, come on up, please.

11     (*Beginning of bench conference.*)

12        THE COURT:  First of all, what is the relevance of

13  this?

14        MR. OVERHAUSER:  The relevance is to show Mr. Bell's

15  habit for sending out demand letters mentioning 150,000-dollar

16  default judgment when he knows it was invalid because it was

17  obtained against a nonexistent corporation.

18        THE COURT:  But he said he didn't know that.  This

19  doesn't impeach him.  This is a fact that he didn't know, so

20  this doesn't impeach him.

21        MR. OVERHAUSER:  He admits having received this

22  document because it was filed in this litigation.

23        THE COURT:  This litigation right here?

24        MR. OVERHAUSER:  Yes.

25        MS. KENNEDY:  That's what I'm confused on.

*BELL - CROSS/OVERHAUSER*                        171

1          THE COURT:  When was that sent, before or after this

2    litigation?

3          MR. OVERHAUSER:  The letter to HubSpot?

4          MS. KENNEDY:  April 2018.

5          MR. OVERHAUSER:  And that was filed, looks like,

6    January 16th, 2018.  So he knew about this when he sent that

7    letter to HubSpot.

8          MS. KENNEDY:  I don't even know what you're talking

9    about, like, honestly.

10          THE COURT:  What was this filed, as part of what?

11          MS. KENNEDY:  I don't know either.  I've never seen

12    this before.

13          THE COURT:  What's the rest of this document?

14          MR. OVERHAUSER:  What this was --

15          MS. KENNEDY:  Filed by you?

16          MR. OVERHAUSER:  Yes, it was filed by me.  It was

17    filed in this case and it was an exhibit to -- I'm trying to

18    remember -- a motion for summary judgment.

19          MS. KENNEDY:  That was denied.

20          MR. OVERHAUSER:  I don't remember exactly what

21    motion it was, some kind of dispositive motion, maybe a motion

22    to dismiss.

23          MS. KENNEDY:  Which wasn't granted because we're

24    here.

25          THE COURT:  So even if he did, what does that have

1   to do with whether or not his copyright was infringed in this

2   case?  What does it have to do with whether or not the license

3   was retroactive or not?  What does it have to do with whether

4   or not he had the authority to rescind a license?  What does

5   that have to do with anything in this case?

6           MR. OVERHAUSER:  It just has to do with his claim

7   for $150,000 in damages.  He submitted this HubSpot document

8   suggesting that -- that suggests to the jury, hey -- the fact

9   he may have a valid claim for $150,000.

10          MS. KENNEDY:  He didn't --

11          THE COURT:  Look, I'm telling you, you people talk

12  to me.

13          What happens if they did exist?  Or if they

14  reincorporated someplace else or whatever?  What does that

15  have to do with whether or not he's entitled to statutory

16  damages here, which is up to the jury to decide what they are?

17          MR. OVERHAUSER:  Well, the reason it's relevant is

18  because Mr. Bell himself introduced this exhibit referencing

19  the 150,000-dollar judgment; and the jurors may see that and

20  think, "Wow, well, if he got that much in that case, maybe

21  it's reasonable to award that much in this case."

22          So I'm entitled to show that in the A1 Luxury case,

23  it was a default judgment that he never informed the Court

24  about.

25          THE COURT:  I don't know what you mean "entitled."

*BELL - CROSS/OVERHAUSER*                                173

1  You're suggesting that he has committed a fraud on the court.

2  Is that what you're suggesting?

3           MR. OVERHAUSER:  He did not inform the Court that

4  the company had been dissolved, even though he knew about it.

5           THE COURT:  Inform what Court in what instance?

6           MR. OVERHAUSER:  He did not inform the Court in the

7  A1 Luxury Limousine case that the A1 Luxury Company had been

8  dissolved.

9           MS. KENNEDY:  He said he didn't know.

10           THE COURT:  That was decided in August of 2017.

11  This is dated April -- or January of 2018, and he said he

12  didn't know.

13           MR. OVERHAUSER:  But this was before he sent the

14  letter to HubSpot.

15           THE COURT:  You just pivoted from a fraud on the

16  court to HubSpot.  So which is it here?

17           MR. OVERHAUSER:  He's using the letter to HubSpot to

18  try to pump up his claim for statutory damages of $150,000,

19  even though he knew at that time that the default judgment

20  that he had gotten was against a nonexistent company.

21           THE COURT:  First of all, as you know, he didn't

22  even ask for statutory damages until the final pretrial

23  conference.

24           I'll take this under advisement.  Right now, it's

25  not going to be admitted, but I'll take it under advisement.

*BELL – CROSS/OVERHAUSER*                            174

1   I fail to see the relevancy of it.

2          MS. KENNEDY:  Thank you, Your Honor.

3      *(End of bench conference.)*

4   BY MR. OVERHAUSER:

5   Q   Just to conclude this matter, Mr. Bell, when you obtained

6   the default judgment against A1 Luxury Limousine, you did not

7   inform the court that the company had been dissolved, had you?

8   A   No.

9          THE COURT:  All right.  You don't have to answer

10  that question.  We've already established he didn't know; and

11  I just made a ruling, so please move on.

12         MS. KENNEDY:  Your Honor, I ask that that answer be

13  stricken from the record based on your ruling.

14         THE COURT:  I think he answered that before.  He

15  said he didn't know.  So he didn't know.

16  BY MR. OVERHAUSER:

17  Q   Now, Mr. Bell, when you sent this letter to HubSpot, here

18  it says that you demanded $10,000 from them?

19  A   Correct.

20  Q   Did you lose $10,000 in your professional photography

21  business because this picture was on HubSpot's computer?

22  A   I'm asking for statutory damages under that situation.  So

23  I didn't lose actual damages, but that's what the award would

24  likely be.

25  Q   And then you also included a sentence here that says,

*BELL - CROSS/OVERHAUSER*                          175

1   "Most companies have liability insurance that covers this

2   issue."

3   A   That's correct.

4   Q   How do you know that?

5   A   Because frankly, you've represented several companies that

6   have liability insurance on this very issue.

7   Q   So you have experience in dealing with insurance companies

8   for people that you threaten to sue for copyright

9   infringement?

10  A   I generally don't -- I'm generally not the one that deals

11  with them.  The lawyer for the insurance company deals with

12  them.

13  Q   This letter also says that you would file suit against

14  HubSpot within 14 days unless it paid $10,000.  Do you see

15  that?

16  A   Yes.

17  Q   Did HubSpot pay you the $10,000 within 14 days?

18  A   They did not.

19  Q   Did you file a lawsuit against HubSpot?

20  A   I did not.

21  Q   Now, on March 28th of this year, you filed another

22  copyright infringement complaint against National Association

23  of Realtors, didn't you?

24  A   That's correct.

25  Q   And can I direct your attention in the exhibit volume to

*BELL - CROSS/OVERHAUSER*                                        176

1    Exhibit 31?

2    A    Is 31 admitted?

3    Q    Yes, 31 in that volume.

4    A    Is it admitted?

5              THE COURT:  You can just look at it, Mr. Bell.

6              THE WITNESS:  All right.

7    BY MR. OVERHAUSER:

8    Q    Can you tell me what it is?

9    A    Yes.  It's a complaint that I filed.

10   Q    Against National Association of Realtors?

11   A    Yes.

12             MR. OVERHAUSER:  I would move to admit Exhibit 31

13   and move to publish it.

14             THE COURT:  Objection?

15             MS. KENNEDY:  Yes, Your Honor.  I object to the

16   relevance of this complaint.  It doesn't involve anyone in

17   this lawsuit.  Again, an association of Realtors is an

18   association of individuals.  There are no individual

19   defendants in this matter.  It's Carmen Commercial Real

20   Estate, and also a complaint.  He's again bringing up a

21   lawsuit from another matter, not this lawsuit.

22             THE COURT:  All right.  The parties can approach,

23   please.

24        (*Beginning of bench conference.*)

25             THE COURT:  All right.  Mr. Overhauser, what's the

1  relevance of this one?

2             MR. OVERHAUSER:  The relevance to show that this is

3  a lawsuit that involves the same Indianapolis photo, the same

4  suit that was settled via the release -- by the settlement

5  agreement and release agreement that operated to release

6  Carmen Commercial.

7             THE COURT:  What's the complaint have to do with it

8  and how much time are we going to spend on this?  Why can't we

9  just talk about the release, the fact that there was a

10 lawsuit?

11            MR. OVERHAUSER:  Well, for one thing, to show that

12 it has the same picture in it.

13            THE COURT:  Why can't you just ask him about it,

14 just like we did before?  You just asked him if he filed a

15 lawsuit.  He said yes.  You can ask him if it's the same

16 picture, right?

17            MR. OVERHAUSER:  Yes.

18            THE COURT:  He can say, "Yes"; and then you can ask

19 him if there's a release.  I don't know why we have to burden

20 the jury with all this stuff.

21            MS. KENNEDY:  Thank you, Your Honor.

22        *(End of bench conference.)*

23 BY MR. OVERHAUSER:

24 Q   Mr. Carmen -- or Mr. Bell, excuse me -- the complaint you

25 filed against the National Association of Realtors alleged

*BELL – CROSS/OVERHAUSER*                              178

1  infringement of the same Indianapolis photo that's at issue in

2  this case, didn't it?

3  A   Yes.

4  Q   And it also alleged that you took the picture of the

5  Indianapolis photo in March of 2000, didn't it?

6  A   Yes.

7  Q   Now, I may refer to the National Association of Realtors

8  for short as "NAR."  Is that okay with you?

9  A   That's correct.

10 Q   Now, NAR is a pretty big organization, isn't it?

11 A   Yes.

12 Q   It has members all across the country, doesn't it?

13 A   I guess it has members.

14 Q   And NAR is a much larger organization than Carmen

15 Commercial, correct?

16        MS. KENNEDY:  Objection, Your Honor.  That calls for

17 speculation.

18        THE COURT:  Ask him if he knows.

19 BY MR. OVERHAUSER:

20 Q   Do you know if NAR is a larger organization than Carmen

21 Commercial?

22 A   Far larger organization?

23 Q   Yes.

24 A   Yes.

25        THE COURT:  I'm sorry, yes, you know or yes, it is?

*BELL – CROSS/OVERHAUSER*                                   179

1             THE WITNESS:  Yes, it is a larger organization.

2    BY MR. OVERHAUSER:

3    Q   And you reached a settlement agreement with NAR, didn't

4    you?

5    A   That's correct.

6    Q   And can you please turn to Exhibit 32 in your exhibit

7    binder?

8    A   Yes.

9    Q   And is Exhibit 32 the settlement agreement that you

10   reached with NAR?

11   A   It is.

12             MR. OVERHAUSER:  I move to admit and to publish

13   Exhibit 32.

14             THE COURT:  Any objection?

15             MS. KENNEDY:  Yes, Your Honor.  Again, Exhibit 32

16   does not involve any of the defendants in this case.  The

17   defendant is Carmen Commercial, and a Realtor -- a Realtor's

18   association would include individuals, not corporations.  So

19   we do not find it relevant to this case at hand.

20             THE COURT:  It's overruled.  That's admitted.

21      *(Defendant's Exhibit 32 was received in evidence.)*

22   BY MR. OVERHAUSER:

23   Q   So let me show you Exhibit 32.  And, in fact, there's a

24   lot of small type on here that may be hard to read.  Here's a

25   blowup.

1          MR. OVERHAUSER:  Your Honor, I request these be used

2     as demonstrative exhibits.

3          THE COURT:  Yes.  Ladies and gentlemen, a

4     demonstrative exhibit is something that's used to help you

5     understand evidence.  It's not evidence in the case.  It's an

6     unusual demonstrative in that it's kind of a blowup of this.

7     That will not go back with you to the jury room.

8          MR. OVERHAUSER:  Your Honor, may I approach the

9     exhibit to explain it?

10         THE COURT:  You may.

11    BY MR. OVERHAUSER:

12    Q    Mr. Bell, this settlement agreement identifies you as one

13    party, correct?

14    A    It does.

15    Q    And the other party is called Move, Inc., correct?

16    A    That's correct.

17    Q    And Move, Inc. is the parent company that owns the

18    National Association of Realtors, isn't it?

19    A    That's my understanding.

20    Q    And in this settlement agreement, you get paid $15,000,

21    right?

22    A    Correct.

23    Q    And you grant a release, correct?

24    A    That's correct.

25    Q    Now, you don't know all of the members of NAR, do you?

*BELL - CROSS/OVERHAUSER*                                    181

1  A    The members that this document refers to --

2  Q    My question is you don't know who all the members of NAR

3  are, do you?

4  A    I was explained who they were.

5  Q    I'm sorry.  You do know all the members?

6  A    I know all the members that this document refers to.

7  Q    Okay.  So there may be other members that you don't know

8  about, right?

9  A    I don't think so.

10 Q    And the National Association of Realtors has members

11 throughout the country, right?

12 A    The members that this document was referring to were the

13 members of the LLCs that were underneath Move, Inc.

14 Q    Okay.  I'm not asking about the members of NAR that this

15 document refers to, but I'll move on.

16       Now, you agree that Christopher Carmen is a member of

17 the National Association of Realtors, don't you?

18 A    I have no evidence of that.

19 Q    Well, you've stipulated to that previously.  Christopher

20 Carmen is a member of the National Association of Realtors,

21 correct?

22 A    All right.  But I've not stipulated the defendant is a

23 member.

24 Q    Now, the part I would like to talk to you about is this

25 paragraph called, "Release and discharge"; and it has a lot of

*BELL - CROSS/OVERHAUSER*                           182

1   legalese in it, so I would like to just walk you through and

2   confirm some of the key language here.

3          It says, "Complainant" -- and that would be you,

4   correct?  You're the complainant?

5   A    Yes.

6   Q    It says, "Hereby releases"?

7   A    Correct.

8   Q    It says, "the move parties"?

9   A    Right.

10  Q    "From any and all claims" --

11         THE COURT:  Hold on.

12         Ms. Kennedy, if you want to move over to that chair,

13  you can.

14         MS. KENNEDY:  That would be great, thank you.

15  BY MR. OVERHAUSER:

16  Q    So there's a release of the Move parties from any and all

17  claims?

18  A    Uh-huh.

19  Q    "Whether now known or unknown, which the complainant" --

20  that would be you?

21  A    Uh-huh.

22  Q    -- "ever had or now has," okay, "against any Move party"?

23  A    Right.

24  Q    -- based on conduct as of the effective date"?

25  A    Uh-huh.

*BELL - CROSS/OVERHAUSER*                        183

1   Q   And this was -- this agreement was signed in April of this

2   year, correct?

3   A   "Based upon conduct of the effective date."

4   Q   And your claims in here are based on conduct that Carmen

5   Commercial undertook prior to April 2019, right?

6   A   This -- I can explain to you that this -- no.

7   Q   "Based on conduct as of the effective date that arises out

8   of or is substantially the same as or is based or otherwise

9   pertains to the complaint or the photo."  And the photo is

10  defined up here to be the Indianapolis photo, right?

11  A   Correct.

12  Q   So same photo that's at issue here, right?

13  A   Right.

14  Q   And then -- so this provides a release of the Move parties

15  for claims relating to the photo?

16  A   Uh-huh.

17  Q   But the claim extends to Move parties, and then "Move

18  parties" is defined right here, right?

19  A   Uh-huh.

20  Q   So Move parties means Move and Move's affiliates; and then

21  it says, "The National Association of Realtors," agreed?

22  A   Correct.

23  Q   "And each of their respective successors, predecessors,

24  and assigns and each of their respective directors, members,"

25  okay?

*BELL – CROSS/OVERHAUSER*                                    184

1   A    The members refer --

2   Q    I'm just asking you if I'm reading this correctly.

3   A    Okay.

4   Q    So it applies to members, correct?

5   A    Yes.

6   Q    And then it says, "in each case past, current and future"?

7   A    Correct.

8   Q    Then it says, "and in each case, direct and indirect,"

9   correct?

10  A    Uh-huh.  Right.

11  Q    And then it says, "complainant," that would be you --

12  A    Uh-huh.

13  Q    -- "promises to never assert or support against any Move

14  party any claim or actions substantially the same as, based

15  on, alleging or asserting any claims, losses, causes of

16  action, liabilities, demands or obligations hereby released or

17  that in any other way" --

18          THE COURT:  Hold on.  There's no way she can get

19  that down.  You're reading that quickly.  So if you're going

20  to read it, please slow down a little bit.

21          MR. OVERHAUSER:  Okay.

22  BY MR. OVERHAUSER:

23  Q    "Any claim or action substantially the same as, based on

24  alleging or asserting, any claims, losses, causes of action,

25  liabilities, demands or obligations hereby released, or that

*BELL - CROSS/OVERHAUSER* 185

1  in any respect are based on or otherwise pertain to the

2  complaint, the photo, or any act, omission, or circumstance in

3  any way relating thereto based upon conduct as of the

4  effective date."  Okay.  Did I read that correctly?

5  A    You did.

6  Q    And then it goes on to say what an affiliate is right

7  here?

8  A    Uh-huh.

9  Q    "An affiliate of a person shall mean a person that

10 directly or indirectly through one or more intermediaries

11 controls or is controlled by or is under common control with

12 the person specified."  Okay.  Did I read that correctly?

13 A    Yes.

14 Q    Then it says -- defines the word, "Person."  It says, "The

15 term 'person' shall be read broadly," broadly, "and may

16 include a corporation, partnership, limited liability company,

17 trust, consortium, association, group, company, entity or

18 organization or a human individual."

19        Did I read that correctly?

20 A    Yes.

21 Q    So just to start out with, would you agree that this

22 release would release anybody that is a member of the National

23 Association of Realtors at the time was signed?

24 A    No.  The member refers to the member -- the LLC members,

25 which are underneath the arm of Move.com.  Move has various

*BELL - CROSS/OVERHAUSER*                              186

1  subsidiaries and includes LLCs.

2  Q   Well, that's your interpretation; but what this says --

3  A   I'm the one --

4           THE COURT:  Hold on.  Let him finish.

5  BY MR. OVERHAUSER:

6  Q   What this says is that the Move parties means the National

7  Association of Realtors, each of their respective members.

8  That's what it says, right?

9  A   And that's why I said that, because the members refers to

10 the LLC; members of the LLC.  Members of the LLC control the

11 LLC and control Move.com.

12 Q   Can you come --

13          MR. OVERHAUSER:  Can I ask the witness to come down

14 and show the jury where this reference is in LLC in here?

15          THE COURT:  No.  I mean he's got it there.  He can

16 tell you whether it's there or not.

17 BY MR. OVERHAUSER:

18 Q   You have a copy of this.  Isn't it true that this document

19 does not reference an LLC anywhere?

20 A   It does not specifically say so, but it talks about

21 subsidiaries; and the subsidiaries are LLC members.

22 Q   Okay, but you agree the term "LLC" -- LLC stands for

23 limited liability company, correct?

24 A   Correct.

25 Q   And the word or term "LLC" isn't in this settlement

*BELL – CROSS/OVERHAUSER*                              187

1  agreement anywhere, isn't it?

2          THE COURT:  What's that second line from the bottom?

3  A   Yeah, right there.

4  BY MR. OVERHAUSER:

5  Q   Okay.  It appears where it says, "The term 'person' can

6  include a limited liability company"?

7  A   That's right.  That's exactly what it meant.

8  Q   But there's no specific LLC identified in Exhibit 32, is

9  there?

10 A   No, and --

11 Q   Okay.  Now, let me show you another part of this.  For the

12 assistance of the jury, if you look on the first page, this

13 also has a paragraph called, "Known or Unknown Claims."  And

14 I've blown that up.  So tell me if I'm reading this correctly.

15         It says, "Known or Unknown Claims.  The parties

16 understand and expressly agree that this agreement extends to

17 all claims of every nature and kind released above whether

18 known by complainant" -- that would be you, right, whether you

19 know about -- you're the complainant, right?

20 A   Right.

21 Q   -- "and whether or not complainant believes he may have

22 any such claims," okay.

23 A   Uh-huh.  That's against the LLC.

24 Q   Well, that's an argument you can make to the jury.  I'm

25 just trying to stay with what the text on this document says.

*BELL - REDIRECT/KENNEDY*                                    188

1   A   Well, I was involved in the drafting of the document, and

2   I pretty much --

3   Q   Respectfully, Mr. Bell, there's not a question pending.

4           MR. OVERHAUSER:  And, in fact, with that, I have no

5   further questions.

6           THE COURT:  Okay.  Let's move all this out of the

7   way, and then any redirect?

8           MS. KENNEDY:  I'll be quick, Your Honor.

9           THE COURT:  All right.

10                      **REDIRECT EXAMINATION**

11  BY MS. KENNEDY:

12  Q   Mr. Bell, just a few minutes ago, you were asked whether

13  or not Chris Carmen was a member of the NAR when the release

14  that he just placed up here was signed.  And, in fact, the

15  parties have reached a stipulation.  I'm going to put this on

16  the document finder.

17          Mr. Bell, Mr. Carmen wasn't even a member when this

18  settlement was signed, was he?

19  A   That's correct.

20  Q   The stipulation between the parties, No. 3, states,

21  "Mr. Christopher U. Carmen became a member of the NAR" on what

22  date?

23  A   August 14th, 2019, just a few weeks ago.

24  Q   Just a few weeks ago?

25          And this was -- so he was not a member at the time

1  that you signed the release with Move, Inc., NAR?

2  A   That's correct.

3  Q   And Mr. Bell, in your e-mails to HubSpot, for example, and

4  also to Carmen Commercial, you attached the photo known as the

5  Indianapolis photo.  Did you attach the photo that they have

6  on their website or do you attach the photo that you believe

7  to be the Indianapolis photo?  What is your procedure with

8  those initial demand e-mails?

9  A   I send them the identical photo that they have on their

10 website.  I download that so that they can verify that that's

11 the one we're talking about, but I own the rights to those

12 photos.

13 Q   So when you e-mailed HubSpot, essentially, you copy and

14 pasted their copyright infringed photo as you allege to their

15 e-mail?

16 A   Yes.

17 Q   So that's why it's missing your copyright symbol on the

18 right-hand side?

19 A   That's correct.

20 Q   Because you want, as you just testified, them to know that

21 that's the exact photo that is committing the infringement?

22 A   That's correct.

23 Q   And Mr. Bell, the defense counsel recently brought up

24 about an hour ago or so an e-mail.  I believe it was

25 Exhibit 67.  You don't need to turn to it or anything.  It was

1   between a man named Mr. Shelton.  At that time -- I believe it

2   was dated June 2011?

3   A    Correct.

4   Q    Did you settle that case for pennies, and did you have a

5   reason for that?

6   A    Yes.

7   Q    Can you explain?

8   A    The reason is that I had not yet registered the photo with

9   the U.S. Copyright Office.  Until I registered the photo with

10  the U.S. Copyright Office -- and by the way -- I could not

11  receive any enhanced damages.  I could only receive actual

12  damages of $200.

13  Q    So at that time in Exhibit 67, was the $200 that you and

14  Mr. Shelton had apparently agreed to -- was that enough at the

15  time?

16  A    It wasn't enough, but it was all I was going to be able to

17  get under the law.

18  Q    And have things changed now after registering your

19  copyright in the --

20          MR. OVERHAUSER:  Objection, vague.

21          THE COURT:  All right.  Please reask the question.

22  Rephrase it.

23  BY MS. KENNEDY:

24  Q    Mr. Bell, do you feel that things are different after

25  registering the copyrighted Indianapolis photo?

*BELL – REDIRECT/KENNEDY*                                191

1           MR. OVERHAUSER:  Same objection.  Vague and

2    irrelevant.

3           THE COURT:  All right.  Please be a little more

4    specific.

5    BY MS. KENNEDY:

6    Q   Mr. Bell, if Mr. Shelton had contacted you now in 2019

7    instead of 2011 to settle this matter, would $200 be enough,

8    now that you have registered with the copyright office?

9           MR. OVERHAUSER:  Objection.  Calls for a

10   hypothetical.

11          THE COURT:  I'll overrule that.  You can answer.

12   A   Yes, and the reason is that the world is on notice as of

13   the date I filed with the copyright office that I have

14   registered; and I am eligible to receive statutory damages.

15   BY MS. KENNEDY:

16   Q   So to clarify, would $200 be enough?

17   A   No.

18   Q   And earlier, defense counsel asked if you had lost $5,000

19   in potential photography proceeds due to Carmen Commercial's

20   infringement.  Could you have lost money because of

21   third-party infringers?

22   A   Yes.

23          MR. OVERHAUSER:  Objection.  Irrelevant,

24   hypothetical, speculative.

25          THE COURT:  You opened the door on that.  Overruled.

*BELL – REDIRECT/KENNEDY*                                192

1   A   Yes.

2   BY MS. KENNEDY:

3   Q   One more question, Mr. Bell.  Could you please turn to

4   Exhibit 26?  And this was one that was --

5           MS. KENNEDY:  I'll go ahead and ask defense counsel

6   if they stipulated to it.  It was the one where Exhibit 38 and

7   26 --

8           THE COURT:  Twenty-six is admitted.

9   BY MS. KENNEDY:

10  Q   If everyone would turn to Exhibit 26, Mr. Bell, just

11  turning to the actual photo and the order number listed on

12  that page, I do believe that is the same order number that you

13  testified earlier to Carmen Commercial's -- excuse me --

14  Christopher Carmen's purchase of the SmugMug license?

15  A   Yes.

16  Q   And on that colored photo, do you see your copyright

17  symbol?

18  A   Yes.

19  Q   So earlier, Mr. Overhauser was saying there's several

20  versions of the Indianapolis photo; but do you believe SmugMug

21  has been clear about which photo was purchased?

22  A   Yes.

23  Q   Do you see that photo in Exhibit 26?

24  A   Yes.

25  Q   And that includes a copyright symbol?

*BELL — REDIRECT/KENNEDY*                             193

1   A    Yes.

2   Q    And in all the evidence produced today, have you seen

3   Carmen Commercial use the photo with your copyright symbol on

4   it?

5   A    No.

6   Q    It's lacking that copyright symbol?

7   A    That's correct.

8              MS. KENNEDY:  That's all I have.

9              THE COURT:  I think that -- is that the one that

10  goes with 38?  Mr. Overhauser?

11             MR. OVERHAUSER:  Thirty-eight?

12             THE COURT:  I believe it's 38.

13             MR. OVERHAUSER:  Yes.

14             THE COURT:  Members of the jury, this Exhibit 26

15  is -- the first portion of it that you see here -- or maybe

16  not the first portion, but the portion you see here is also

17  contained in Exhibit 38; and Exhibit 38 contains additional

18  documents.

19             So, for example, here in No. 3, it says, "The

20  documents attached hereto."  They're not here, but they're in

21  that Exhibit 38.  The difference is this is color so you can

22  see the color photo.  This exact same portion, these pages

23  here, 1 and 2, are also in that Exhibit 38.  So they kind of

24  go together.

25             MS. KENNEDY:  Thank you, Your Honor.

BELL - REDIRECT/KENNEDY                    194

1          THE COURT:  Any recross?

2          MR. OVERHAUSER:  No recross, Your Honor.

3          THE COURT:  Any questions from the jury?  If you

4 have any questions, you can write them down on your notepad

5 there, and we'll collect them.  So if you have a question,

6 just raise your hand and we'll come get it.

7          Anybody got some questions?  All right.  We've got

8 some questions.

9          All right.  Parties, please approach.

10     (Beginning of bench conference.)

11          MR. OVERHAUSER:  It would be beyond the knowledge of

12 this witness.

13          THE COURT:  I'll ask him if he knows.

14          MR. OVERHAUSER:  I don't know how he could possibly

15 know.

16          MS. KENNEDY:  I don't think he will.

17          THE COURT:  If he doesn't know, he doesn't know.

18 Any legal objection to it?  Obviously, it's got to be in his

19 personal knowledge.

20          MR. OVERHAUSER:  Okay.  Okay.

21     (End of bench conference.)

22          THE COURT:  All right, Mr. Bell.  Do you know how

23 the purchase of the photo -- what type of credit card was used

24 to purchase the photo?

25          THE WITNESS:  I do not know.

BELL – REDIRECT/KENNEDY                      195

1              THE COURT:  You do not know.

2              THE WITNESS:  No, I do not know.

3              THE COURT:  Any other questions?

4              All right.  Mr. Bell, you may step down.

5         (Witness excused.)

6              THE COURT:  Ms. Kennedy, please call your next

7    witness.

8              MS. KENNEDY:  Your Honor, the plaintiff would like

9    to rest its case.  We have no other witnesses.

10             THE COURT:  All right.  Thank you.

11             Ladies and gentlemen of the jury, the first question

12   I have for you, we're going to take a short break here.

13   Sometimes short breaks turn into long breaks.  So we could go

14   until 5 or 5:15 or we could go to 5:30 or we could try to get

15   as far with the next witness as we can so that you would get

16   this case earlier tomorrow rather than later.  I think we

17   probably have a couple of hours with the next witness.

18             Would that be a fair statement, Mr. Overhauser?

19             MR. OVERHAUSER:  I project my examination of

20   Mr. Carmen will take about 45 minutes, assuming there are no

21   objections.

22             THE COURT:  Maybe an hour or so.  We could just go

23   ahead and let you out early today and just break for the

24   evening; or again, we could come back here whenever we're

25   finished doing some housekeeping things here until -- I don't

196

1    know -- five o'clock or so, and then be back in here -- if we

2    were to break now, I would like to start probably at least by

3    eight o'clock if you could be here for that.

4                Any thoughts on that?  How many would like to

5    continue later tonight?

6                How many would like to break for the night?

7                Okay.  So we have a couple that want to break for

8    the night.  Why don't we do this.  Why don't we see how long

9    this is going to take.  Why don't we do a recess of

10   undetermined amount here, and we'll see how long it is going

11   to take.

12               Please don't talk about the case among yourselves.

13   Please don't do any independent research.  Please don't listen

14   to or look at any reports about the case.

15               COURTROOM DEPUTY:  All rise.

16       *(Jury out.)*

17               THE COURT:  Please be seated.  First of all, how are

18   you doing on bathroom breaks?

19               MS. KENNEDY:  I could quickly go now; but otherwise,

20   I've been doing all right.

21               THE COURT:  Let me first ask, I think I heard there

22   was going to be a motion that's going to be made; is that

23   right?

24               MR. OVERHAUSER:  Yes, Your Honor.

25               THE COURT:  What's the form of the motion?

1    MR. OVERHAUSER:  It would be verbal.  I would

2 like -- would you like me to make it now?

3    THE COURT:  Sure.  How long is it going to be.  I'm

4 just trying to see if she needs to go or not.

5    MR. OVERHAUSER:  Two minutes.

6    THE COURT:  Okay.

7    MR. OVERHAUSER:  Your Honor, on behalf of Carmen

8 Commercial, I hereby move for a judgment and finding as a

9 matter of law under Rule 50A on the grounds that a reasonable

10 jury would not have a sufficient -- legally sufficient

11 evidentiary basis to find for the plaintiff on the issue of

12 willfulness by Carmen Commercial.

13    The reason this motion should be granted is that

14 there is no, quote, clear and convincing, unquote, evidence

15 that Carmen Commercial acted willfully.  In fact, there is no

16 evidence that it had any notice that the Indianapolis photo

17 was copyrighted by anyone, let alone by Mr. Bell.

18    The version Mr. Bell registered with the copyright

19 office does not even have a copyright notice.  In the absence

20 of any evidence of -- any clear and convincing evidence of

21 willful infringement, the issue of willfulness should be

22 resolved in favor of Carmen Commercial.

23    THE COURT:  All right.  Any response?

24    MS. KENNEDY:  Yes, Your Honor.

25    One response would be -- I believe it was Exhibit --

1   the exhibit where he uploaded the photos to the copyright

2   application.  Not once does it mention you need a copyright

3   notice.  And also, that seems counterintuitive.  You don't get

4   the copyright notice until you submit an original photo.  Then

5   you get the privilege, if approved, to use a copyright notice

6   symbol.  So, of course, it wasn't submitted to the copyright

7   office.  It shouldn't be.  That would be assuming you got a

8   copyright symbol, and they can certainly deny people.

9           Second, they've had so much notice of this copyright

10  infringement; and again putting their Carmen Commercial Real

11  Estate with a copyright symbol at the bottom of the page, it

12  has been determined as willfulness in mostly default judgment

13  rulings, three of them that were originally listed on our

14  witness and exhibit list; but since you said they aren't

15  pending here, we haven't brought those up.  But again, that's

16  shown willfulness; and it's held up in court, at least in the

17  default level.  And we just couldn't disagree more.  There's

18  so much evidence showing that they had after notice --

19          THE COURT:  Help me out here.  I thought -- I

20  thought that there was some testimony and some evidence that

21  after Mr. Bell contacted either Carmen or Mr. Overhauser, that

22  it continued to be on the website; is that right?  What

23  exhibits are those?

24          MS. KENNEDY:  Yes.  It continued for at least two

25  years.

199

1          THE COURT:  After the initial notice?

2          MS. KENNEDY:  After the initial notice.  So those

3    would be Exhibit 17 and 18.  That was on a print date of

4    August 1st, 2016.  That's the same instance right there.

5          THE COURT:  I'm sorry.  What do you mean "the same

6    instance"?

7          MS. KENNEDY:  Seventeen and 18 are one instance of

8    after infringement, after notification; but the second one,

9    which is 18, shows that third parties could actually save it

10   and download it.  So it's the same date, same article.  So

11   that's number one.

12         And number two would be Exhibit 19 and 20.  That

13   would be the second instance of after infringement when

14   HubSpot admits that its customer, Carmen Commercial, placed

15   the Indianapolis photo on its website.

16         THE COURT:  What was the date of that HubSpot?

17         MS. KENNEDY:  HubSpot was all the way April 9th,

18   2018.

19         THE COURT:  Mr. Overhauser, those clearly were after

20   Carmen was put on notice that Mr. Bell owned the copyright or

21   at least asserted ownership of the copyright.

22         MR. OVERHAUSER:  I disagree, Your Honor.  Exhibit 17

23   was a capture of Carmen's website as of April 21st, 2016,

24   which was before he was put on notice.

25         MS. KENNEDY:  He's looking at old Exhibit 17.  I'm

200

1   sorry.  I just wanted to be clear.  We did get the new

2   Exhibit 17 and 18 into evidence, and those definitely don't

3   show those dates.

4           THE COURT:  What I'm looking at, Mr. Overhauser, is

5   that the printout is dated 8-1-2016; and then on page 2 of 3

6   of that Exhibit 17, it says, "Indianapolis Visibility Surges

7   With Nationwide Tech Talent," posted 7-19-16; and then it has

8   what appears to be the picture there.

9           And then 17 is -- I think the testimony was when you

10  click on that, it takes you to this article, which again shows

11  July 17th, 2018 -- excuse me, 2016.

12          MR. OVERHAUSER:  With regard to that posting on

13  7-19-2016, that was after the license had been purchased.  So

14  that cannot be the basis for willful infringement.

15          THE COURT:  Okay.  Well, is that -- seems to me that

16  that may be an issue in this case, isn't it, whether or not --

17  who was the purchaser of that and whether or not it could be

18  unilaterally rescinded.  It seems to me that those are two

19  issues in the case right now, are they not?

20          MR. OVERHAUSER:  They are, Your Honor.

21          THE COURT:  All right.  What were the other ones

22  that you pointed out?

23          MS. KENNEDY:  And then Exhibit 19 and 20, that was

24  just one instance again on HubSpot; and it's dated April 9th,

25  2018.  Twenty actually shows the actual photo.

1          THE COURT:  Is this the same thing?  This was after

2  the license was allegedly purchased -- well, purchased and

3  then rescinded or rejected or revoked I guess would be the

4  term?  So these are of the same nature?

5          MS. KENNEDY:  Yes, Your Honor, two years after this

6  lawsuit.

7          THE COURT:  So let's do this.  Let's -- I will

8  consider this, and why don't you take your bathroom break.

9          Now, let me ask you folks before this happens.  I'm

10  inclined at this point to just let the jury go for the evening

11  and start anew -- afresh tomorrow.  Sounds like it might be an

12  hour to two with Mr. Carmen; is that right?

13          MR. OVERHAUSER:  That sounds reasonable, Your Honor.

14          THE COURT:  Sounds unreasonable to me.  An hour

15  would sound very reasonable.  I think Mr. Carmen would

16  probably prefer that, too.

17          So if we do an hour and then we've got 20 minutes of

18  close for each, so two hours -- I'm sorry, an hour, that would

19  be two forty closing or final instructions would be maybe two

20  fifty-five.  We ought to be able to get this to the jury in

21  the morning I would think before lunch if we go through

22  this -- I mean, if those -- if the questioning goes as you --

23  as I think it will.

24          Obviously, you have not moved for a Rule 50 in the

25  entire case.  I suppose I need to factor in there whether or

 1  not the plaintiff's going to make a motion as well tomorrow,

 2  but it still seems as though we could start anew or start

 3  tomorrow and not get any more testimony tonight 30 minutes

 4  down the road.  I'm not sure that's going to do any good.

 5          Any thoughts on that, Ms. Kennedy?

 6          MS. KENNEDY:  I agree with you, Your Honor.

 7  Probably won't do much good.

 8          THE COURT:  Mr. Overhauser?

 9          MR. OVERHAUSER:  Agreed.

10          MS. KENNEDY:  One quick question about work for

11  hire.  So if they -- if the defendant submits a whole bunch of

12  evidence about work for hire -- I mean, we believe -- we've

13  testified no one's claimed to it, Cohen & Malad hasn't, blah,

14  blah, blah.  I mean, if they're going to go on and on about

15  it, we might have to call someone from Cohen & Malad here in

16  the morning.

17          THE COURT:  I suppose you can try a rebuttal witness

18  if you need to.  That's your prerogative.

19          MS. KENNEDY:  It won't be long.

20          THE COURT:  Anything for you, Mr. Overhauser?

21          MR. OVERHAUSER:  Nothing further, Your Honor.

22          THE COURT:  Hopefully, they're on the way.

23          MR. OVERHAUSER:  Can we keep all of our stuff here

24  this evening?

25          THE COURT:  Yes.  It'll be locked.

203

1        *(Jury in.)*

2              THE COURT:  Please be seated.

3              Welcome back, ladies and gentlemen.  We've concluded

4    our business; and as you can see, it's just about five

5    o'clock.  So it really doesn't make much sense to start the

6    next witness and stop a little bit into it.  We should be able

7    to get this all finished by -- before lunch tomorrow.

8              So what will happen tomorrow is we will come back

9    here.  We will take the next witness; and it will be the same

10   thing we just had here, direct, cross, redirect, recross, jury

11   questions.

12             And then the plaintiff has rested.  The defendant

13   would have at that time the ability to rest.  The plaintiff

14   could then either rest or maybe have a rebuttal witness or two

15   if that's necessary and then rest its entire case.

16             And then we would have my final instructions to you;

17   and then we would have closing arguments of the parties, about

18   20 minutes apiece; and then it would go to you for

19   deliberation.  By calculation, we ought to be able to do that

20   in the morning.

21             Now, what do you all think about starting at 8:30

22   tomorrow?  Would that work for you?

23             So why don't we plan on being back here at 8:30

24   tomorrow.  Overnight, please don't discuss the case with

25   anyone; and your family will ask you all about this case.  So

204

1   you just have to resist.  Ask them to trust you that you can't

2   talk about it.

3            Please don't do any research about this case or

4   anything that you've heard in here, any terms.  Please don't

5   befall or succumb to that temptation.  Please don't read

6   anything, listen to anything about the case, and leave it

7   here.  Just leave it here in the courtroom.  Leave your

8   notebook up there.  Just go home and enjoy the evening.

9            With that, we are in recess until 8:30 tomorrow.  We

10  will see you back -- maybe be here at 8:25 so we can start

11  right on time.

12           COURTROOM DEPUTY:  All rise.

13    *(Jury out.)*

14           THE COURT:  All right.  Please be seated.  As you

15  heard, we're going to start with the jury at 8:30 tomorrow.

16  Why don't we plan on being here at eight o'clock.  I'll have

17  my ruling on the Rule 50 motion and then anything else we need

18  to take up.  For example, please pay close attention to the

19  final jury instructions and the verdict form; and if you have

20  anything that you want to discuss about that, let's try to

21  take that up tomorrow at eight o'clock.

22           The alternative, of course, is that we would have to

23  take it up sometime between when you all rest your cases and

24  the time that we do final instructions, and I would rather

25  keep it moving.  So please look at those things.

1          Anything that -- from the plaintiff that we need to

2   take up?

3          MS. KENNEDY:  No, Your Honor.

4          THE COURT:  Anything from the defendant?

5          MR. OVERHAUSER:  So I'm clear, we have jury

6   instructions and verdict form available at 8 a.m. tomorrow?

7          THE COURT:  I think they're available right now.  Do

8   you not have copies of them?  We had some -- hold on a second.

9          We'll get you copies.  We'll e-mail those copies to

10  you.  Right now what they will indicate, since I haven't ruled

11  on the Rule 50, obviously the final -- some of those may be

12  different, depending on how I rule on any motions; but we'll

13  get you at least what we have thus far.  So just look at those

14  as if the -- as if everything was going to the jury and so

15  that we can discuss those.  Obviously, if we have them in a

16  good form and that's not the case, it's easy to throw them

17  out.  It's a lot easier to get them negotiated.  So we'll get

18  those to you this evening, so please look at those.

19         I apologize.  I thought you had copies.

20         All right.  So we'll see you all at eight o'clock

21  sharp tomorrow morning.  Thank you.

22         MR. EDWARDS:  All rise.

23         *(The proceedings were adjourned at 5:02 p.m.)*

24

25

1                    CERTIFICATE OF COURT REPORTER

2

3       I, Cathy Jones, hereby certify that the foregoing is a

4    true and correct transcript from reported proceedings in the

5    above-entitled matter.

6

7

8     /s/ Cathy Jones                    November 25, 2019

9    _____
     CATHY JONES, RDR, FCRR
     Official Court Reporter
10   Southern District of Indiana
     Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25